## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **JAMIE MARQUARDT,** | : | **Case No. 1:18-cv-00333-SO** |
| | : | |
| **Plaintiff,** | : | **Judge Solomon Oliver, Jr.** |
| | : | **Magistrate Judge David A. Ruiz** |
| **v.** | : | |
| | : | |
| **NICOLE CARLTON, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

*Defendants' Memorandum of Law*
*in Support of their Motion for Summary Judgment*

**Zashin & Rich Co., L.P.A.**
**Patrick J. Hoban (#0079794)**
 pjh@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
950 Main Avenue, 4th Floor
Cleveland, OH  44113
T:  (216) 696-4441
F:  (216) 696-1618

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

BRIEF STATEMENT OF THE ISSUES TO BE DECIDED .................................................... v

SUMMARY OF THE ARGUMENT ..................................................................................... 1

RELEVANT FACTS ........................................................................................................... 2

    I.     THE PARTIES.......................................................................................................... 2

    II.    THE DEPLORABLE FACEBOOK POSTS .................................................................. 3

    III.   THE CITY TERMINATES MARQUARDT'S EMPLOYMENT ............................... 4

    IV.   MARQUARDT, NOT "DONNIE," MADE THE POSTS ......................................... 6

STANDARD OF REVIEW ................................................................................................. 8

LAW AND ARGUMENT.................................................................................................... 8

    I.     MARQUARDT'S 14TH AMENDMENT DUE PROCESS CLAIM LACKS
         MERIT ................................................................................................................... 8

    II.    MARQUARDT'S 1ST AMENDMENT RETALIATION CLAIM LACKS
         MERIT ................................................................................................................... 9
         A. The Posts are Not Constitutionally Protected ........................................................10
            1.  *Marquardt's Posts Did Not Speak on a Matter of Public Concern* ............ 10
            2.  *Pickering Balancing Weighs Strongly in the City's Favor* ......................... 12
         B. The Posts' Content Is Akin to Fighting Words and True Threats and
            Entitled to Little or No First Amendment Protection ...........................................17

    III.   MARQUARDT'S OVERBREADTH/PRIOR RESTRAINT CLAIM IS
         MERITLESS ........................................................................................................ 18

    IV.   MARQUARDT'S FAILURE TO TRAIN CLAIM IS MERITLESS........................ 18

    V.    MARQUARDT'S OHIO REV. CODE § 2307.60 CLAIMS ARE
         MERITLESS ........................................................................................................ 19

    VI.   COMMISSIONER CARLTON IS ENTITLED TO QUALIFIED IMMUNITY....... 20

CONCLUSION ................................................................................................................ 20

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1.......................................... 21

CERTIFICATE OF SERVICE ........................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Amer. Postal Workers Union v. Postal Svc.*, 820 F.2d 294 (D.C. Cir. 1987) ............................. 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 8

*Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888 (6th Cir. 2003) ....................................... 10

*Brown v. City of Trenton*, 867 F.2d 318 (6th Cir. 2003).................................................. 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 8

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) .............................................. 9, 17

*Cherry v. Pickell*, 188 Fed. Appx. 465 (6th Cir. 2006).................................................. 14

*City of Canton v. Harris*, 489 U.S. 378 (1989)........................................................... 18

*City of San Diego v. Roe*, 543 U.S. 77 (2004) ....................................................... 9, 10

*Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036 (6th Cir. 2001) ...................................... 13

*Connick v. Myers*, 461 U.S. 138 (1983)......................................................... 10, 11, 13

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995).............................. 10, 11, 12, 18

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012)........................................ 9

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) ........................................... 8, 9, 11, 14

*Feathers v. Avey*, 319 F.3d 843 (6th Cir. 2003)........................................................ 20

*Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005) ....................................................... 19

*Geer v. Altiere*, No. 4:16CV2213, 2018 U.S. Dist. LEXIS 53368 (N.D. Ohio March 28, 2018) ....................................................................................... 16

*Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017).................................................... 9, 13, 14

*Gratsch v. Hamilton County*, 12 Fed. Appx. 193 (6th Cir. 2001) ...................................... 20

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................ 20

*Jacobson v. Kaforey*, 75 N.E.3d 203, 149 Ohio St. 3d 398 (Ohio 2016) ................................ 19

*Johnson v. City of Battle Creek*, No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300 (W.D. Mich. May 10, 2005) ....................................................................... 12

*Leary v. Daeschner*, 228 F. 3d 729 (6th Cir. 2000) ...................................................................... 13

*Mayhew v. Town of Smyrna*, 856 F.3d 456 (6th Cir. 2017) ................................................... 10, 11

*McMurphy v. Flushing*, 802 F.2d 191 (6th Cir. 1986) ................................................................. 10

*Naghtin v. Montague*, 674 Fed. Appx. 475 (6th Cir. 2016) ......................................................... 9

*Ortiz v. Kazimer*, No. 1:11 CV 01521, 2015 U.S. Dist. LEXIS 38496 (N.D. Ohio March 26, 2015) ................................................................................................................................ 19

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ............................................................ 12, 13, 16

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ..................................................................................... 9

*Rankin v. McPherson*, 483 U.S. 378 (1987) .............................................................................. 13

*Rogers v. Banks*, 344 F.3d 587 (6th Cir. 2003) ......................................................................... 12

*Schorfhaar v. McGinnis*, No. 5:97-cv-10, 1998 U.S. Dist. LEXIS 22947 (W.D. Mich. Feb. 6, 1998) ........................................................................................................................ 10

*Smith v. Fruin*, 28 F.3d 646 (7th Cir. 1994) ............................................................................. 10

*Snyder v. Phelps*, 562 U.S. 443 (2011) ................................................................................. 9, 17

*United States v. Houston*, 683 F. Appx. 434 (6th Cir. 2017) ..................................................... 17

*Virginia v. Black*, 538 U.S. 343 (2003) ................................................................................. 9, 17

*Waters v. Churchill*, 511 U.S. 661 (1993) ........................................................................... 11, 14

*Wegener v. Covington*, 933 F.2d 390 (6th Cir. 1991) ................................................................. 20

## Statutes

R.C. 2307.60                                                                                                    v, 19

R.C. 2921.45                                                                                                        19

## Rules

FED. R. CIV. P. 56 .......................................................................................................................... 8

## <u>BRIEF STATEMENT OF THE ISSUES TO BE DECIDED</u>

I.     Did Defendants violate Plaintiff Jamie Marquardt's 14th Amendment due process rights where Defendants gave Marquardt written notice of the charges against him, an opportunity to respond before his discharge, a pre-disciplinary hearing, and where a neutral third-party arbitrator conducted an arbitration of Marquardt's discharge, during which Marquardt's union represented him?

II.    Does the First Amendment protect Marquardt's personal Facebook posts stating that Marquardt was glad Tamir Rice was dead and Marquardt's upset that he did not get to kill Tamir Rice?

III.   Given that the First Amendment does not protect Marquardt's speech, can Marquardt recover under a theory that a City policy applicable to him, which he cannot even identify, is unconstitutionally overbroad or a prior restraint on speech?

IV.   Did the City fail to train Commissioner Carlton as to employee rights under the First Amendment?

V.    Are Marquardt's claims under Ohio Rev. Code § 2307.60 untimely, and if not, absent a criminal conviction, can Marquardt recover civilly against Commissioner Carlton for her alleged criminal acts, particularly when Commissioner Carlton did not violate any law?

VI.   Given the lack of a clearly established constitutional right to post the heinous Facebook posts at issue, is Commissioner Carlton entitled to qualified immunity?

## SUMMARY OF THE ARGUMENT

This case is about two deplorable Facebook posts (the "Posts"), which Plaintiff Jamie Marquardt ("Marquardt") admits were posted to his Facebook page.  In the Posts, Marquardt expressed that he was "glad" that "[Tamir Rice] is dead" and "upset" that he "did not get the chance to kill the little criminal fucker."  Following an investigation, Defendant the City of Cleveland ("City") discharged Marquardt from his position as a Captain in the City's Division of Emergency Medical Services ("EMS").

The personal nature and content of the Posts expressing Marquardt's desire to kill a child removed them from the realm of "public concern."  Even if the Posts were a matter of public concern (they are not), they caused Marquardt's coworkers to fear for their safety, interfered with EMS' operations, and further strained the delicate relationship between City safety forces and the public. The City's interest in efficiently providing EMS services significantly outweighed Marquardt's interest in engaging in his personal and volatile speech.

Marquardt's due process claim is frivolous.  He received notice of the charges against him and had ample opportunity to respond to them prior to his discharge.  He also arbitrated his discharge before a neutral third-party arbitrator, who upheld his discharge.  Because the Constitution does not protect the Posts and Defendants did not violate his due process rights, Marquardt's remaining claims fail.

Tamir Rice's death profoundly affected the City, its citizens, and its safety forces' employees.  EMS treated Tamir Rice and transported him to the hospital, where he later died. EMS's efforts to save Tamir Rice's life honored its mission to serve the public without bias or judgment.  Marquardt's glee and murderous intent directed at City residents directly conflicted with this core EMS mission and detracted from public debate.

## RELEVANT FACTS

## I.  THE PARTIES

EMS hired Marquardt in 1995.  Marquardt Dep. 116:5-7, Dec. 12, 2018.[1]  His disciplinary issues began soon after his hire, as he was issued an unpaid suspension after receiving a DUI.  Marquardt 116:20-117:5.  Marquardt received multiple other suspensions and written warnings.  Marquardt 138:2-139:17, 140:23-141:12, 158:1-16.

In 2010, in lieu of discharge, the City placed Marquardt on a two-year Last Chance Agreement ("LCA") related to his continued alcohol abuse.  Marquardt 137:11-15, 141:13-142:9.  During the LCA, while under the influence of alcohol, Marquardt assaulted a City police officer who tried to take him for a psychiatric evaluation.  Marquardt 143:4-19, 145:10-146:3, 157:1-12.  The City could have terminated Marquardt's employment for his misconduct, but instead, exhibited lenience and extended the LCA for another year.  Marquardt 144:8-17.

At the time of his 2016 separation, Marquardt was an EMS Captain responsible for directing, controlling, and monitoring an EMS shift of 40 to 45 employees.  ECF #1 at ¶ 1; Marquardt 125:18-20.  Marquardt's core duties included ensuring EMS provided emergency care to the public without prejudice or bias.  Marquardt 125:14-17.

Defendant Nicole Carlton ("Commissioner Carlton") is the Commissioner of EMS.  Carlton Dep. 5:13-16, Dec. 18, 2018.[2]  EMS is part of the City's Department of Public Safety, which also includes Police and Fire.  *See* Ex. 3 (Declaration of Nicole Carlton) at ¶ 3.  EMS is responsible for treating all people within the City, regardless of their race, age, background, or the circumstances of their illnesses or injuries.  Marquardt 122:22-123:5; Carlton 23:8-25:2.

---

[1] Excerpts from Marquardt's deposition transcript are attached as Exhibit 1 and cited as "Marquardt _:_."
[2] Excerpts from Commissioner Carlton's deposition transcript are attached as Exhibit 2 and cited as "Carlton _:_."

## II.     THE DEPLORABLE FACEBOOK POSTS

Tamir Rice was a 12-year old child shot by a City police officer on November 22, 2014, who died on November 23, 2014.   Marquardt 50:18-52:9; Ex. 3 at ¶ 4.   EMS personnel responded to the scene, cared for Tamir Rice, and transported him to the nearest hospital while working to save his life.  Marquardt 121:16-122:17; Ex. 3 at ¶ 5.

Marquardt considers the Tamir Rice incident a "tragedy" (Marquardt 52:10-15), yet, on February 15, 2016, the following posts were posted to his Facebook page:

- Let *me* be the first on record to have the balls to say Tamir Rice should have been shot and *I am glad he is dead*.  *I* wish *I* was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around acting bad.  *I am upset I did not get the chance to kill the little criminal fucker*.

- Stop Kevin.  How would you feel if you were walking in the park and some *ghetto rat* pointed a gun in your face?  Would you look to *him as a hero*? Cleveland sees this *felony hood rat as a hero*.[]

Ex. 4 (Posts) (emphasis added);[3]  Marquardt 53:9-54:5; *see also* ECF #1 at ¶¶ 27-29.

Marquardt says he did not make the Posts.  Marquardt 57:21-58:3.  He contends a friend named "Donnie" made them.  Marquardt 44:21-45:6.  Donnie allegedly came to Marquardt's apartment on the evening of February 14, 2016.  Marquardt 57:12-17.  Then after Marquardt went to sleep, Donnie allegedly took Marquardt's phone and made the Posts on Marquardt's Facebook on the morning of February 15, 2016.[4]  Marquardt 57:18-20; ECF #1 at ¶¶ 9-20.[5]

Regardless of who made the Posts, Marquardt admitted he is responsible for what appears on his Facebook page.  Marquardt 59:23-60:12.  He considers the Posts egregious, particularly

---

[3] Authenticated at Marquardt 52:17-54:5.
[4] Marquardt has provided varying explanations as to when Donnie allegedly made the Posts, including when Marquardt was in the bathroom (Marquardt 261:25-262:24) and when Marquardt was doing laundry (Marquardt 170:25-171:25).
[5] Marquardt's Complaint alleges Donnie came to his house on February 13, 2016 and that the Posts were made on February 14, 2016.  ECF #1 at ¶¶ 15, 17, 18.  Marquardt testified that these dates were incorrect and should have been February 14 and February 15 respectively and that Paragraphs 15, 17, and 18 of his Complaint were wrong. Marquardt 187:10-188:23.

because they make it look like he "want[s] to shoot a kid." Marquardt 67:25-68:14. Upon waking up and seeing the Posts, Marquardt recognized their vile nature, immediately deleted them, and "posted a global apology." Marquardt 90:2-5, 112:19-113:3.

Marquardt was "[a]bsolutely" worried about the adverse impact of the Posts on himself and others. Marquardt 71:21-23. In fact, Marquardt was concerned people might try to kill Donnie if they thought Donnie authored the Posts. Marquardt 177:14-21; Ex. 3 at ¶ 6; Ex. 5 (text messages between Marquardt and Commissioner Carlton).[6] Marquardt also was concerned about his children, who were "harassed at school" because of the Posts. Marquardt 35:7-36:5, 71:21-72:1. Additionally, if the public was angry with EMS, Marquardt understood that such anger "could create a problem" for EMS. Marquardt 73:5-8.

## III. THE CITY TERMINATES MARQUARDT'S EMPLOYMENT

When posted, the Posts were immediately accessible to Marquardt's hundreds of Facebook contacts, including: his EMS subordinates and peers; other City employees; and members of the public. Marquardt 226:12-15; Ex. 6 (arbitration transcript excerpts) at 199:17-200:17. Early on the morning of February 15, 2016, the Posts circulated throughout EMS and were a hot topic for days. Barrett Dep. 16:22-17:4, 18:4-5, Jan. 14, 2019;[7] Hyde Dep. 28:23-29:7, Jan. 14, 2019.[8] Within days of the Posts, local media ran a story about them, which included a condemnatory statement from the Cleveland NAACP. Marquardt 80:10-81:3.

Within hours of the Posts appearing on Marquardt's Facebook page, his EMS subordinates Mark Barrett ("Barrett") and Gregory Hyde ("Hyde") separately reported their serious concerns about the Posts to EMS supervisors, Captains Threat and Kazimer. Barrett

---

[6] Authenticated at Ex. 3 at ¶ 6.
[7] Excerpts from Mark Barrett's deposition transcript are attached as Exhibit 7 and cited as "Barrett __:__."
[8] Excerpts from Gregory Hyde's deposition transcript are attached as Exhibit 8 and cited as "Hyde __:__."

19:4-16; Hyde 20:25-21:9.  Based on these reports, the Captains reviewed the Posts, concluded they were "very bad" and raised safety concerns, and immediately reported them to Deputy EMS Commissioner David Miller.  Threat Dep. 26:14-21, Jan. 14, 2019;[9]  Ex. 3 at ¶ 7.  Deputy Commissioner Miller immediately reported the Posts to Commissioner Carlton.  Ex. 3 at ¶ 7.

The City investigated the Posts.  Ex. 3 at ¶ 8.  At the conclusion of the investigation and the pre-disciplinary hearing process, the City discharged Marquardt for multiple policy violations.  *See* Ex. 10 (discharge letter).[10]  The City properly concluded that Marquardt's Posts were inflammatory and disrupted and brought dishonor to EMS.  *See* Ex. 10.  Furthermore, the Posts made a mockery of both the City's mission statement and EMS's community pledge:

> City of Cleveland Mission Statement
> We are committed to improving the quality of life in the City of Cleveland by strengthening our neighborhoods, delivering superior services, embracing the diversity of our citizens, and making Cleveland a desirable, safe city in which to live, work, raise a family, shop, study, play, and grow old.

> Cleveland EMS Pledge to our Community
> We are committed to improving the quality of life in the City of Cleveland by maintaining the highest ethical and professional standards of prehospital care, treating our patients with dignity and respect, and caring for each patient as if they were a member of our own family.

*See* Ex. 3 at ¶ 9; Ex. 10.

Marquardt's Posts also disrupted EMS's services, as demonstrated by the complaints submitted by Marquardt's subordinates, who feared for the safety of EMS personnel.  Marquardt 78:8-10; Ex. 3 at ¶ 10.  Additionally, the potential for backlash against EMS for retaining a Captain who reveled in the tragic death of a child after a police-involved shooting was a clear concern.  Ex. 3 at ¶ 11.  The City cannot employ an EMS Captain who publically declared upset that he did not shoot a 12-year old City resident to death, was happy over the child's death, and

---

[9] Excerpts from Michael Threat's deposition transcript are attached as Exhibit 9 and cited as "Threat __:__."
[10] Authenticated at Marquardt 181:21-182:4.

calls any group of City residents "little criminal fuckers" and "ghetto rats."  Ex. 10; Ex. 3 at ¶ 12; *see also* Carlton 97:5-102:2.

## IV.  MARQUARDT, NOT "DONNIE," MADE THE POSTS

In an attempt to corroborate his Donnie story, Marquardt gave the City his text messages with his ex-wife.  Marquardt 163:3-9; Ex. 11 (text messages from Feb. 14, 2016).[11]  These text messages reference someone being at Marquardt's apartment in the early morning of February 14, 2016 -- 24-hours before the Posts appeared on Marquardt's Facebook page.  Marquardt 163:10-165:10; Ex. 11.  Marquardt's only explanation for this glaring inconsistency between when he claims Donnie made the Posts on the morning of February 15 and when he was texting his ex-wife about Donnie allegedly being at his apartment on the morning of February 14 is that the time-stamp of his texts to his ex-wife "was wrong" on his phone.  Marquardt 165:15-166:1.

After reviewing all this evidence, the arbitrator held:  Marquardt made the Posts; and his version of events, including his "Donnie" story, was "implausible."  Marquardt 185:9-13; *see also* Ex. 12 (arbitration award denying Marquardt's discharge grievance) at 14.[12]  The arbitrator denied Marquardt's grievance and held the City discharged him with just cause.  *See* Ex. 12.

Further undermining Marquardt's "Donnie" story is the striking similarity between Marquardt's other Facebook communications about Tamir Rice and the Posts:

- In a November 24, 2014 (the day after Tamir Rice died) Facebook post, Marquardt wrote, "Bebe, fuck these little ghetto rats that kill innocent people. You, as I would, would bust our kids asses before they reached that point…" Marquardt 220:6-221:2; *see* Ex. 13 (Marquardt's Facebook post).[13]
- In a November 28, 2014 Facebook post, Marquardt refers to Tamir Rice as a "street thug".  Marquardt 228:20-230:6; *see* Ex. 14 (Marquardt's Facebook post).[14]

---

[11] Authenticated at Marquardt 163:3-9.
[12] Authenticated at Marquardt 184:14-185:3.
[13] Authenticated at Marquardt 220:6-221:7.
[14] Authenticated at Marquardt 228:20-230:2.

- In a December 7, 2014 Facebook message, Marquardt wrote, "I had one of our black dispatchers ask me the other day why the police car had to pull the car up so close to Tamir.  (Tamir is the African name for pistol holding criminal nigger with no parental supervision).  I told her the police should have bounced his skull off of the under carriage of the police car.  She filed racist charges against me.  I had to laugh."  Marquardt 251:13-252:14; Ex. 15 (Facebook message sent by Marquardt).[15]
- In a January 9, 2016 (approximately a month before the Posts) Facebook comment, Marquardt wrote, "Tamir Rice is dead.  Good."  Marquardt 208:21-210:20 (despite admitting he likely made the comments surrounding this comment, Marquardt denies he made this comment but cannot explain how Facebook attributed the comment to him).  Ex. 16.[16]

These posts are consistent with the Posts that led to Marquardt's discharge.  Marquardt's November 24, 2014 post describes Tamir Rice as a "ghetto rat" (*see* Ex. 13) -- the same phrase Marquardt used to describe Tamir Rice in the Posts (*see* Ex. 4).  Marquardt's January 9, 2016 post expressed his glee that Tamir Rice was dead, the same sentiment he expressed, one month later, in the Posts.[17]  Hyde, Marquardt's former Facebook friend and 20-year coworker, was not surprised that Marquardt would make the Posts about Tamir Rice.  Hyde 15:19-24, 20:9-21.

These Facebook communications combined with the disqualifying dates on Marquardt's texts with his ex-wife, prove Marquardt made the Posts.  Marquardt expressed his pleasure at Tamir Rice's death from the date it happened through the date of the Posts, which conveyed to members of the public Marquardt's disappointment he did not kill Tamir Rice.  *See* Ex. 4.

As additional evidence of Marquardt's history of volatile Facebook posts, the City previously investigated Marquardt's Facebook post regarding the Freddie Gray protests in Baltimore, Maryland in which he stated, "Open fire in Baltimore.  Gun all of them down.  When

---

[15] Authenticated at Marquardt 251:13-252:14.
[16] Marquardt produced the above Facebook communications in response to a request for his Facebook information. *See* Ex. 17 (Declaration of David Vance) at ¶ 3.
[17] Marquardt also made posts referring to "hood rats" a term used in the Posts.  Marquardt 213:3-15.  Marquardt also made a post referring to a "thug" that dies as a "hero" much the same way he refers to Tamir Rice as a "hero" in the Posts.  Marquardt 226:12-228:1.

did we start tolerating this behavior." Ex. 18 (Marquardt's Facebook post);[18] Ex. 3 at ¶ 13. The City did not discipline Marquardt for this post (Marquardt 87:15-21), as it did not relate to an EMS patient or have the same damaging effects on the City's EMS operations as the Posts did.

## STANDARD OF REVIEW

Summary judgment is not "a disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Rather, summary judgment is "an integral part of the Federal Rules." *Id.* Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once Defendants make this showing, Marquardt cannot merely rest on his pleadings, but must instead "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

## LAW AND ARGUMENT

## I.  MARQUARDT'S 14TH AMENDMENT DUE PROCESS CLAIM LACKS MERIT

Prior to his discharge, Marquardt received written notice of the charges against him, had an opportunity to review the charges and the City's evidence, had a pre-disciplinary hearing, and had a full opportunity to present his side of the story. Marquardt 160:12-161:23. Further undermining Marquardt's Fourteenth Amendment due process claim is that Marquardt, with union representation, arbitrated his discharge grievance before a neutral arbitrator and with sworn witness testimony. Marquardt 182:5-20; Ex. 6. Marquardt's arbitration alone satisfied due process requirements. *See Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004) ("due process is fulfilled by a post-termination, trial-type proceeding where an opportunity to 'ferret out bias, pretext, deception and corruption by the employer in discharging the employee' is provided").

---

[18] Authenticated at Marquardt 83:24-84:13.

## II.    MARQUARDT'S 1ST AMENDMENT RETALIATION CLAIM LACKS MERIT

To prove a *prima facie* case of retaliation, Marquardt must demonstrate:

(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).  Marquardt's retaliation claim falls at the first step.

Whether Marquardt's Posts are constitutionally protected speech is a question of law.

*Farhat*, 370 F.3d at 593.  For the Posts to be protected, Marquardt must demonstrate:

(1) his speech was made as a private citizen, rather than pursuant to his official duties;
(2) that his speech involved a matter of public concern; and
(3) that his interest in speaking on the matter of public concern outweighed the government-employer's interest in promoting the efficiency of the public services it performs through its employees.

*Naghtin v. Montague*, 674 Fed. Appx. 475, 478-79 (6th Cir. 2016) (internal citations omitted).

The form, content, and context of Marquardt's Posts threaten violence, address "matters of purely private significance," constitute "no essential part of any exposition of ideas," and, thus, enjoy little or no constitutional protection.  *R.A.V. v. St. Paul*, 505 U.S. 377, 385 (1992) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)); *Virginia v. Black*, 538 U.S. 343, 359-60 (2003); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)).

Marquardt's Posts expressed only his personal pleasure at Tamir Rice's death and his "upset" that he had not personally killed Rice.  Ex. 4.  Such content is not "a subject of general interest and of value and concern to the public."  *See City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).  Even if Marquardt's ghoulish Posts were a matter of public concern, the City's interest in employee safety and public order outweighs Marquardt's interest in spewing his personal hate.

-9-

A.     **The Posts are Not Constitutionally Protected**

     *1.    Marquardt's Posts Did Not Speak on a Matter of Public Concern*

The Court first must determine whether Marquardt spoke on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147 (1983). "[P]ublic concern is a subject of legitimate news interest; that is a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego* 543 U.S. at 84); *see also Connick*, 461 U.S. at 146 (a matter of public concern relates "to any matter of political, social, or other concern to the community").

"When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices without intrusive oversight by the judiciary in the name of the First Amendment." *McMurphy v. Flushing*, 802 F.2d 191, 197 (6th Cir. 1986) (quoting *Connick*, 461 U.S. at 146)). "The fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render his remarks on that subject protected." *Schorfhaar v. McGinnis*, No. 5:97-cv-10, 1998 U.S. Dist. LEXIS 22947, *16 (W.D. Mich. Feb. 6, 1998) (quoting *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994)). The key is not whether an employee spoke as an employee or a citizen, "but whether the employee's speech in fact touches on a matter of public concern." *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 894 (6th Cir. 2003).

Whether speech is on a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 467 (6th Cir. 2017) (quoting *Connick*, 461 U.S. at 147-148)). Courts examine the "point of the speech in question" -- "not why the employee spoke, but what he said." *Id.*; *see also Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1187-88 (6th Cir. 1995) (a court must look at the speaker's "communicative purpose").

While it is not necessary for the entire expression to address matters of public concern (*Mayhew*, 856 F.3d at 467-68 (quoting *Connick*, 461 U.S. at 149)), the Sixth Circuit held that:

> [T]he proper inquiry is not what might be incidentally conveyed by the speech, and that passing or fleeting references to an arguably public matter do not elevate the speech to a matter of public concern where the focus or point of the speech advances only a private interest.

*Farhat*, 370 F.3d at 592-93 (internal quotations and citations omitted).  This comports with the U.S. Supreme Court's instruction that, "[a]n employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements."  *Waters v. Churchill*, 511 U.S. 661, 681 (1993).

The focus of Marquardt's Posts was not public safety, law enforcement, government operations, or some other "political, social, or other concern to the community."  Ex. 4.  To the contrary, Marquardt asserted that "he" had "the balls" to state that Tamir Rice "should have been shot" and express *his* personal joy Tamir Rice "is dead."  Ex. 4.  After fleeting reference to Tamir Rice's purported acts, Marquardt states *he* is "upset" that *he* "did not get the chance to kill the little criminal fucker."  Ex. 4.  Marquardt's EMS coworkers, other City employees, and members of the public all saw the Posts.   Marquardt 78:14-79:15.

Consider -- Marquardt, an EMS Captain charged with providing and supervising emergency medical care to the public regardless of race, age, or circumstance (Marquardt 123:1-8), stated his "upset" that he could not take the life of a child whose life EMS tried to save.  Ex. 4; Marquardt 121:16-122:17.  It is inconceivable that Marquardt's macabre glee and murderous desires were part of the free and robust public debate or meaningful dialogue leading to truth.

"Controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection."  *Dambrot*, 55 F.3d at 1187.  In *Dambrot*, a basketball coach

-11-

repeatedly used the n-word in "motivational" speeches to players.  The Court deemed his use of

the n-word unprotected as it "served only to reflect his attitude toward his students."  *Dambrot*,

55 F.3d at 1187.  The Court also held that such speech was unprotected as it "imparted no

socially or politically relevant message."  *Id*.  Marquardt's speech, like Dambrot's, reflected his

personal attitude toward Tamir Rice.  Marquardt 63:14-22, 66:10-12 (Marquardt admits the Posts

are very personal in nature and attack Tamir Rice).  The personal nature of Marquardt's first Post

is demonstrated by Marquardt's use of "me" and "I" -- six times in three sentences.  Ex. 4.

The Posts did not focus on public sentiment or tie Marquardt's homicidal intent to public

concerns.  *See Johnson v. City of Battle Creek*, No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300,

*27 (W.D. Mich. May 10, 2005) ("plaintiff's statement concerning shooting someone in the

posterior was not a matter of public concern and therefore was not protected speech").  The Posts

did not focus on "issues about which information is needed or appropriate to enable the members

of society to make informed decisions about the operation of their government" and the First

Amendment does not protect them.  *Rogers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003).  As the

Posts were not on a matter of public concern, the Court need not apply *Pickering* balancing.

### 2. *Pickering Balancing Weighs Strongly in the City's Favor*

If this Court were to conclude that the Posts related to a matter of public concern, then the

Court must "balance" Marquardt's interest "in commenting upon matters of public concern and

the interest of the [City], as an employer, in promoting the efficiency of the public services it

performs through its employees."  *Pickering v. Bd. of Educ*., 391 U.S. 563, 568 (1968).  In

balancing these interests, "pertinent considerations" include:

> whether the statement impairs discipline by superiors or harmony among co-
> workers, has a detrimental impact on close working relationships for which
> personal loyalty and confidence are necessary, or impedes the performance of the
> speaker's duties or interferes with the regular operation of the enterprise.

*Rankin v. McPherson*, 483 U.S. 378, 388 (1987). In this context, the City has "wide discretion and control over the management of its personnel." *Connick*, 461 U.S. at 151 (internal citation omitted). "Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id*.

This "particularized balancing" of the interests weighs the degree to which employee speech involved matters of public concern against the public employer's operational disruption concerns. *Leary v. Daeschner*, 228 F. 3d 729, 737-738 (6th Cir. 2000). The less employee speech focused on matters of public concern, the lesser interest an employer needs to justify regulating the speech. *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001).

The City need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick, 461 U.S.* at 151-52. In *Gillis v. Miller*, 845 F.3d 677 (2017), the Sixth Circuit held that a public employer need not show "actual disruption" of operations to prevail under *Pickering* and courts "must assess whether the employer could reasonably predict that the employee speech would cause disruption in light of the manner, time and place the speech was uttered, as well as the context in which the dispute arose." *Id.* at 685-87 (internal citations and quotations omitted).

The *Gillis* Court quoted the D.C. Circuit's acknowledgment that, "there are cases where the harmful nature of speech is so apparent that no evidentiary inquiry need be made into actual disruption of the employer's responsibilities to the public." *Id.* at 687 (quoting *Amer. Postal Workers Union v. Postal Svc.*, 820 F.2d 294, 303 n. 12 (D.C. Cir. 1987)). This echoes the U.S. Supreme Court's holding that, "[a] government employer has the right to prevent disruption in the workplace and discipline employees for doing or saying things that detract from the efficient

and effective operation of the agency."  *Waters*, 511 U.S. at 674-75.  Additionally, a public employer's judgment as to disruptive speech by a safety force employee is due greater deference. *See Cherry v. Pickell*, 188 Fed. Appx. 465, 469-70 (6th Cir. 2006); *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 2003); *Gillis*, 845 F.3d at 684.

Where an employee's speech causes coworkers to "fear[] for their physical safety," the speech is disruptive.  *Farhat*, 370 F.3d at 594-95.  Quoting the U.S. Supreme Court's plurality decision in *Waters* extensively, the *Farhat* Court explained that a public employer's "mission" grants greater discretion in addressing employee speech than private citizens' speech and that even "potential disruptiveness" outweighs whatever First Amendment value employee speech might have had.  *Id*. at 594-595 (quoting *Waters*, 511 U.S. at 673-75, 681)).

Here, Marquardt's EMS subordinates Barrett and Hyde separately learned of the Posts through conversation with fellow employees.  Ex. 6 at 17:25-19:13; 37:20-40:7; 42:14-43:10. Barrett and Hyde separately contacted EMS supervisors to express their concerns.  Ex. 6 at 20:23-22:3.  Barrett recognized the disruptive and inappropriate nature of the Posts by an EMS supervisor.  Ex. 6 at 22:6-23.  Hyde reported concerns for his and other EMS employees' safety once the public learned of the Posts.  Ex. 6 at 39:3-40:22.  As Hyde testified at the arbitration:

> The potential that if somebody had seen this or knew of this, could we face potential aggression with families or people that we interact with?
>
> Basically in that neighborhood where I generally work is the neighborhood where the shooting had transpired and family members of Tamir Rice lived in that area.

Ex. 6 at 40:15-22.  Hyde related his discussions about the Posts with other EMS employees as: "What was he thinking when he put that up and what happens if people see this and know that it came from somebody that works for us."  Ex. 6 at 43:3-10.

Hyde expressed concerns that the "racially inappropriate" Posts could affect on-scene

-14-

safety and "could be volatile."  Ex. 6 at 77:14-23.  Specifically, Hyde told Captain Threat that

the Posts were "dangerous", and that Hyde was concerned about:

> …the civil unrest that was present at the time.  And he also stated that it could be
> damaging to the reputation of the City, meaning because everybody in EMS kind
> of gets credit for the bad news that pops in about the Division, so something hits
> the media, you know, it's going to be bad for everybody.  That's what he
> expressed.

Ex. 6 at 78:4-16.  Hyde also said the Posts "disturbed" him, "were bad," and "could cause

potential safety issues for personnel responding to the public."  Threat 21:8-22:2.

Captains Threat and Kazimer reviewed the Posts, agreed that they were "very bad,"

"upsetting," and must be reported to their superiors.  Ex. 6. at 80:4-8, 104:14-18.  Captain Threat

reported the Posts because it is his "job to report anything that could be high profile, damaging or

unsafe" and to make sure "safety was going to be maintained."  Ex. 6. at 80:11-21.  Threat

further testified that the first Post alone was "enough for me to know that it was pretty

problematic."  Threat 23:23-24:1.  Captain Kazimer agreed.  Ex. 6 at 106:11-21.

Marquardt also recognized the volatile nature of the Posts and was concerned that people

may attempt to kill the Posts' author.  Marquardt 177:14-21.  The Posts' content, form, and

context led Marquardt, his EMS coworkers, and Captains Threat and Kazimer to conclude they

would lead to violence.  There also was civil unrest throughout the City surrounding the Rice

case, which disrupted EMS's operations, as well the operations of the City's other safety forces.

Ex. 3 at ¶ 14.  Marquardt's Posts had the clear potential to reignite that unrest.  Ex. 3 at ¶ 14.

Marquardt previously testified that EMS needs the trust of the community to operate

effectively.  Marquardt 128:17-129:3; Ex. 6 at 200:14-201:2 (EMS's operational effectiveness

also hinges on the public seeing EMS members as the good guys and not feeling judged or

condemned by EMS members).[19]   It also was important that Marquardt's subordinates trusted him.  Marquardt 125:21-25.  One need not strain to conclude that Marquardt's glee at a 12 year-old EMS patient's death, desire to have personally killed the child, and the characterization of City residents as "ghetto rats" would shake EMS members' and the public's trust in Marquardt to fulfill EMS's mission to care for the public without bias or prejudice.

In *Geer v. Altiere*, No. 4:16CV2213, 2018 U.S. Dist. LEXIS 53368 (N.D. Ohio March 28, 2018), this Court held that a safety force employee's racially insensitive and inflammatory Facebook posts regarding Baltimore's Freddie Gray protests were unprotected.  In that case, as here, Geer made off-duty personal Facebook posts.  *Id*. at *3.  Like Marquardt's condemnation of those that considered Tamir Rice a hero (*see* Ex. 4), Geer's posts chastised those that protested Gray's death.  *Id*. at *1.  As in this case, in *Geer* multiple individuals reported concerns about the negative consequences of Geer's posts.  *Id*. at *3-4.  Applying *Pickering*, the *Geer* Court reasoned that it was proper for the public employer "not [to] want any perception that law enforcement officers would treat anyone differently because of his race" and to want "to avoid protests that could erupt in the community and cause public safety issues like had occurred in other cities at the time of the Freddie Gray incident." *Id*. at *14.

The Freddie Gray incident occurred in Baltimore, Maryland -- while Geer worked in Ohio.  The Tamir Rice incident occurred in Cleveland -- where Marquardt was an EMS Captain. City EMS cared for and transported Tamir Rice to the hospital where he died of his injuries. Thus, the potential for civil disorder and disruption of City operations from Marquardt's Posts was far greater than the potential disruption in *Geer*.  The City's interests in efficiently operating EMS far outweigh Marquardt's interest in engaging in such personal and inflammatory speech.

---

[19] Authenticated at Marquardt 127:21-128:7.

**B.**   **The Posts' Content Is Akin to Fighting Words and True Threats and Entitled to Little or No First Amendment Protection**

Not all speech is of equal First Amendment importance…and where matters of purely private significance are at issue, First Amendment protections are often less rigorous.  That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest:  There is no threat to the free and robust debate on public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose a risk of a reaction of self-censorship on matters of public import.

*Snyder*, 562 U.S. at 452 (internal quotations and citations omitted).  The Posts' content is closely akin to "fighting words" and "true threats" further undercutting First Amendment protection.

"Fighting words" are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction" and enjoy no constitutional protection.  *Virginia*, 538 U.S. at 359.  In detailing the exclusion of fighting words from First Amendment protection, the Supreme Court instructed:

It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Chaplinsky*, 315 U.S. at 571-572.

"True threats", defined as: "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" are also unprotected.  *Virginia*, 538 U.S. at 359; *see also United States v. Houston*, 683 F. Appx. 434, 438 (6th Cir. 2017) ("A statement need not be communicated directly to the targeted individual in order to constitute a true threat (comments on YouTube or Facebook can qualify), and a statement can be a true threat even if the speaker lacks the ability to make good on his promised aggression.").

Marquardt's Posts did not advance the public's journey toward truth but expressed only his purely personal joy at Tamir Rice's death and disappointment that he did not kill Rice.  The

Posts used abusive epithets ("little criminal fucker" and "ghetto rat") and expressed serious intent regarding an unlawful, violent act directed at Tamir Rice and those Marquardt identified as "little criminal fuckers" or "ghetto rats." Ex. 4. As such, the Posts are not protected speech.

## III. MARQUARDT'S OVERBREADTH/PRIOR RESTRAINT CLAIM IS MERITLESS

Marquardt has not identified in any City policy language he claims is overbroad, vague, or an unconstitutional prior restraint. *See* ECF #1 at ¶¶ 52-57. In fact, Marquardt could not even identify a single City policy he claims is unconstitutional. Marquardt 195:7-196:4.

Regardless, unless the First Amendment protects the Posts, an unconstitutional policy could not have injured Marquardt. *See Dambrot*, 55 F.3d at 1185. In *Dambrot*, the defendant employer's policy was overbroad, but since the employee Dambrot's speech was unprotected, his employer's application of the policy did not injure him:

> Without a finding that Dambrot's speech is protected under the First Amendment, the application of the policy does not injure Dambrot. Without the demonstration of some harm, Dambrot cannot recover.

*Id*. Even without knowing the specific City policy language Marquardt claims is unconstitutional, Marquardt's sixth claim fails, because the Posts are not protected. Thus, Marquardt's seventh claim for injunctive relief based on the merits of his sixth claim also fails.

## IV. MARQUARDT'S FAILURE TO TRAIN CLAIM IS MERITLESS

Marquardt can maintain his fifth claim against the City for failure to train EMS staff and Commissioner Carlton as to the First Amendment (*see* ECF #1 at ¶ 50), only if his Posts are constitutionally protected. Since the Posts are unprotected, his failure to train claim fails.

Additionally, Marquardt's failure to train claim requires a showing that the City had a "deliberate indifference" to his First Amendment rights. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). To make such a showing, Marquardt "must show prior instances of unconstitutional

conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). EMS has no history of First Amendment issues. *See* Ex. 3 at ¶ 15. That EMS did not discipline Marquardt for his posts about the Baltimore riots (*see* Ex. 18) undermines any attempt by Marquardt to demonstrate otherwise. As a matter of law, Marquardt's failure to train claim fails.

## V.   MARQUARDT'S OHIO REV. CODE § 2307.60 CLAIMS ARE MERITLESS

Defendants filed a Motion for Partial Judgment on the Pleadings seeking dismissal of Marquardt's second, third, and fourth claims under Ohio Rev. Code § 2307.60, under which he seeks to recover civilly for Defendants alleged criminal acts, based on two grounds:

1.  Marquardt's Ohio Rev. Code § 2307.60 claims are time-barred, as he filed them nearly a year after the one-year statute of limitations ran; and
2.  Defendants have not been convicted of any crime related to Marquardt's employment or separation, and civil recovery under Ohio Rev. Code § 2307.60 "depends on the existence of a criminal conviction." *See Ortiz v. Kazimer*, No. 1:11 CV 01521, 2015 U.S. Dist. LEXIS 38496, *34-35 (N.D. Ohio March 26, 2015).

*See* ECF #15.[20]

Additionally, for Commissioner Carlton to be liable under Ohio Rev. Code § 2307.60, she actually had to commit a "criminal act" (i.e., violate the statutes Marquardt cites in his claims -- Cleveland Ord. 171.49 (Ex. 19), Cleveland Ord. 615.13 (Ex. 20), and Ohio Rev. Code § 2921.45). *Jacobson v. Kaforey*, 75 N.E.3d 203, 149 Ohio St. 3d 398, 40 (Ohio 2016). Thus, Marquardt's Ohio Rev. Code § 2307.60 claims also fail because Commissioner Carlton committed no criminal act. For there to be a criminal act under the cited statutes, Defendants must have violated Marquardt's constitutional rights, which, as detailed above, did not happen.

---

[20] Marquardt opposed Defendants' Motion (*see* ECF #16) and Defendants replied to his Opposition (*see* ECF #19). Defendants incorporate their arguments from ECF #15 and ECF #19 into this Memorandum.

**VI.**     **COMMISSIONER CARLTON IS ENTITLED TO QUALIFIED IMMUNITY**

> Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate **clearly established** statutory or constitutional rights of which a reasonable person would have known." [*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).]  The ultimate burden of proof is on the plaintiff to show the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

*Gratsch v. Hamilton County*, 12 Fed. Appx. 193, 201 (6th Cir. 2001) (emphasis added); *see also*

*Feathers v. Avey*, 319 F.3d 843, 848 (6th Cir. 2003).

As detailed above, Marquardt's discharge did not violate a constitutional right.  Even if it did, Marquardt cannot meet his burden of identifying a case **clearly establishing** the First Amendment protected the Posts.  Furthermore, Marquardt has no reason to believe Commissioner Carlton hated him.  Marquardt 179:18-20.  In fact, Marquardt testified that he did not believe his discharge was "a personal attack."  In discharging Marquardt, Commissioner Carlton merely did her job, and is entitled to qualified immunity.

## CONCLUSION

For the above reasons, Marquardt's claims have no merit, and the Court should grant Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

*s/ David R. Vance*
**Patrick J. Hoban (#0079794)**
 pjh@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
**Zashin & Rich Co., L.P.A.**
950 Main Avenue, 4th Floor
Cleveland, OH  44113
T:  (216) 696-4441
F:  (216) 696-1618

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

The undersigned certifies that the Court assigned this case to the standard track (ECF #11

at 1) and that this filing adheres to the 20-page limitation set forth in Local Rule 7.1(f).

*s/ David R. Vance*
**Patrick J. Hoban (#0079794)**
 pjh@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
**Zashin & Rich Co., L.P.A.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2019 the foregoing document was filed via the

Court's electronic filing system and will be served on all parties via that system.

*s/ David R. Vance*
**Patrick J. Hoban (#0079794)**
 pjh@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
**Zashin & Rich Co., L.P.A.**
950 Main Avenue, 4th Floor
Cleveland, OH  44113
T:  (216) 696-4441
F:  (216) 696-1618

*Attorneys for Defendants*