# In The Matter Of:

*Jamie Marquardt v.*
*Nicole Carlton, et al.*

---

*Jamie Marquardt*
*December 12, 2018*

---

*Fincun-Mancini, Inc.*
*1801 E. Ninth Street*
*Suite 1720*
*Cleveland, Ohio 44114*
*(216) 696-2272*

**Min-U-Script® with Word Index**

EXHIBIT
1

---

**Page 1**

1       IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF OHIO
                EASTERN DIVISION
3                   - - -
4   Jamie Marquardt,            )
                               )
5           Plaintiff,          )
                               )
6       vs.              )Case No. 1:18-CV-00333-SO
                         ) Solomon Oliver, Jr., J.
7   Nicole Carlton, et al.,     )
                               )
8           Defendants. )
9                   - - -
10
11       Deposition of Jamie Marquardt, the plaintiff
12   herein, called on behalf of the defendants for oral
13   examination, pursuant to the Federal Rules of Civil
14   Procedure, taken before Karen A. Toth, Notary Public
15   in and for the State of Ohio, pursuant to notice, at
16   the offices of Zashin & Rich, Ernst & Young Tower,
17   950 Main Avenue, 4th Floor, Cleveland, Ohio 44113 on
18   Wednesday, December 12, 2018, commencing at
19   9:58 a.m.
20                   - - -
21
22
23
24
25

---

**Page 2**

1   APPEARANCES:
2   On behalf of the Plaintiff:
3           William C. Livingston, Esq.
            Berkman, Gordon, Murray & DeVan
4           55 Public Square, Suite 2200
            Cleveland, Ohio 44113
5
6   On behalf of the Defendants:
7           David R. Vance, Esq.
            Patrick J. Hoban, Esq.
8           Zashin & Rich
            Ernst & Young Tower
9           950 Main Street, 4th Floor
            Cleveland, Ohio 44113
10
11   Also present:
12           Nicole Coleman
             Jzinae Jackson (After lunch)
13
14                   - - -
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1                   INDEX
2   WITNESS:                         CROSS
3   Jamie Marquardt
4       by Mr. Vance                 6
                    - - -
5
6
7               E X H I B I T S
8   Defendants':                    Marked
9       1                            23
10      2                            24
11      3                            27
12      4                            29
13      5                            52
14      6                            55
15      7                            83
16      8                           127
17      9 and 10                    133
18      11                          135
19      12                          137
20      13                          138
21      14                          140
22      15                          141
23      16                          143
24      17                          146
25      18                          154

---

**Page 4**

1           E X H I B I T S (Cont.)
2   Defendants':                    Marked
3       19                          157
4       20                          160
5       21                          162
6       22                          169
7       23                          176
8       24                          181
9       25                          184
10      26                          186
11      27                          199
12      28                          200
13      29                          202
14      30                          203
15      31                          226
16      32                          232
17      33                          234
18      34                          236
19      35                          238
20      36                          259
21      37                          260
22      38                          263
23      39                          266
24      40                          268
25      41                          269

---

Page 33

1     was for angioedema.
2 Q  And what is that, sir?
3 A  It's a reaction to a blood pressure medicine.
4     Throat, face, tongue swell.
5 Q  Kind of like anaphylaxis?
6 A  Much worse.
7 Q  And when was that; do you recall?
8 A  I believe I provided that to you. I don't
9     remember the exact date. There were a
10    number -- unfortunately it happened a number
11    of times.
12 Q  What is your current address?
13 A  10034 Pleasant Lake Boulevard, Apartment J18,
14    Parma.
15 Q  How long have you been in that apartment?
16 A  At least three years.
17 Q  Do you live with anyone?
18 A  No.
19 Q  And you're divorced; is that correct?
20 A  Correct.
21 Q  And when were you divorced?
22 A  2015. 2015.
23 Q  Is that when it was finalized?
24 A  I believe so, yeah, somewhere in that area.
25 Q  And what is your ex-wife's name?

Page 34

1 A  Debra.
2 Q  Does she is still go by Marquardt?
3 A  Yes.
4 Q  Have you discussed with your ex-wife this case
5     at all?
6 A  Only when she -- yes, I did.
7 Q  What have you discussed?
8 A  I think I -- when it originally happened I
9     told her what happened.
10 Q  What do you mean by what happened?
11       MR. LIVINGSTON: Can we clarify the
12    time frame, whether you were married or
13    divorced?
14       MR. VANCE: I'll worry about the
15    record and whether or not it's clear, okay?
16       MR. LIVINGSTON: That could be a
17    privilege. That's why I'm stating that.
18       MR. VANCE: I asked him when he
19    spoke with his ex-wife about it.
20       MR. LIVINGSTON: I know and I'm saying
21    ex-wife at the time? This is a privilege that
22    I have to protect. I just want to clarify and
23    make sure he wasn't married at the time.
24 Q  Were you married at the time of your
25    separation, sir?

Page 35

1 A  Separation from the City?
2 Q  From the City.
3 A  No.
4 Q  And how long before your separation from the
5     City were you divorced; do you recall?
6 A  Maybe less than a year.
7 Q  Okay. So you just stated that you spoke with
8     your ex-wife about what happened. What is
9     what happened?
10 A  With the Facebook posts.
11 Q  And what did you two discuss?
12 A  I just told her I didn't do it.
13 Q  Is that a verbal communication?
14 A  Yes.
15 Q  Any other conversations you've had with your
16    ex-wife about this case?
17 A  Yes.
18 Q  Okay. What is that?
19 A  My kids. My two daughters.
20 Q  For the record, I don't want to know what your
21    daughters' names are. I'm going to ask you
22    how old they are here, but other than that
23    we'll try to keep their names out of the
24    record, okay?
25 A  Sure.

Page 36

1 Q  Sorry. I didn't mean to cut you off. I
2     wanted to make that clear.
3 A  That's okay. My two daughters are being
4     harassed at school regarding that because it
5     was in the news.
6 Q  So the two of you spoke about that?
7 A  Yes.
8 Q  Anything else?
9 A  Not that I can recall, no.
10 Q  Are you currently dating?
11 A  No.
12 Q  And how old are your daughters?
13 A  My daughters are 14 and 16.
14 Q  Have you discussed the case with them at all?
15 A  Yes.
16 Q  Okay. What have you told to them?
17 A  That, you know, you're going to see some stuff
18    on the news.
19 Q  Anything else?
20 A  No.
21 Q  Where did you go to high school?
22 A  Midview.
23 Q  And you graduated of Midview?
24 A  Yes.
25 Q  Do you have any post high school education?

Page 45

1 A   I don't know for sure who made that post, no.
2 Q   Who do you believe it could be?
3 A   I believe it's a guy named Donnie.
4 Q   I'm sorry, did you say Don or Donnie?
5 A   Donnie. I'm not sure what his -- I call him
6     Donnie.
7 Q   Any other instances in which you are aware
8     that someone else made a post on your Facebook
9     account without your approval?
10 A   Not that I'm aware of.
11 Q   Are you familiar with Facebook Messenger?
12 A   Yes.
13 Q   Describe for me what Facebook Messenger is, if
14     you could.
15 A   I believe when you send messages back and
16     forth from one person to another. I believe
17     that's what they call Facebook Messenger. I
18     don't know the exact term. I'm assuming
19     that's what it is.
20 Q   I believe that to be the case as well.
21        Are you aware of anyone sending
22     messages via Facebook Messenger on your
23     behalf?
24 A   No, not that I'm aware of.
25 Q   I'm sorry, not that you're aware of?

Page 46

1 A   Not that I'm aware of, no.
2 Q   What does it mean to update your status on
3     Facebook?
4 A   That's a post that's seen -- whenever you
5     write in that block is seen by all your
6     friends or everybody, depending on your
7     security setting.
8 Q   Are you aware of anyone ever updating your
9     status on behalf of you?
10 A   Yes.
11 Q   Okay. Who was that?
12 A   That's the same.
13 Q   Same incident?
14 A   Yes, that was posted through a -- through a
15     status update.
16 Q   Any other instances?
17 A   Not that I'm aware of.
18 Q   And also through Facebook you can make posts
19     or comments on another people's Facebook
20     pages; is that correct?
21 A   If you're friends, yes, you can answer.
22 Q   So you can make a post on somebody else's
23     Facebook page, right?
24 A   Yes.
25 Q   And you can also comment on somebody else's

Page 47

1     Facebook pages?
2 A   Yes.
3 Q   Are you aware of anyone making a post or a
4     comment on somebody else's page with Facebook
5     on your behalf without your approval?
6 A   Not that I'm aware of.
7 Q   Are you aware of any other instance in which
8     someone has acted as you through your Facebook
9     account other than the one you mentioned?
10 A   Not that I'm aware of.
11 Q   Has your Facebook account ever been hacked?
12        MR. LIVINGSTON: Object to the term
13     hacked.
14 A   Yeah, because I'm technically -- you know,
15     when somebody, like in this case, uses my
16     phone it could be called a hack, or it could
17     be done through a password behind the scenes
18     hack. So I'm --
19 Q   Other than the incident with Donnie we spoke
20     about briefly are you aware of any other
21     instances in which you would consider your
22     Facebook account to have been hacked?
23 A   No.
24 Q   Ever made any report to Facebook relative to
25     improper activity on your Facebook account?

Page 48

1 A   No.
2 Q   Have you ever not posted -- let's talk about
3     when you were a City employee. Have you ever
4     not posted something on Facebook because you
5     felt the posting would be prohibited by City
6     policy?
7        MR. LIVINGSTON: Objection.
8 A   Yes.
9 Q   And what were you contemplating posting that
10     you didn't post?
11 A   Anything relating to my job or the City or a
12     call.
13 Q   Can you think of a specific instance in which
14     you were contemplating posting something that
15     you didn't post?
16 A   No, I didn't contemplate. I knew not to.
17 Q   And what do you believe was prohibited from
18     posting on Facebook via City policy?
19 A   Anything related to -- like I said, anything
20     related to the City, my job, a call, a
21     patient; specific details of, you know, events
22     that occurred. Anything about my job.
23 Q   And what policy did you believe was applicable
24     to that?
25 A   I don't think it needs a policy. I think it's

1    just understood you don't do that.
2 Q    Did somebody tell you that you were prohibited
3    from doing those things?
4 A    No. It's just an understanding that every --
5    I mean, you know, you don't post stuff like
6    that.
7 Q    How did you come to have that understanding?
8 A    Well, my ex works for Cleveland Clinic. They
9    have a very strict social media policy. So,
10    you know, I kind of knew the ins and outs of
11    what you can and can't post, plus just
12    watching the news.
13 Q    Did anyone ever from the City direct you as to
14    what you could or could not post on your
15    Facebook?
16 A    There is a social media policy within the
17    City.
18 Q    And had you received that social media policy?
19 A    I never received it.
20 Q    You were a captain at the time of your
21    separation from the City?
22 A    Correct.
23 Q    As part of your duties as captain were you
24    responsible for ensuring that your
25    subordinates abided by general orders of EMS?

1 A    Yes.
2 Q    And you had access to those general orders?
3 A    I have access to what I was given.
4 Q    Did you know where you could find general
5    orders when you were a captain?
6 A    They were starting to be put online.
7 Q    And how do you mean online?
8 A    Through your city account they would be in
9    folders.
10 Q    Any other way in which you believe that there
11    are -- how you came to have this understanding
12    of what was and was not allowed to be posted
13    on Facebook?
14 A    No.
15 Q    Can you describe for me what happened relative
16    to Tamir Rice?
17 A    I don't understand the question.
18 Q    So obviously there was a shooting that
19    involved Tamir Rice, correct?
20 A    Yes.
21 Q    Do you recall when that was?
22 A    No.
23 Q    So let's go back, if we could, go back to
24    Exhibit 4.
25 A    Okay.

1 Q    In the first paragraph there, second line, it
2    talks about the shooting of a 12 year old boy
3    who police said was killed by an officer when
4    the boy reached toward his waistband for a
5    realistic pellet gun in November 2014.
6 A    Yes.
7 Q    Is that fairly accurate or is that an accurate
8    description of the Tamir Rice incident?
9 A    The date appears correct.
10 Q    You believe it was in November of 2014?
11 A    If they put it, yes. I have no reason not to.
12 Q    And is it your understanding that the claim
13    was that Tamir reached into his waistband for
14    a gun?
15 A    Am I aware of the claim?
16 Q    Your understanding of the incident?
17 A    Yes.
18 Q    And is it your understanding that that gun
19    turned out to be fake?
20 A    Yes.
21 Q    And was there an orange safety tip that was
22    removed from that gun; is that your
23    understanding?
24 A    I have no idea. I had heard that.
25 Q    That was something that you had heard?

1 A    Yes.
2 Q    And is it your understanding that Tamir was
3    indeed a 12 year old boy?
4 A    That's my understanding, yes.
5 Q    And that he was shot by the police?
6 A    Yes, that's my understanding.
7 Q    And that he died the following day; is that
8    right?
9 A    I don't recall when he died. I know he died.
10 Q    Would you consider that incident to have been
11    a tragedy?
12    MR. LIVINGSTON: Objection.
13 A    A tragedy?
14 Q    Yes.
15 A    Yes.
16 Q    Let's go to Exhibit 5.
17    (Defendant's Exhibit 5
18    marked for identification.)
19 Q    What is Exhibit 5, sir?
20 A    This is the post that ultimately I received my
21    termination for.
22 Q    There is a couple posts here; is there not?
23    Two separate posts?
24 A    Yes, this looks like it's the start of the one
25    on Page 2.

Page 53

1 Q    So there is a post at the top of Page 1 and
2    then there is a second post that begins on
3    Page 1 but it's not the whole thing, and then
4    the whole thing is on Page 2; is that right?
5 A    Yes.  It's a -- this is a post and it looks
6    like this one is a reply. (Indicating.)
7 Q    A reply to a comment to the original post?
8 A    It must be, yeah.
9 Q    Okay.  So if you could for me please read into
10    the record what the first post is.
11 A    What it is?
12 Q    Yeah, please read it for me.
13 A    "Let me be the first on record to have the
14    balls to say Tamir Rice should have been shot
15    and I am glad he is dead.  I wish I was in the
16    park that day as he terrorized innocent
17    patrons by pointing a gun at them walking
18    around acting bad.  I am upset I did not get
19    the chance to kill the little criminal
20    fucker."
21 Q    And then if you could read the reply.
22        MR. LIVINGSTON: I'll object.  The
23    document speaks for itself, but you can go
24    ahead.
25 A    "Stop Kevin.  How would you feel if you" --

Page 54

1    it's cut off -- "Walking in the park and some
2    ghetto rat pointed a gun in your face?  Would
3    you" -- cut off again -- 'to him as a hero?
4    Cleveland sees this felony hood rat as a
5    hero."
6 Q    On the second page there it says two hours
7    ago.  Do you see that on the bottom?
8 A    Yes.
9 Q    And then there is -- what exact time do you
10    believe that these posts were made on your
11    Facebook -- these posts showed up on your
12    Facebook page, correct?
13 A    Yes.
14 Q    And when exactly do you believe these posts
15    were on your Facebook page?
16 A    Sometime in the morning.
17 Q    The morning of what date, do you recall?
18 A    It would have been the 14th.  I believe the
19    14th.  Like I said, I don't know the dates.
20 Q    Okay.
21 A    I would have to look at something.  I think
22    it's the 14th.
23 Q    So let's try and get this date squared away so
24    we're all on the same page here.  You had a
25    interview with James Votypka of the OIC,

Page 55

1    correct?
2 A    Yes.
3 Q    And that interview was the same week as the
4    post, correct?
5 A    I believe so, yes.
6 Q    Okay.  And you were to be truthful during the
7    interview; is that right?
8 A    Yes.
9 Q    And were you truthful during that interview?
10 A    Yes.
11        MR. VANCE: Okay.  Bill, I don't
12    have this to give to you today but this is the
13    recording of that interview.  You have it
14    already.  It was produced at -- I can't tell
15    you the exact number.  But after this depo is
16    over I'll email it to you.  And, Karen, I'll
17    email it to as well so you can include it in
18    the exhibits.
19        MR. LIVINGSTON: So are you marking
20    this as 6?
21        MR. VANCE: I will mark this as
22    6.
23        (Defendants' Exhibit 6
24        marked for identification.)
25        MR. VANCE: And so we're all on

Page 56

1    the same page, this is Bates stamped City
2    0560.
3        If anybody has any trouble listening
4    or hearing, it should be loud enough but just
5    say so.  I'm just going to play a little bit
6    of it from the beginning.
7        (Tape playing.)
8        (Tape stopped.)
9 Q    Let me pause this for a second.  So Sunday
10    night is when you believe that this started;
11    is that correct?
12        MR. LIVINGSTON: Objection.  I believe
13    he said probably Sunday.
14        MR. VANCE: Then he said it was
15    Sunday night.
16 A    Whatever the tape says.
17 Q    Let's go back and listen to it again.  We can
18    do that.
19        (Tape playing.)
20        (Tape stopped.)
21 Q    Okay.  So is it your recollection that on
22    Sunday night somebody had come over to your
23    house?
24 A    Yes.
25 Q    Okay.  And who was that gentleman that came

Page 57

1 over?

2 A Donnie.

3 Q That was Donnie?

4 A Yes.

5 Q All right. So we're all on the same page, I
6 don't intend to mark this as an exhibit but I
7 can if you want me to. This is a printout of
8 a calendar for 2016. Okay. So if you want to
9 take a look at February. I have February
10 here. It says that Sunday was the 14th.

11 A Okay.

12 Q Okay. So your testimony is that Donnie came
13 over to your house on Sunday, February 14,
14 2016 around 9:00 in the evening?

15 A Yes.

16 Q And then you guys were up for some time?

17 A Yes.

18 Q And then these posts were then made the
19 following morning on February 15th, correct?

20 A Yes.

21 Q If we can go back to Exhibit 5. Did you make
22 either this -- let's start with the first
23 post. Did you make the first post?

24 MR. LIVINGSTON: Objection. Asked and
25 answered.

Page 58

1 A No.

2 Q And did you make the reply on the second page?

3 A No.

4 Q So generally then, if it's the morning of
5 February 15th, about what time in the morning
6 do you believe these posts were made?

7 A I don't know. It was after I went to bed.

8 Q And when do you recall going to bed that day?

9 A Probably like four or five in the morning.

10 Q So I see here on the second page there is a
11 time there, 9:13.

12 A Okay.

13 Q And down at the bottom it says two hours ago.
14 So using that, and this is a little rough, but
15 give or take, somewhere probably around 7 a.m.
16 these were made?

17 MR. LIVINGSTON: Objection.

18 A That's what it appears to be.

19 Q Somewhere in that general vicinity. And these
20 are indeed the posts that were and did appear
21 on your Facebook account, correct?

22 A Yes.

23 Q As to the second one, ghetto rat, is that
24 something you ever say?

25 A Yes.

Page 59

1 Q It is?

2 A Yes.

3 Q What about hood rat, is that something you say
4 as well?

5 A Yes.

6 Q Did you ever talk to Donnie about Tamir Rice?

7 A It's possible. I don't recall a specific
8 conversation.

9 Q Did you ever use that language with Donnie,
10 ghetto rat or hood rat?

11 A It's possible.

12 Q Do you have any recollection of ever doing
13 that?

14 A I don't actually recall a conversation where I
15 said specifically that.

16 Q Either of those things. Do you recall a
17 conversation where you've used either of those
18 phrases with Donnie?

19 MR. LIVINGSTON: Objection. Asked and
20 answered.

21 A I don't recall. I'm not going to say yes, I'm
22 not going to say no. It's possible.

23 Q Do you accept any responsibility for the posts
24 that are in Exhibit 5?

25 MR. LIVINGSTON: Objection.

Page 60

1 Relevance.

2 A Do I accept responsibility? It's on my
3 Facebook post so that I'm responsible for.

4 Q Are you saying that you're responsible for
5 what appears on your Facebook page?

6 MR. LIVINGSTON: Objection.

7 A No, I'm saying that it's -- I have to -- it's
8 on my Facebook post, so regardless I'm
9 responsible, you know, for what appears I
10 guess. I don't know how to word it. I didn't
11 do it. I'm not going to take responsibility
12 for it but it's on my Facebook account.

13 Q What's your opinion of these posts --

14 MR. LIVINGSTON: Objection.

15 Q -- in Exhibit 5?

16 A I don't agree with it. It's not my opinion.
17 It's somebody else's opinion. They have a
18 right to it but it's not mine.

19 Q So you wholeheartedly disagree with the
20 contents of the posts in Exhibit 5?

21 MR. LIVINGSTON: Objection.
22 Mischaracterizes his testimony.

23 MR. VANCE: I'm asking him
24 whether he does.

25 A Could you resay that again?

Page 61

1 Q   Do you wholeheartedly disagree with the
2 contents of the posts reflected in Exhibit 5?
3       MR. LIVINGSTON: Objection to the
4 relevance.
5 A   Most of it, yes.
6       MR. VANCE: Hold on a second, if
7 we could.  What's the objection to relevance
8 here?  You're objecting an awful lot.  It's
9 not clear to me other than to disrupt the
10 deposition what the nature of the objection
11 is.
12      MR. LIVINGSTON: I was objecting due
13 to the content of the post.  It's in black and
14 white.  Whether he wrote it, whether he didn't
15 write it, whether he agrees with it, whether
16 he doesn't agree with it doesn't change the
17 fact that he was terminated for the content of
18 this post.  That's what we're here today on.
19      MR. VANCE: There is much more in
20 play other than the content of the posts.
21 It's bigger than just that.  It speaks to a
22 whole number of issues.
23      MR. LIVINGSTON: I disagree.  That's
24 why I made the objection.
25      MR. VANCE: I would caution you

Page 62

1 to have a significant basis.
2 Q   So the purpose of the post --
3       MR. VANCE: And we'll make it
4 clear and if you still feel the same way you
5 can continue to object, but as it stands these
6 objections are more or less just disrupting
7 the deposition for no good purpose.
8       MR. LIVINGSTON: I have to --
9       MR. VANCE: Let me finish please.
10 Whether or not he made the posts speaks to his
11 veracity, speaks to a whole number of issues
12 That are relevant to the case.
13 Mr. Marquardt's truthfulness, his veracity are
14 relevant to the case.  You have to agree with
15 that.
16      MR. LIVINGSTON: I believe this is a
17 First Amendment case.  I'm not exactly sure
18 how his veracity would impact this.
19      MR. VANCE: So whether or not
20 Mr. Marquardt is a truthful individual is
21 immaterial to this case; is that your
22 position?
23      MR. LIVINGSTON: I think for the
24 legality of whether the post is protected or
25 not, yes.

Page 63

1       MR. VANCE: Okay.  But it's more
2 than -- you brought more than just a First
3 Amendment claim; have you not?
4       MR. LIVINGSTON: Well, I believe it
5 all goes to the heart of the issue of whether
6 it's protected or not.
7       MR. VANCE: The City is allowed
8 to assert affirmative defenses; is it not?
9       MR. LIVINGSTON: Of course.
10      MR. VANCE: Okay.  Well, those
11 affirmative defenses relate to whether or not
12 Mr. Marquardt is a truthful individual.
13      MR. LIVINGSTON: Okay.
14 Q   All right.  So these posts, these are personal
15 opinions, correct?
16 A   That's what they appear to be, yes.
17 Q   And the posts are very personal in nature,
18 agreed?
19 A   Yeah.
20 Q   They reflex the poster's, whomever it was,
21 attitude as to Tamir Rice?
22 A   I think that's fair to say.
23 Q   And the posts speak specifically about the
24 poster's desire to have killed Tamir Rice?
25 A   I can't speak on that, what the poster's

Page 64

1 motives or whatever is.
2 Q   But the post says very clearly I'm upset I
3 didn't get the chance to kill the little
4 criminal fucker, correct?
5 A   Yes.  But you're asking me if that poster
6 actually wanted to kill him.  I can't answer
7 that question.
8 Q   But they expressed upset that they didn't have
9 the opportunity to do that?
10 A   That's what's written, yes.
11 Q   And the word fucker, is that something that
12 you typically say?
13 A   No.
14 Q   Is that something you ever say?
15 A   I've said it, yes.
16 Q   Now, you said when I asked you whether or not
17 you wholeheartedly disagreed with these posts,
18 you said most of it.  What was it that you --
19 what of these posts do you agree with, if
20 anything?
21      MR. LIVINGSTON: In order not to
22 disrupt your deposition will you give me a
23 continuing objection as to relevance?
24      MR. VANCE: Absolutely.  A good
25 solution.

Page 65

1 A    On Page 1 I would agree that he was walking
2    around acting bad.
3 Q    Okay. Anything else you don't disagree with
4    or you don't agree with? Excuse me. Excuse
5    me. Let me scratch that. Anything else that
6    you disagree with as to these posts?
7 A    Disagree with?
8 Q    Yes.
9 A    Or agree with?
10 Q    Agree with. Excuse me. Anything else you
11    agree with as to these posts?
12 A    I believe he -- where it says terrorized
13    innocent patrons, I believe he did that. Or
14    the tape, the videotape that was on the news
15    appeared to show that.
16 Q    Anything else?
17 A    No, not on Page 1.
18 Q    How about Page 2?
19 A    I mean, if I take out the some ghetto rat I
20    would -- see, I didn't -- I don't know what
21    the person was replying to. But the fact
22    that, you know, it's not cool to have a gun
23    pointed at your head. That's what.
24 Q    Do these posts in any way speak out against
25    the City of Cleveland?

Page 66

1 A    The City?
2 Q    Yes, sir.
3 A    No. Well, I mean it says Cleveland but I
4    don't know what they mean by that.
5 Q    But as you read them you don't feel that they
6    speak out against the City in any way, do
7    they?
8 A    I don't know the intention of the writer.
9    They don't appear to be.
10 Q    If anything they seem to attack Tamir Rice; is
11    that correct?
12 A    Yes, that's what it appears to be.
13 Q    Do these posts in any way relate to a public
14    concern, that you're aware of?
15    MR. LIVINGSTON: Objection. He's not
16    a lawyer. You can answer.
17 A    I'm not sure. Is there a way you can reword
18    that?
19 Q    Sure. These posts, as you read them, do they
20    relate in any way to a social concern?
21 A    This whole case was a social concern.
22 Q    How so do you believe that those posts relate
23    to a social concern of the City or of the
24    community?
25 A    I mean, the fact that you have, you know, a

Page 67

1    child shot. You have, you know, the police
2    having to shoot him. You have public outrage.
3    You have public support. You have -- I mean,
4    it was just a whole -- it's a national story.
5    Endless.
6 Q    What part of the sentence "I am upset I did
7    not get the chance to kill the little criminal
8    fucker" relates to a social concern, if any?
9 A    I don't know if it's a social concern. It's
10    someone's opinion.
11 Q    And same question relative to any political
12    concern; do these posts relate in any way to a
13    political concern?
14 A    I believe the case is a political concern,
15    yes.
16 Q    What aspect of "I'm upset I did not get a
17    chance to kill the little criminal fucker"
18    relates to a political concern, if any?
19 A    I don't think it has anything to do with it.
20 Q    And why do you believe that the posts here
21    relate in any way to a community concern?
22 A    I read it as one person's opinion.
23 Q    Okay.
24 A    That's the way I'm reading it.
25 Q    Were these posts upsetting to you?

Page 68

1 A    I was upset about them, yes.
2 Q    How come?
3 A    Because, number one, it was on my Facebook
4    post and it made it look like it was my
5    opinion.
6 Q    And if you had this opinion why would that be
7    bad?
8 A    Because the person wants to shoot -- it
9    appears they want to shoot a kid.
10 Q    And you would consider that to be egregious,
11    the death of a child and the idea that --
12 A    I would consider that --
13 Q    -- somebody wants to kill a child is --
14 A    If that was the person's true intention, yes.
15 Q    Yes, that's pretty heinous?
16 A    It's -- I don't know how to answer that
17    question because, you know, I've read this
18    post a thousand times and to me it -- I took
19    this as it appears that if this person was in
20    the park that day when the crime was
21    occurring, it's almost like a support for the
22    police officer is the way I read this. Now,
23    if somebody else reads it they can get a
24    different opinion of it. Obviously it's black
25    and white. It says what it says. But I think

1     it's up to the reader to determine. And the
2     only person that truly knows is the person
3     that posted it and I'm not him so I don't
4     know.
5 Q   How exactly do you read the police into either
6     of those posts, Mr. Marquardt?
7 A   Because it appears -- I don't know about read
8     the police into it. It appears that there was
9     a crime being committed and that, you know,
10    obviously the police shot him and this
11    person's saying he would shoot him.
12 Q   And that he was angry that he didn't get the
13    chance to do that?
14 A   Well that one, yeah. I don't see the police
15    in that part.
16 Q   I'm still confused on where exactly do you
17    read the police into these posts?
18 A   I don't read the police into it, but at this
19    particular time, if I recall correctly,
20    everybody was attacking the police and it
21    seemed like everybody was polarized in one
22    direction or the other. They were either
23    supporting the police and had this type of
24    opinion or they were supporting, you know,
25    Tamir Rice and his -- you know, his actions.

1 Q   Where did you fall in that spectrum?
2 A   I saw both sides of it.
3 Q   Were you glad this 12 year old boy Tamir Rice
4    was dead?
5 A   No.
6 Q   Did you in any way see that as a good thing?
7 A   No.
8 Q   So is it fair to call these posts egregious?
9 A   Yes. I -- yes. I mean, that part of it, yes.
10 Q   Do you agree that these posts have a potential
11    to affect EMS operations?
12 A   No.
13 Q   Why not?
14 A   Because they didn't. It's my opinion it
15    didn't affect it at all.
16 Q   Why do you believe that to be the case?
17 A   Because I got blamed for this and I continued
18    to work after this post was made for a month
19    and there were absolutely no ill effects about
20    it. I was worried about that.
21 Q   And you can speak to the totality of EMS?
22 A   I would have heard about it, yes.
23 Q   Why would you have heard about it?
24 A   Because I'm a captain of operations. I
25    oversee everybody there.

1 Q   You oversee all EMS employees?
2 A   On my shift and when I work overtime hours,
3    yes.
4 Q   Do you believe that these posts harmed your
5    friendships?
6 A   No.
7 Q   Why not?
8 A   Because I would have known. Somebody would
9    have said I don't want to be friends with you
10    anymore.
11 Q   Do you feel these posts at all negatively
12    impacted your working relationships?
13 A   No.
14 Q   Had you been the one, at least according to
15    you that -- and I understand that you say you
16    didn't make these posts, but had you made
17    these posts would they have impacted your
18    working relationships?
19 A   You're asking me to predict something. I
20    don't know.
21 Q   Were you worried about the adverse effects of
22    the posts?
23 A   Absolutely.
24 Q   Why?
25 A   Because it was on the news. I was more

1     worried about my kids.
2 Q   Anything else you were worried about?
3 A   I was worried that people were going to think
4    that this was who I was.
5 Q   Any concern that you as a captain of EMS, that
6    they'd also consider this is who EMS was?
7 A   No.
8 Q   Why not?
9 A   Because people that know me know I wouldn't --
10    this is not me, so I wasn't concerned about
11    that.
12 Q   You don't know everybody in the City, correct?
13 A   I thought you were talking about EMS.
14 Q   No, just that there would be a concern that
15    this would be attributed to you and in turn
16    attributed to EMS.
17 A   No, I don't believe so.
18 Q   No concern about that whatsoever?
19 A   No.
20 Q   Why not?
21 A   Because everybody had an opinion at the time,
22    like I said. There were opinions all over the
23    place.
24 Q   If these posts had been attributed to you as a
25    captain in EMS could that cause the public to

Page 73

1 become angry with EMS?
2 A I don't -- again, you're asking me to predict
3 something. I don't know. I can't speak for
4 the public.
5 Q Let's say if the public was angry with EMS,
6 would that be a problem for EMS? Could that
7 create a problem?
8 A It could create a problem, yes.
9 Q What do you think the public's reaction would
10 be if it felt that an EMS captain wanted to
11 kill a child?
12 MR. LIVINGSTON: Objection.
13 A I don't know.
14 Q Now, we spoke a little bit about your
15 interview with Mr. Votypka. Were you 100
16 percent truthful as part of that interview?
17 A As I recall, yes.
18 Q Do you recall stating during that interview
19 that I never used the F word?
20 A I never said that. I said I never used the F
21 word on Facebook.
22 Q Let's go back to Exhibit 6, if we could.
23 Just so the record is clear, Exhibit 6
24 is a recording of your interview with
25 Mr. Votypka, correct?

Page 74

1 A Yes.
2 Q All right. Let me play it here. If you can
3 listen.
4 (Tape playing.)
5 (Tape stopped.)
6 A I was referring to Facebook when I said I
7 don't use the word fuck or balls. It was
8 Facebook.
9 Q So through Facebook and as part of Facebook
10 you never use fuck --
11 A Not in my posts, no.
12 Q Any other part of Facebook that you use that
13 word?
14 A Maybe during personal conversations, not --
15 Q It talked about also Tamir Rice. Have you
16 ever through Facebook posted anything about
17 Tamir Rice?
18 A Not in my posts, no.
19 Q Not in your posts. Anywhere on Facebook at
20 all?
21 A That's possible. I have conversations all the
22 time with persons.
23 Q Seemed pretty clear to me that this was not
24 necessarily limited to Facebook. I mean, you
25 start off with I never say fuck. I never have

Page 75

1 talked about Tamir Rice.
2 A I would never say that. That's not true.
3 First of all, everybody in the City discussed
4 Tamir Rice, and I would never say that I never
5 used the F word. I was referring to Facebook.
6 My Facebook posts. That's what we were
7 talking about.
8 Q So that testimony relative to your OIC
9 interview with Mr. Votypka, that was strictly
10 limited to Facebook?
11 A Actually, my Facebook word posts, yes.
12 Q How about the N word, have you ever use the N
13 word?
14 MR. LIVINGSTON: Objection. You can
15 answer.
16 A Throughout my whole life?
17 Q Throughout the last five years let's say.
18 A I don't recall. It's possible. I'm not going
19 to deny it.
20 Q Did you use the N word in a derogatory fashion
21 in the last five years?
22 MR. LIVINGSTON: Same objection.
23 A Same answer. Possible.
24 Q You understand that the N word is a highly
25 inflammatory word?

Page 76

1 A Yes.
2 Q It's a racist word?
3 A It is highly inflammatory.
4 Q You don't consider it a racist word?
5 A Not always.
6 Q You as a white man, if you were to use that
7 word would you consider it to be racist?
8 MR. LIVINGSTON: Objection. You can
9 answer.
10 A It depends how it's used.
11 Q If you're using it to refer to a black
12 individual, would that be racist?
13 A Not necessarily.
14 Q No? Why not?
15 A Cuz I could -- I use it once in a while. I'm
16 sure I used it with my friends.
17 Q In what context would this word be appropriate
18 with your friends?
19 A Just joking around.
20 Q How so?
21 A Simple as that, just joking around.
22 MR. LIVINGSTON: I'm going to object
23 to this whole line of questioning.
24 Q How do you joke around using that word?
25 A You joke around with your friends. It has no

Page 77

1    derogatory meaning. It doesn't.
2  Q  Can you recall context in which you joked
3    around using the N word?
4  A  No.
5  Q  You were aware that your co-workers complained
6    about the post in Exhibit 5; were you not?
7  A  Yes.
8  Q  Including that they felt the postings were
9    unsafe?
10 A  Who are you referring to? I'm sorry.
11 Q  Mark Barrett and Gregory Hyde were two of your
12   co-workers; were they not?
13 A  One complained, one didn't.
14 Q  Who do you believe did not complaint?
15 A  Mark Barrett.
16 Q  You don't think Mark Barrett complained about
17   the posts?
18 A  He didn't complain.
19 Q  Did he raise the posts to his supervisor?
20 A  Yes, to ask -- so I didn't get in trouble he
21   asked the supervisor to contact me and asked
22   if I thought I should take it down, but he
23   wasn't complaining about it.
24 Q  If he thought maybe you should take it down
25   does that suggest that Mr. Barrett was

Page 78

1    concerned about the posts?
2  A  No, he told me directly he was concerned about
3    me.
4  Q  Concerned what about you, your safety?
5  A  That I might get in trouble.
6  Q  Was he concerned about your safety?
7  A  No.
8  Q  How about Mr. Gregory Hyde, was he concerned
9    that the posts could be unsafe?
10 A  For himself.
11 Q  Was he also concerned about your safety; do
12   you know?
13 A  No, he didn't specify that.
14 Q  Do you know if other co-workers saw the posts?
15 A  I don't know for sure. I'm sure they did.
16 Q  Are you aware of any others that may have seen
17   the posts?
18 A  No. I mean, I shouldn't say no. Yeah. Yes,
19   other people saw it.
20 Q  Other co-workers of yours at the time?
21 A  Yes.
22 Q  Who was that?
23 A  My friend Al told me he read it.
24 Q  Al who?
25 A  Flores.

Page 79

1  Q  Anyone else?
2  A  John Wearstler.
3  Q  How do you spell John's last name, if you
4    would?
5  A  It's W-h-e-a-s-t-l-e-r (sic) I believe.
6  Q  Okay. Anyone else?
7  A  I'm sure a lot of people did. I don't know
8    exactly.
9  Q  A lot of your co-workers saw the posts?
10 A  I'm guessing they did. At least saw the news
11   story. I don't know. I go by people who
12   spoke directly to me. So I would say that
13   Paul Melhuish saw it. I would say Dan Nemeth
14   saw it. Obviously the captains that reported
15   it saw it.
16 Q  That would be Michael Threat and Captain
17   Kazimer. Like I said, I don't know for sure.
18 A  Correct. Like I said, I don't know for sure.
19   I'm assuming they did.
20 Q  And so your co-worker Gregory Hyde and your
21   co-worker Mark Barrett, both these individuals
22   raised the posts to a supervisor?
23 A  That's my understanding, yes.
24 Q  And that was close in proximity to the time
25   the posts were made on February 15th?

Page 80

1  A  I was not privy to when they called.
2  Q  Now, were you friends with Mark Barrett on
3    Facebook?
4  A  I don't recall.
5  Q  Were you friends with Gregory Hyde?
6  A  I don't believe so.
7  Q  You agree that these Facebook posts in Exhibit
8    5 spread pretty quickly?
9  A  I'm not sure.
10 Q  Are you aware that the media learned of the
11   posts within a day?
12 A  I knew they learned but I'm not sure when.
13 Q  Was their a story about the posts the next
14   day; do you recall?
15 A  It was close. Yes, I don't know if it was the
16   next day or --
17 Q  Within three days of the posts let's call it
18   there was an article on cleveland.com about
19   the posts and the media picked it up?
20 A  I saw the story on the news.
21 Q  On the news. In fact, on a certain level it
22   became a national story?
23 A  That's my understanding, yes.
24 Q  And that the Cleveland NAACP made a statement
25   about it?

Page 81

1 A    Who?
2 Q    The Cleveland NAACP.
3 A    Yes, that was during the news story.
4 Q    Have you ever made any other posts about Tamir
5      Rice in your Facebook account that you're
6      aware of?
7          MR. LIVINGSTON: Objection. Asked and
8      answered.
9 A    No.
10 Q   Have you ever make any comments on another
11     people's pages about Tamir Rice?
12 A   That's possible. Yeah, that's possible. I
13     don't -- like answering -- you mean, like
14     private conversations and stuff?
15 Q   Private conversations or just a post on
16     somebody else's page?
17 A   It's possible.
18 Q   How about any status updates that you put on
19     your page relative to Tamir Rice?
20 A   No.
21 Q   Not on your Facebook page in the status
22     updates?
23 A   No.
24 Q   Have you ever been to the pavilion where the
25     Tamir Rice shooting took place?

Page 82

1 A    Yes.
2 Q    When was the last time you were there?
3 A    It was afterwards, after the shooting.
4 Q    When?
5 A    When they had put a makeshift memorial there.
6 Q    What did you do there?
7 A    I was on duty. I drove over there, said a
8      prayer.
9 Q    Did you stay in your vehicle, get out of your
10     vehicle?
11 A   I got out of my vehicle.
12 Q   Anybody with you?
13 A   No.
14 Q   Do you recall what that prayer was?
15         MR. LIVINGSTON: Objection.
16 A   I'm not going to answer that.
17 Q   You don't have a choice, sir.
18         MR. LIVINGSTON: Answer the question.
19 A   I just said a prayer. I prayed that, you
20     know, as a result of this thing happened
21     hopefully God will see him differently than
22     everybody sees him.
23 Q   Who is hopefully God will see him; who are you
24     referring to as him?
25 A   Tamir Rice.

Page 83

1 Q    How did you see Tamir Rice?
2 A    A victim of circumstance.
3          Can we take a break?
4 Q    Sure.
5          (Short recess.)
6          MR. VANCE: Back on the record.
7 By Mr. Vance:
8 Q    Mr. Marquardt, what is your opinion of black
9      people?
10         MR. LIVINGSTON: Objection.
11 A   I don't have an opinion.
12 Q   Have you ever been called a racist before?
13 A   Not that I can recall. Yes, that's not true.
14 Q   When was that?
15 A   Well, it was indicated from Reginald Anderson
16     that works at Cleveland EMS.
17 Q   What context was that; do you recall?
18 A   It was regarding my objection to the Baltimore
19     riots.
20 Q   How did that come up?
21 A   It was a Facebook post.
22 Q   Facebook post that you had made?
23 A   Yes.
24         MR. VANCE: Mark this 7.
25         (Defendants' Exhibit 7

Page 84

1          marked for identification.)
2 Q    Could you identify for me what Exhibit 7 is,
3      sir?
4 A    It's a Facebook post.
5 Q    And is this the Facebook post that you're
6      referring to when you're talking about
7      Reginald Anderson?
8 A    Yes.
9 Q    Could you read that Facebook post for me?
10 A   "Open fire in Baltimore. Gun them all down.
11     When did we start tolerating this behavior?"
12 Q   And was that a post that you had made?
13 A   Yes.
14 Q   Do you recall when you made that post?
15 A   It says April 27th. I'm not sure what the
16     year was.
17 Q   Was that related to the Freddie Gray unrest in
18     Baltimore; are you aware?
19 A   I'm not sure of the name, to be honest with
20     you.
21 Q   Do you recall what you were referring to then
22     here in this post?
23         MR. LIVINGSTON: Objection.
24 A   Yeah.
25         MR. LIVINGSTON: Objection. You can

Page 85

```
 1    answer.
 2  A  Yes. I turned on the television and
 3     protesters were hitting police officers in the
 4     head with bricks.
 5  Q  And your response to that was to --
 6  A  Right there. Yes, that was my response.
 7  Q  Gun all the protesters down?
 8  A  Yes. Not all the protestors.
 9  Q  You don't differentiate. You just say all
10     here?
11  A  Yes, but I meant the ones who were assaulting
12     police officers.
13  Q  But you don't provide that here, correct?
14  A  Correct.
15  Q  And how was it that you came to learn that
16     Mr. Anderson had complained about this?
17  A  He had sent an email or letter to Commissioner
18     Carlton. I'm not sure which one. The Union
19     President for the paramedics sent me a copy.
20     Again, I don't remember if it was a hard copy
21     or an email copy but I had an opportunity to
22     read it.
23  Q  Okay. And did you talk with anybody else
24     about this post?
25  A  No.
```

Page 86

```
 1  Q  And Mr. Anderson, he was the Union President
 2     of the -- what was Mr. Anderson's --
 3  A  No, he had a newly elected second vice
 4     president, I believe.
 5  Q  Of CARE?
 6  A  Yes.
 7  Q  And what's CARE?
 8  A  It's the Cleveland Association of Rescue
 9     Employees. It's the union for street level
10     paramedics, EMTs and dispatchers.
11  Q  And he had raised this concern with the City
12     about this post?
13  A  He wrote a letter raising concern, yes.
14  Q  Did you talk with anybody at the City about
15     this post?
16  A  Paul Melhuish. He sent me it.
17  Q  What did the two of you discuss?
18  A  That it was -- he was out of line.
19  Q  Who was out of line?
20  A  Paul indicated to me that he was out of line
21     in sending that post, that he was not supposed
22     to do it that way and sent me a copy of it to
23     read.
24  Q  Oh, Paul had sent you the post, sent you the
25     email from Reginald?
```

Page 87

```
 1  A  Sent me the letter -- like I said, I don't
 2     remember. I believe it was an email, but he
 3     sent me a copy. That's what it was. I think
 4     it was an attachment to an email. It was a
 5     copy of the letter.
 6  Q  And Paul suggested he shouldn't do it that
 7     way?
 8  A  He indicated -- he let me know that this
 9     letter was in existence. He said Reggie
10     Anderson went around him as president and gave
11     this to Nicole, and he said I'll send you a
12     copy of what he sent her.
13  Q  Okay.
14  A  And that's how it came about.
15  Q  Did you have any other conversations with
16     anybody at the City relative to this post here
17     in Exhibit 7?
18  A  No, not that I can recall.
19  Q  Did you receive any discipline relative to
20     this post?
21  A  No.
22  Q  And you believe that as part of that complaint
23     Mr. Anderson suggested you were a racist; is
24     that right?
25  A  That's the way I read his letter, yes.
```

Page 88

```
 1  Q  Any other instance?
 2  A  No. No.
 3  Q  Do you ever curse on your Facebook page?
 4         MR. LIVINGSTON: Objection.
 5  A  I would imagine I have.
 6  Q  So if you said at any point in time nor do I
 7     ever curse on my Facebook page that would be
 8     inaccurate?
 9  A  That would be inaccurate probably.
10  Q  Go back to Exhibit 5 if we could for a second.
11  A  Which one is 5?
12  Q  The posts.
13  A  Okay.
14  Q  On the second page where it says "Stop Kevin."
15  A  Yes.
16  Q  Who is Kevin, do you believe?
17  A  If I remember right -- it doesn't say on here,
18     but I believe it's Kevin Poplar.
19  Q  Had Kevin made some sort of comment? I notice
20     on the first page there is one comment. It
21     refers to there being one comment. Did Kevin
22     comment on the original post?
23  A  I don't know. It's not on here.
24  Q  And you deleted that? If there were any
25     comments they've been deleted?
```

1 A  This was printed before I deleted anything.
2 Q  Had to have been, otherwise we wouldn't have
3    it.
4 A  No, but I mean the reply.  There is something
5    missing is what I'm saying.  Because Kevin's
6    replying to something.
7 Q  Well, you're replying to Kevin.
8 A  Right, but first of all, it's not me, but --
9 Q  Your account is replying to Kevin?
10 A  Right.  But whatever Kevin had written is not
11   in here.
12 Q  Right.  And that would most likely be -- if
13   you go to the first page there is one comment
14   to the original post?
15 A  Yes.
16 Q  Do you recall whether or not you ever read
17   that comment?
18 A  I don't recall.
19 Q  So you don't know if that comment was made by
20   Kevin or not?
21 A  I just -- I can't figure this out because it
22   says one comment but then it's got this
23   comment under there.  So that -- there would
24   have to be two comments.
25 Q  Not necessarily if you reply to a comment.

1 A  There is a comment.  This one and Kevin's.
2 Q  But you don't have -- all this had been
3    deleted.  You deleted all this from your
4    Facebook account, correct?
5 A  When I saw it, yes.
6 Q  But that Kevin you believe to be Kevin Poplar?
7 A  I believe so, yes.
8 Q  And that's your cousin?
9 A  Yes.
10 Q  And you don't have any recollection of any
11   comments that were made to your original post,
12   what that one comment may have been?
13 A  No.
14 Q  Do you recall when you went to bed on February
15   15th, when in that morning?
16 A  Yeah, I said it was probably four or five.
17 Q  Four or five in the morning, a.m.?
18 A  Yeah.
19 Q  And do you recall when it was that you woke
20   up?
21 A  I think it was somewhere around noon.  I know
22   it was after noon.
23 Q  And how exactly was it that you found out
24   about the Facebook posts?
25 A  There were a number of messages on my phone

1    and then there were a number of messages on
2    Facebook.
3 Q  Messages on your phone, I'm assuming those are
4    text messages you're referring to?
5 A  Text messages, voice messages.
6 Q  Let's start with voice messages.  Do you
7    recall who left a voice mail for you?
8 A  I believe my sister.
9 Q  Which sister?
10 A  Her name is Shelley.
11 Q  What's her last name?
12 A  Nowak.
13 Q  And any other voice mail messages that you're
14   aware of?
15 A  Not that I can recall.  As I said, I don't
16   remember.
17 Q  And I'm assuming you don't have that voice
18   mail message any longer?
19 A  No.
20 Q  Who all do you recall receiving texts from?
21 A  I can't differentiate between texts and
22   Facebook messages.
23 Q  Okay.
24 A  So I don't know which one they did.  You know,
25   I can't remember that far back.

1 Q  Who do you recall either sending you a
2    Facebook message or a text message about the
3    posts?
4 A  The ones I remember were John Wearstler.  I'm
5    trying to think who else did.  I think John
6    McNamara but I'm not sure.
7 Q  Who is John McNamara?
8 A  Somebody I used to work with.
9 Q  In EMS?
10 A  Yes.  I don't recall who else called me.
11 Q  You don't have any of these messages anymore
12   I'm assuming?
13 A  No.
14 Q  You deleted them?
15 A  Yeah.  I have to because voice mail only holds
16   so much and the messages on Facebook only goes
17   so long I think.
18 Q  How certain are you that Donnie made these
19   posts on Exhibit 5?
20 A  How do you want me to --
21 Q  If you had to assign a percentage to it, if
22   you're on a scale of zero to 100 percent,
23   what's your comfort level that Donnie was the
24   one that did this?
25 A  I'd say 90.

1 A    Probably have.
2 Q    Did Donnie make any other posts or did
3 anybody -- were any other posts made the early
4 morning of February 15th other than what's in
5 Exhibit 5?
6 A    If they were I didn't see them.
7 Q    Are you aware of whether or not he sent any
8 Facebook messages on February 15th on your
9 behalf?
10 A    He might have. I'm not sure.
11 Q    Unaware of any?
12 A    I'm not aware of any, yes.
13 Q    Do you believe that Donnie did anything else
14 with your phone?
15 A    I don't know. I can't -- I don't have any
16 evidence if he did.
17 Q    Were any other text messages, Facebook
18 messages, anything else sent on February 15th
19 that you did not send?
20 A    I don't remember.
21 Q    Don't recall whether or not there were any
22 text messages sent that weren't from you?
23 A    There was something else that happened. I
24 can't remember what it was now. But I don't
25 recall specifically what it was.

1 Q    Do you believe that the Facebook posts on
2 Exhibit 5 were the reason the City discharged
3 you?
4 A    Yes.
5 Q    Any other reason?
6 A    No.
7 Q    Who do you think made the decision to
8 discharge you?
9 A    I don't know who did.
10 Q    Any idea? Any inkling whatsoever?
11 A    Well, just three.
12 Q    Okay. Who are the three you think?
13 A    Nicole Carlton, Ed Eckart or the Mayor.
14 Q    Any reason to believe or any evidence to
15 suggest that the Mayor was involved in the
16 decision to discharge you?
17 A    Do I have any evidence? No.
18 Q    Why do you believe that the Mayor may have
19 been involved?
20 A    Because it was a media story. I'm sure he was
21 aware of it.
22 Q    But no evidence to suggest that he was
23 involved in the decision?
24 A    I don't have any physical evidence, no.
25 Q    Anybody tell you that?

1 A    No.
2 Q    How about Ed Eckart? He's the assistant
3 safety director for the City?
4 A    Correct.
5 Q    That was his position at the time of your
6 separation?
7 A    Yes.
8 Q    And he used to be the commissioner of EMS,
9 correct?
10 A    Correct.
11 Q    And why is it that you believe that Ed Eckart
12 may have been involved in your discharge?
13 A    Well, he was interviewed the day after the
14 post was made.
15 Q    Interviewed by whom?
16 A    Ed Gallek.
17 Q    Did he say anything?
18 A    He pretty much came on there and accused me of
19 it before the hearing was held.
20 Q    Anything that you received that suggested that
21 Ed made the decision to discharge you?
22 A    No.
23 Q    Anybody say that it was Assistant Safety
24 Director Eckart's decision?
25 A    No.

1 Q    How about Commissioner Carlton, why do you
2 believe it was her decision to discharge you?
3 A    Because she said it during the arbitration.
4 Q    Do you think it was an easy decision for
5 Commissioner Carlton to make?
6        MR. LIVINGSTON: Objection.
7 A    I don't know.
8 Q    Do you have any idea who replaced you after
9 your separation?
10 A    Nobody directly replaced me. I think they
11 hired -- I heard they hired people or promoted
12 a couple people.
13 Q    So after your separation someone else was
14 promoted to captain of operations?
15 A    That's what I understand.
16 Q    Your position remained there, it was just now
17 somebody else was in it?
18 A    Correct. As far as I know.
19 Q    So what exactly did you do in response to the
20 posts once you saw them?
21 A    I erased them right away and then I posted a
22 global apology. Status update apology.
23 Q    Why was it that you apologized?
24 A    Because I apologized if anybody thought it was
25 me.

Page 113

1 Q Did you apologize due to the inflammatory
2 nature of the posts?
3 A Yes.
4 Q How long did you think the posts were up for
5 total?
6 A I don't -- I'm not sure.
7 Q Less than -- probably at least less than 12
8 hours if you went to bed at five?
9 A Definitely, yeah.
10 Q Definitely less than 12. And did you contact
11 Commissioner Carlton that day about the posts?
12 A Yes.
13 Q And you contacted her the same day that you
14 learned of the posts, correct?
15 A I believe so.
16 Q Did you ever file for bankruptcy before?
17    MR. LIVINGSTON: Objection.
18 A No.
19 Q Other than your divorce have you ever been a
20 party to another legal action? Not criminal,
21 civil.
22 A Not that I'm aware.
23 Q Have you ever asserted any other claims
24 against an employer?
25    MR. LIVINGSTON: Objection.

Page 114

1 A What do you mean by claims?
2 Q Have you ever sued another employer?
3 A No.
4 Q Not including the grievance related to your
5 separation from the City did you ever file any
6 other grievance while you worked for the City?
7 A Yes, but I can't remember what for.
8 Q Do you have any idea how many you think you
9 filed?
10 A Not many.
11 Q Less than two, less than -- I mean less than
12 three?
13 A I can't remember because I was doing
14 grievances too as a union member. So as a --
15 as an employee I don't believe I filed a
16 grievance, but if I did it was only one or
17 two.
18 Q But you did obviously grieve your separation?
19 A Yes. Yes.
20 Q Have you ever testified in court before?
21 A Yes.
22 Q When was that?
23 A It was in the '90s. Probably late '90s.
24 Q Do you recall what the case was?
25 A Yeah, councilman accused of beating his wife.

Page 115

1 Q Do you remember who the councilman was?
2 A Cintron.
3 Q Can you spell that?
4 A C-i-n-t-r-o-n I believe.
5 Q And did you respond to the call?
6 A Yes.
7 Q Any other instance in which you testified in
8 court?
9 A Not that I can recall.
10 Q Have you ever been convicted of any crimes?
11 A Traffic included?
12 Q Yes.
13 A Yes.
14 Q When was that? If we can, let's work
15 backward. When was the most recent?
16 A Oh, boy. 2002, maybe.
17 Q Okay. What was that?
18 A A DUI.
19 Q And were you actually then convicted or did
20 you plead to a DUI?
21 A Yes.
22 Q And the City was aware of that?
23 A Yes.
24 Q You kept your job?
25 A No. Can I correct you?

Page 116

1 Q Absolutely.
2 A It was 1997.
3 Q Maybe '96?
4 A Possible.
5 Q So that was shortly after you had been hired,
6 right?
7 A Right.
8 Q So when you were hired -- where you hired -- I
9 have it at September 5, 1995; is that right?
10 A Yes.
11 Q And what position were you hired into?
12 A Paramedic.
13 Q EMT? Same thing or different?
14 A Different.
15 Q Different. Okay.
16    All right. Anything else that you can
17 think of as to crimes that you may have been
18 convicted for?
19 A No.
20 Q Did you receive any discipline from the City
21 for that?
22 A Yes.
23 Q For the DUI I'm asking?
24 A Yes.
25 Q Do you remember what that was?

Page 117

1 A    I was off duty. The case was being handled so
2      I wasn't paid for that time. They called it
3      administrative suspension.
4 Q    Unpaid admin suspension?
5 A    Unpaid, yes.
6 Q    How was it that you came to work for the City?
7 A    A friend of mine I was working with named John
8      McNamara.
9 Q    He worked for the City at the time?
10 A   He worked for the -- he worked for the City
11     and he worked part time --
12 Q   I got to ask, Mr. Marquardt, I got to ask you
13     not to try to read what your counsel was
14     writing.
15 A   I wasn't reading.
16 Q   Sorry. Go ahead.
17         MR. LIVINGSTON: I'd be happy to show
18     you.
19 A   I wasn't reading, I was just staring.
20 Q   That may well be the case.
21 A   What was the question?
22 Q   The question was how was it that you came to
23     work for the City, and you referenced John
24     McNamara.
25 A   John McNamara worked for the City and both of

Page 118

1      us worked for Life Care Ambulances. I was
2      full time, he was just PRN.
3 Q    And he suggested that you apply for the City?
4 A    Yes.
5 Q    And you did, you got hired?
6 A    Yes.
7 Q    And were you a member of the union?
8 A    Yes.
9 Q    And what union were you a member of at the
10     time that you were hired; do you recall?
11 A   CARE.
12 Q   CARE. And then you subsequently became a
13     member of another union?
14 A   Yes.
15 Q   Different union. What union was that?
16 A   CWA.
17 Q   And that was upon a promotion?
18 A   Not the sergeant promotion, the captain
19     promotion.
20 Q   So CARE represents we'll say the rank and
21     file, and then you have the sergeants. CWA
22     represents the captains?
23 A   Correct.
24 Q   And you were represented -- you were a union
25     member at the time of your separation?

Page 119

1 A    Yes.
2 Q    And you were promoted at different times
3      during your employment?
4 A    Yes.
5 Q    And where was it that you were promoted or
6      what position were you promoted into?
7 A    Sergeant of logistics.
8 Q    And do you recall when that was?
9 A    2002, 2003 area.
10 Q   Any other promotions?
11 A   No, that would have been '13. I'm sorry.
12 Q   2012, 2013?
13 A   Somewhere in that area, yeah.
14 Q   Any other promotions?
15 A   Yeah, to captain.
16 Q   And when do you think you were promoted to
17     captain?
18 A   Probably about -- probably '14, '15.
19 Q   Okay.
20 A   It would have been '15. It would have been
21     '14.
22 Q   '14, somewhere in there?
23 A   Yeah.
24         MR. VANCE: Just so we're clear,
25     I wasn't suggesting -- let the record reflect

Page 120

1      that I didn't think counsel was trying to, you
2      know, share any information with
3      Mr. Marquardt.
4 Q    At the time of your separation whom did you
5      report to?
6 A    Directly David Miller.
7 Q    And what was his position?
8 A    Administrative -- or no, he was --
9 Q    Assistant commissioner or assistant director?
10 A   I forgot now. Assistant -- assistant
11     commissioner maybe. Deputy commissioner. I'm
12     sorry --
13 Q   Deputy commissions --
14 A   -- I couldn't think of the word.
15 Q   -- of EMS?
16 A   Yes.
17 Q   The entirety of your employment with the City
18     was in EMS?
19 A   Yes.
20 Q   At the time of your separation what were your
21     job duties as a captain?
22 A   There were two. There was one shift you
23     worked the dispatch center and you would field
24     complaints, oversee the dispatchers, allocate
25     resources, problem solve and just make sure

Page 121

1    you had a smooth operation. It's the main
2    point of the -- the dispatch center oversees
3    how the whole service is running.
4  Q  So that's one. And then what is the other?
5  A  Field operations.
6  Q  And what did that entail?
7  A  It entailed getting the staffing together for
8    the field, allocating overtime, dealing with
9    supply issues the units have, and then also
10   going out and going on calls and monitoring
11   field employees for compliance.
12 Q  So you were responsible for potentially caring
13   for individuals that are injured as part of
14   crime?
15 A  Yes.
16 Q  And you're aware that EMS responded to the
17   Tamir Rice shooting; is that correct?
18 A  Yes.
19 Q  And EMS was responsible for caring for Tamir?
20 A  I don't know what exactly happened on the
21   call, but I assume, yes. I don't know if he
22   called -- meaning I don't know if he was
23   pronounced or they transported him or not. I
24   don't remember.
25 Q  He didn't actually pass away until the

Page 122

1    following day or sometime after the shooting.
2    Do you recall that at all?
3  A  I don't remember.
4  Q  So assuming he was still alive at the time
5    they arrived on scene, EMS would have cared
6    for Tamir?
7  A  I would imagine, yes. Hopefully.
8  Q  And EMS transported Tamir?
9  A  I don't know. That's what I'm say, I don't
10   know if they did or not.
11 Q  No reason to disagree with that or any reason
12   to dispute that EMS transported Tamir Rice?
13 A  If that's what you say I have to believe you.
14   I don't have any evidence to the contrary.
15 Q  Any reason to dispute that your EMS colleagues
16   worked to save Tamir Rice's life?
17 A  If they transported him they would have, yes.
18 Q  Any idea whether or not any of your colleagues
19   suffered trauma as a result of the Tamir Rice
20   incident, including those that treated him?
21 A  I'm not aware.
22 Q  Is EMS also responsible for treating those
23   that may be injured during times of civil
24   unrest?
25 A  Yes. We're responsible at all times.

Page 123

1  Q  So I mean, in a nutshell EMS is responsible
2    for caring for all individuals within the City
3    regardless of race, how they were injured,
4    anything?
5  A  Absolutely, yes.
6  Q  As a captain were you responsible for
7    enforcing the City's rules?
8  A  Yes.
9  Q  Were you responsible for recommending
10   discipline?
11 A  No.
12 Q  No. Were you responsible for reporting
13   misconduct?
14 A  Yes.
15 Q  What would you have done if you saw the posts
16   in Exhibit 5?
17       MR. LIVINGSTON: Objection.
18 Q  And if they were made by a subordinate of
19   yours, if they were on the page of a
20   subordinate of yours, what would you have done
21   in that instance?
22       MR. LIVINGSTON: Objection.
23 A  A subordinate of mine?
24 Q  Yes.
25 A  Nothing.

Page 124

1  Q  Nothing. You would just have left them?
2  A  No. It happens all the time.
3  Q  Have you ever seen a post before where
4    somebody is disappointed that he didn't get a
5    chance to kill a child?
6  A  I haven't seen one, no.
7  Q  So is it your contention then that it was
8    improper for Captain Threat to report it?
9  A  I never said that.
10 Q  Well, if you wouldn't have reported it -- if
11   you saw it as captain, you wouldn't have
12   reported these posts in Exhibit 5; is that was
13   your testimony is?
14 A  Yes.
15 Q  So was it then improper for Captain Threat to
16   report it?
17 A  No. That's his --
18 Q  Why wouldn't you have reported it?
19       MR. LIVINGSTON: Objection. Asked and
20   answered.
21 A  Because nowhere does it say anything about EMS
22   on there.
23 Q  Just ignore it?
24 A  Yeah.
25 Q  And as a captain you're responsible for

Page 125

1 directing and controlling and monitoring the
2 activities of your shift?
3 A Yes.
4 Q You may at times be required to supervise a
5 crisis situation?
6 A Yes.
7 Q Do you have a good working relationship with
8 your co-workers?
9 A Yes.
10 Q Was that important, as a captain, to have a
11 good working relationship with your
12 co-workers?
13 A Yes, I believe so.
14 Q Would you agree that it's inherent in EMS's
15 mission to provide assistance without
16 prejudice or bias?
17 A Absolutely.
18 Q How many employees were on your shift that you
19 oversaw as a captain, give or take?
20 A Around 40 or so, 45.
21 Q Would you agree that it's important that those
22 employees are able to trust you?
23 A That's what I strived for.
24 Q So that would be something that's important?
25 A To me, yes.

Page 126

1 Q Is it also important that you're able to trust
2 your employees?
3 A Yes.
4 Q Would it be a problem if your employees lied
5 to you?
6 A It depends what the subject matter is.
7 Q Something related to work.
8 A Again, it depends on the situation.
9 Q You agree with me that the EMS employees are
10 required or should be truthful in engaging in
11 their duties for the City, correct?
12 A Yes.
13 Q Do you agree that EMS needs the trust of the
14 community to operate efficiently?
15 A No.
16 Q You don't think the community needs to trust
17 EMS?
18 A You just said to run efficiently. No, I don't
19 believe to run efficiently. Desired.
20 Q That's desired?
21 A Yes.
22 Q Do you believe that it would be helpful for
23 EMS's operations if it had the trust of the
24 community?
25 MR. LIVINGSTON: Objection. Asked and

Page 127

1 answered.
2 A I don't think so. No.
3 Q You don't think so. So whether or not the
4 community trusts EMS is immaterial to how EMS
5 operates?
6 A I think we would still operate the same.
7 Q Why is that?
8 A Because you'd have the same people, same
9 truck, same service provider.
10 Q You recall you testified during your
11 arbitration, correct?
12 A Yes.
13 Q And do you recall that you were under oath at
14 the time of that arbitration, correct?
15 A Yes.
16 Q Let me ask you again. Would you agree with me
17 that EMS needs the trust of the community to
18 operate effectively?
19 MR. LIVINGSTON: Same objection.
20 A No.
21 Q Okay. Mark this as Exhibit 8.
22 (Defendants' Exhibit 8
23 marked for identification.)
24 Q Did you testify truthfully during your
25 arbitration, by the way?

Page 128

1 A To the best of my recollection, yes.
2 Q Okay. When you get a chance can you identify
3 for me what Exhibit 8 is?
4 A It says it's a transcript of the arbitration.
5 Q And that arbitration was held on January 18,
6 2018; is that your recollection?
7 A That's what it says on here, yes.
8 Q Can I have you flip to Page 200. So I'm
9 talking about the pages in the top right-hand
10 corner here. (Indicating.) There is
11 technically four pages on a page.
12 A Uh-huh.
13 Q Specifically I'll direct you to Line 14. You
14 see all the lines are marked there on the
15 side?
16 A Yes.
17 Q "Question: Now, you would agree with me that
18 EMS needs the trust of the community to
19 operate effectively?
20 Answer: I agree."
21 So that was a question that was posed
22 to you and your response was I agree?
23 A Yes.
24 Q Do you agree with that question?
25 A At the time -- at that time that was my

Page 129

1 opinion.
2 Q That was your opinion at that time?
3 A At that time, yes.
4 Q And now your opinion has changed?
5 A Yes.
6 Q Why has your opinion changed?
7 A Well, because we watched the police department
8 and they had no control, no support of the
9 City and they still are running effectively.
10 Q How long do you believe the police department
11 hasn't had the support of the City, the
12 community?
13 A For a while.
14 Q How long is a while?
15 A Probably at least since 2015 maybe.
16 Q 2015?
17 A Yeah, somewhere in that area.
18 Q Okay.
19 A This made it worse.
20 Q The posts made it worse?
21 A No, the Tamir Rice shooting made it worse.
22 Q The Tamir Rice shooting made it worse.
23     I'm struggling a bit. Again, your
24 arbitration was on January 18, 2018. So at
25 that moment in time you didn't believe that

Page 130

1 the police had the trust of the community,
2 correct?
3 A I don't remember.
4 Q Well, you just said that the police haven't
5 had the trust --
6 A I'm saying at that time.
7 Q Hold on, sir. Let me finish my question. You
8 said at least dating back to 2015 the police
9 have not had the trust of the community,
10 correct?
11 A I'm saying approximately then. I don't know
12 exact date. That's not something you can put
13 a date on.
14 Q Okay. The difference between 2015 and 2018 is
15 pretty significant; wouldn't you agree?
16 A It's three years.
17 Q Right.
18 A Okay.
19 Q So then if at the time of your arbitration you
20 felt that the police department didn't have
21 the trust of the community why did you agree
22 with this statement or with this question?
23 A I don't remember.
24 Q So we're clear, on January 18, 2018 you agreed
25 that EMS needs the trust of the community to

Page 131

1 operate effectively, correct?
2 A That's how I answered the question.
3 Q And that's what you believed at that moment?
4 A At that moment that's how I answered the
5 question, yes.
6 Q Is that what you believed at that time?
7 A That's what's written. I don't even recall
8 the question, to be honest with you.
9 Q Is there any reason why you would have been
10 untruthful during this arbitration?
11 A No.
12 Q So was that a truthful response at the time of
13 the arbitration?
14 A Yes.
15 Q Okay. Tell me again why your answer has
16 changed to the exact same question between
17 January 18, 2018 and today, December 12, 2018?
18 A Because as I sit here, you asked me the
19 question, that's how I feel. I'm being
20 truthful. That's how I feel right now.
21 Q And what has changed your feelings from
22 January 18, 2018 to today?
23 A I haven't been asked that question since then,
24 so to say something changed I don't know.
25 That's an opinion question. And at that

Page 132

1 particular time that was my opinion. Today
2 you asked me the same question. I don't
3 remember being asked that question, but I
4 answered that's my opinion. What changed I
5 can't tell you.
6 Q You worked for EMS for how long, sir?
7 A It would have been 21 years.
8 Q 21 years. So that particular question talks
9 about whether or not EMS needs the trust of
10 the community to operate effectively, correct?
11 A Yes.
12 Q And your answer to that question would have
13 been based in part on your 21 years of
14 experience working for EMS, correct?
15 A It's based on my opinion.
16 Q Which is in part derived from your 21 years on
17 the job?
18 A That's part of it, yeah.
19 Q And you haven't been on the job between
20 January 18, 2018 and today, correct?
21 A No.
22 Q EMS regularly interacts with the public; is
23 that a fair statement?
24 A Yes.
25     MR. VANCE: Take a brief break,

1 been disciplined by the City, was it?
2 A No.
3 Q You've been given a number of chances by the
4 City; isn't that correct?
5 A No.
6 Q No?
7 A No.
8 Q You were put on a last chance agreement at
9 some point, sir?
10 A Yes.
11 Q And generally speaking the last chance
12 agreement means that that is your last chance,
13 if you screw up again you're going to be
14 discharged; is that right?
15 A Yes.
16 Q And you did screw up again, is that right,
17 while on that last chance agreement?
18 A Yes. Yes.
19 Q And then you were not discharged though, were
20 you?
21 A No.
22 Q Rather your last chance agreement was
23 extended?
24 A Yes.
25 (Defendants' Exhibit 12

1 marked for identification.)
2 Q I'm going to hand you what has been marked as
3 Exhibit 12. Can you identify for me this
4 document, sir?
5 A Yeah, it's a missed in-service.
6 Q And this a discipline that you received?
7 A Yes.
8 Q On August 14, 2006?
9 A Yes.
10 Q And you were suspended for one eight-hour day;
11 is that right?
12 A Yes.
13 Q You grieved this discipline?
14 A No.
15 (Defendants' Exhibit 13
16 marked for identification.)
17 Q Hand you what has been marked as Exhibit 13.
18 Can you tell me what that is, sir?
19 A Yeah, this is a notice of a predisciplinary
20 hearing.
21 Q Is this actually the discipline?
22 A No.
23 Q It says at the beginning, "On June 25, a
24 predisciplinary hearing was held" --
25 A Hold on a second. Oh, yes. Okay.

1 Q And you were disciplined on June 26, 2009; is
2 that correct?
3 A Yeah, everybody that worked at that base was
4 disciplined.
5 Q And you were issued a written warning?
6 A Yes.
7 Q Did you grieve that discipline?
8 A I believe it was grieved.
9 Q Do you recall what the outcome was?
10 A No.
11 Q Did you engage in the complaint of conduct?
12 A Did I what? I'm sorry.
13 Q Was it accurate that run sheets were found on
14 clipboards and not in sealed envelopes?
15 MR. LIVINGSTON: Object to the
16 relevance. You can answer.
17 A Yes, they were. Let me see, yes. Okay.
18 Q And not sealing the run sheets in an envelope
19 is a problem because of why?
20 A Because the City doesn't like it.
21 Q Run sheets include confidential patient
22 information?
23 A The fact that they are in a clipboard instead
24 of an envelope, to me it makes no difference.
25 It's the same thing.

1 Q How so?
2 A It's not available to be viewed by anybody.
3 Q So it's important that run sheets aren't
4 available to the public?
5 A Yes.
6 Q And the information on a run sheet is
7 considered confidential?
8 A Some of it is, yes.
9 Q What about details as to your runs, like
10 what's transpired on a run, injuries suffered
11 as part of -- you know, to the people that you
12 serve, is that stuff considered confidential?
13 A There is an organization called HIPAA that
14 lists what's okay and what's not.
15 Q So providing, for example, injuries that
16 individuals suffered, that type of stuff, is
17 that problematic?
18 A No.
19 Q No. That's okay to do?
20 A Yeah.
21 (Defendants' Exhibit 14
22 marked for identification.)
23 Q Handing you what's been marked as Exhibit 14.
24 What's Exhibit 14?
25 A It's a missed in-service.

Page 141

1 Q    And you were disciplined for missing an
2      in-service day; is that right?
3 A    Yeah, there is 12 of them a year. Every time
4      you miss one you get a -- that's why there is
5      so much discipline.
6 Q    You were suspended for one eight-hour day as a
7      result of this?
8 A    Yeah.
9 Q    Did you grieve this at all?
10 A   Uh-huh.
11 Q   I'm sorry, is that a yes or no?
12 A   No. I'm sorry.
13         (Defendants' Exhibit 15
14         marked for identification.)
15 Q   I'll hand you what has been marked as Exhibit
16     15. Take a look at that, sir. What is
17     Exhibit 15, sir?
18 A   It's from 2010. It's a last chance agreement.
19 Q   This is your last chance agreement?
20 A   Yes.
21 Q   And why was it or how was it that you came to
22     be on this last chance agreement?
23 A   Well, when I voluntarily went into substance
24     or alcohol treatment, at most places they
25     encourage that, the City they discipline you

Page 142

1      for it. So when I voluntarily went in they
2      put me on a last chance agreement.
3 Q    Where was --
4 A    It's a conduct last chance agreement.
5 Q    Where was it that you went in?
6 A    Glenbeigh.
7 Q    Glenbeigh. This was a two year last chance
8      agreement; is that correct?
9 A    Yes.
10 Q   So during that two year period I think you
11     testified earlier that this last chance
12     agreement was actually extended; is that
13     right?
14 A   I don't know if this was the one that was
15     extended or if this is the extension. Yeah,
16     I'm not sure if this one is the original or
17     the extension.
18 Q   You missed time from work due to your stay at
19     Glenbeigh I'm guessing?
20 A   Yeah. Yeah. It was an in-treatment program.
21 Q   How long was it; do you know?
22 A   I don't recall. I think it was close to maybe
23     45 days.
24 Q   Was there anything that prompted you to go to
25     Glenbeigh, some significant event, something

Page 143

1      that happened?
2 A    I don't recall what was happening at the time,
3      no.
4 Q    Then do you recall what it was, what incident
5      transpired that resulted in the breach of the
6      last chance agreement?
7 A    Do I recall the incident?
8 Q    Yes.
9 A    Yes.
10 Q   What was that, sir?
11 A   Me and my wife were going through a divorce,
12     getting ready to go through a divorce and I
13     texted my older sister that I wish it was all
14     over, and she -- meaning the divorce. She
15     took that as a suicidal ideology and called
16     the Cleveland Police Department.
17 Q   Were you drunk at the time?
18        MR. LIVINGSTON: Objection.
19 A   I was drinking.
20 Q   Were you intoxicated at that time?
21 A   I don't believe so, but I was drinking.
22        (Defendants' Exhibit 16
23        marked for identification.)
24 Q   Handing you what has been marked as Exhibit
25     16.

Page 144

1 A    Okay.
2 Q    And you'll see there on the second page, what
3      exactly is Exhibit 16, sir?
4 A    It appears to be an extension of the last
5      chance agreement.
6 Q    That's dated September 8, 2011?
7 A    Yes.
8 Q    And there on the second page it talks about
9      your last chance agreement is extended an
10     additional year through June 11, 2013?
11 A   Yes.
12 Q   Did you feel as though Commissioner Eckart cut
13     you a break as related to this?
14        MR. LIVINGSTON: Objection.
15 A   Did I consider it a break?
16 Q   Yeah.
17 A   He could have fired me, yes.
18 Q   Did you think Commissioner Eckart hated you at
19     all?
20        MR. LIVINGSTON: Objection.
21 A   I don't know what he -- how he felt about me.
22 Q   Commissioner Eckart ever do anything to you
23     that was spiteful?
24        MR. LIVINGSTON: Objection.
25 A   Well, I mean --

Page 145

1      MR. LIVINGSTON: You can answer.
2  A   I don't know what he's done and what he hasn't
3      done.
4  Q   Any reason to believe that Commissioner Eckart
5      has ever been malicious to you?
6  A   I don't have any evidence of that, no.
7  Q   Did you grieve at all the discipline or the
8      extension of your last chance agreement?
9  A   No.
10 Q   What happened after your sister called the
11     police department?
12 A   They came to the house.
13 Q   And what happened at the house?
14 A   They told me they were going to take me in.
15 Q   And what was your reaction to that?
16 A   No.
17 Q   Anything else?
18 A   Yeah, we got in a huge argument.
19 Q   You got into a huge argument with the police
20     department?
21 A   Yes.
22 Q   Did you attempt to assault police officers?
23 A   I don't remember.
24 Q   Maybe, you don't know?
25 A   I think when he tried to take me, yeah, by

Page 146

1      force.
2  Q   You resisted?
3  A   Yes.  I didn't do anything wrong.
4  Q   You get charged with any crimes as part of
5      that?
6  A   No.
7      MR. VANCE: I'm going to mark
8      this Exhibit 17.
9      (Defendants' Exhibit 17
10     marked for identification.)
11 Q   Have you had an opportunity to take a look at
12     what Exhibit 17 is?
13 A   Yep.
14 Q   And Exhibit 17 is a Cleveland Police
15     Department offense/incident report dated
16     8-21-11; is that right?  Actually the date on
17     the top is 8-23-11; the date of the incident
18     8-21-11?
19 A   Yes.
20 Q   Does this relate to your sister calling the
21     police department over that incident?
22 A   Yes.
23 Q   It suggests here that you were threatening to
24     shoot yourself in the garage; is that
25     accurate?

Page 147

1  A   No, that's not accurate.
2  Q   No?
3  A   No.
4  Q   It states here also that you were on
5      depression meds including Zanax; is that
6      accurate?
7  A   No.
8  Q   Not on any depression medication?
9  A   Not on Zanax in my entire life.
10 Q   Have you ever taken any depression medication?
11 A   Yeah, I was on Zoloft.
12 Q   Zoloft?
13 A   Yes.
14 Q   When did you take that?
15 A   Years ago.
16 Q   Years ago.  Did you ever suffer from
17     depression at the time you took Zoloft?
18 A   Yes.
19 Q   But you no longer suffer from depression?
20 A   No, that's not true.
21 Q   I asked you earlier -- do you currently suffer
22     from depression?
23 A   Yes.
24 Q   I asked you earlier today if you suffered from
25     any medical conditions today.

Page 148

1  A   That's not a medical condition.
2  Q   It's not.  What exactly is depression?
3  A   Psychiatric.
4  Q   Let me ask you again.  Do you suffer to any
5      psychiatric conditions today?
6  A   Yes, depression.
7  Q   Anything else?
8  A   Generalized anxiety.
9  Q   And how long have you suffered from
10     depression?
11 A   Maybe 20 years.
12 Q   And how about generalized anxiety?
13 A   Same time.
14 Q   And when did you first start taking medication
15     for depression?
16 A   That same -- that's when I was diagnosed.
17 Q   20 years ago, give or take?
18 A   Yes.
19 Q   Have you taken any medication for your
20     generalized anxiety?
21 A   No.  Same meds.
22 Q   Same medication for both?
23 A   Yes.
24 Q   And when was it that you were taking
25     medication for depression?

Page 157

1 Q    Did you tell the officers fuck you?
2 A    Probably. I'd say possible. I don't
3      remember.
4 Q    Did you say you mother fuckers?
5 A    It's possible.
6 Q    Did you cock your arm back as if you were
7      going to throw a punch at one of the officers?
8          MR. LIVINGSTON: Objection.
9      Relevance.
10 A   I don't recall that now.
11 Q   Possible but you don't recall?
12 A   I don't remember.
13         MR. VANCE: Mark this Exhibit 19.
14         (Defendants' Exhibit 19
15         marked for identification.)
16 Q   You were living in the City of Cleveland at
17     the time of that incident, correct?
18 A   Correct.
19 Q   So that was the Cleveland Police Department
20     that had responded?
21 A   Yes.
22 Q   And when you were worked for EMS you would
23     interact with the Cleveland Police Department
24     on a regular basis?
25 A   Yes.

Page 158

1 Q    Exhibit 19, what is Exhibit 19, sir?
2 A    Discipline.
3 Q    And what is that discipline for?
4 A    Sick abuse.
5 Q    Sick leave abuse?
6 A    Yes.
7 Q    Did you receive discipline relative to that
8      sick leave abuse?
9 A    Prior to that?
10 Q   No, as part of this, this discipline.
11 A   Yes.
12 Q   There was a written warning?
13 A   Yes.
14 Q   And did you grieve this discipline at all?
15 A   I told my union to grieve it and they dropped
16     the ball and never did.
17 Q   We talked just briefly about this. Do you
18     remember Freddie Gray at all? Do you recall
19     that name?
20 A   No.
21 Q   No, you do not.
22         Do you recall that there was a state of
23     emergency declared within the city limits of
24     Baltimore?
25         MR. LIVINGSTON: Objection.

Page 159

1 A    I know there was a riot, that's all. I don't
2      remember.
3          MR. VANCE: Why don't we take a
4      break here, break for lunch.
5          (Luncheon recess.)
6              - - -

Page 160

1
2              AFTERNOON PROCEEDINGS
3  By Mr. Vance:
4 Q    Mr. Marquardt, we've now broke for lunch.
5      Back on the record again. Just to remind you
6      that you do remain under oath.
7          MR. VANCE: I'll mark this
8      Exhibit 20. Off the record for a second.
9          (Discussion off the record.)
10         MR. VANCE: Back on the record.
11 By Mr. Vance:
12 Q   Mr. Marquardt, I'm going to hand you what I've
13     marked as Exhibit 20.
14         (Defendants' Exhibit 20
15         marked for identification.)
16 Q   Take a look at this document. What this is
17     document, sir?
18 A   This is a notice of a predisciplinary hearing.
19 Q   And this is the predisciplinary hearing
20     related to the Facebook post?
21 A   Right.
22 Q   And that notice is dated February 24, 2016?
23 A   Yes.
24 Q   And did you receive this notice?
25 A   Yes, I did.

Page 161

1  Q    Did you have an opportunity to read and review
2       it before your actual predisciplinary hearing?
3  A    Yes.
4  Q    You received a -- throughout the discharge
5       process did you receive an explanation as to
6       the City's evidence related to your
7       separation?
8  A    No.
9  Q    No?
10 A    Not throughout the hearing process, no.
11 Q    I'm sorry, say that again?
12 A    What time frame are you talking about?
13 Q    Prior to your separation.
14 A    There was some brought up during this
15      predisciplinary hearing.
16 Q    And did you have a full opportunity to present
17      your side of the story as part of the
18      predisciplinary process?
19 A    Yes.
20 Q    And you actually had then -- your
21      predisciplinary hearing, was it on March 4,
22      2016?
23 A    Yes. I don't believe we rescheduled it.
24 Q    And as part of that hearing do you recall
25      presenting text messages with your ex-wife?

Page 162

1  A    Yes.
2  Q    Why was it that you presented those text
3       messages?
4  A    Because that's when you present them is during
5       the predisciplinary hearing.
6  Q    Was there a specific purpose though that you
7       wanted to use that text message exchange with
8       your ex-wife?
9  A    Yes.
10 Q    What was that?
11 A    To show that I was helping somebody at the
12      time.
13 Q    At the time of the post?
14 A    Yes.
15        MR. VANCE: Mark this as Exhibit
16      21.
17        (Defendants' Exhibit 21
18        marked for identification.)
19 Q    Going back to Exhibit 20 for a moment. That
20      predisciplinary letter, it had two
21      specifications related to posts that were on
22      your Facebook page?
23 A    Yes.
24 Q    And then it listed a number of alleged
25      violations that the City claimed that you had

Page 163

1       engaged in?
2  A    Yes.
3  Q    Exhibit 21, are these the text messages with
4       your ex-wife that you presented to the City?
5  A    Yes.
6  Q    And these were the texts you presented -- and
7       when I say presented to the City I mean at
8       your predisciplinary hearing?
9  A    Yes, I believe they are.
10 Q    When exactly were these texts exchanged in
11      terms of the date and the general time? I
12      have the first text, a least according to this
13      Exhibit 21, is February 14 at 3:30 a.m.; is
14      that right?
15 A    That's what is on here, yes.
16 Q    The last text at approximately February 14,
17      2016 at 4:59 a.m.?
18 A    Yes.
19 Q    Okay. Are these dates accurate, times
20      accurate?
21 A    I have to go by what it says. I believe so.
22 Q    Now, these texts then were actually sent 24
23      hours before Donnie was at your house and the
24      posts were actually made; is that right?
25 A    These texts were sent the night Donnie was

Page 164

1       over.
2  Q    We've already established earlier today that
3       Donnie was at your house, he came and arrived
4       at your house on February 14th at around 9:00
5       in the evening was the testimony and what we
6       established earlier today, correct?
7  A    I believe so. If that's what we went over.
8  Q    Yes. Now these text messages are from earlier
9       in the day on February 14, 2016, so
10      approximately 18 hours before he was over,
11      before you even -- not quite 18 hours. Before
12      he even came over to your house these text
13      messages were exchanged?
14 A    Then one of the dates is Wrong either on the
15      phone or the Facebook because it wasn't that
16      long.
17 Q    So in your arbitration you had stated that you
18      believe the times on these text messages were
19      incorrect. Is that what your testimony is
20      here today as well?
21 A    If it's that kind of time frame, yes, one of
22      them is off.
23 Q    Of the two which one do you believe is off?
24 A    Probably this one. (Indicating.)
25 Q    This one being the text messages in Exhibit

1   21?
2  A  Not the content. The content is correct. I
3   remember typing it. I'm talking about the
4   times that are on the phone.
5  Q  So the actual times the 2-14-16, 3:30 a.m.;
6   2-14-16, 4:20 a.m.; 2-14-16, 4:36 a.m.;
7   2-14-16, 4:59 a.m., you believe those times
8   are incorrect?
9  A  The dates at least are, if that's what you're
10   saying.
11  Q  The date, the date of February 14, 2016?
12  A  Yes. Because according to what happened, if
13   it was on the 15th then this should be the
14   15th.
15  Q  Do you have any explanation for why the date
16   is not February 15th in these texts?
17  A  The time must be wrong on the phone. I don't
18   have any idea why that's not the time or the
19   dates. Must be something wrong with the
20   phone.
21  Q  Has that ever happened to you before?
22  A  I never really paid attention, to be honest
23   with you.
24  Q  So other than the date must be wrong any other
25   explanation for that?

1  A  No.
2  Q  So the first text here with your ex-wife --
3   and Deb I'm assume, at the top that's short
4   for Debra your ex-wife?
5  A  Yes, that is correct.
6  Q  The first text here it says, "Trust me, it is
7   an L & D situation." What's L & D stand for?
8  A  Life and death.
9  Q  What was the L & D situation?
10  A  That he was having a rough time and I thought
11   he should be going in the psych ward, and he
12   hinted towards committing suicide.
13  Q  And this is --
14  A  That's what I was referring to.
15  Q  And you're talking about Donnie here?
16  A  Yes.
17  Q  Donnie was only at your house one night,
18   right?
19  A  That night, yes.
20  Q  But only once did he ever stay over the night
21   at your house?
22  A  Yes.
23  Q  We can go to the next page here. This talks
24   about, "I am with a friend that is hell bend
25   on ending his life tonight. I am truly afraid

1   to leave and do not want CPD involved. Could
2   you please answer me?" Again, that is friend
3   Donnie, your friend Donnie?
4  A  Yes.
5  Q  "I am going to psych ward with him"?
6  A  Yes.
7  Q  Is that Donnie as well?
8  A  Yes.
9  Q  And did you go to the psych ward with Donnie?
10  A  No. He wouldn't go.
11  Q  And then, "I have been tied up with a
12   patient." Is that from Deb?
13  A  Yes.
14  Q  And then these last few, "Can't pick up the
15   girls at 1. Maybe later on Monday would be
16   better."
17  A  Yes.
18  Q  "It's ok. I am stuck in a mess," Those are
19   from you?
20  A  Yes.
21  Q  So you're saying the content of texts are
22   correct?
23  A  Yes.
24  Q  This is what was actually exchanged between
25   you and your ex-wife?

1  A  Yes.
2  Q  It's just this 2-14-16 date should be 2-15-16?
3  A  Yeah. I'm not sure if the date and time are
4   wrong or just the date.
5  Q  But at a minimum the date?
6  A  Yes.
7  Q  And do you often communicate with your ex-wife
8   late at night like this?
9  A  Yes. She works night shift.
10  Q  Okay.
11  Q  So she sleeps during the day.
12  Q  And why was it that you would be up at that
13   late an hour? Is that something you typically
14   did? Would you typically stay up until three,
15   four, five in the morning?
16  A  At the particular time I was on night shift so
17   my body kind of kept me up. But in this
18   particular case it was because he was there.
19  Q  What schedule did you generally keep then when
20   you were working night shift? When were you
21   actually on the clock, assuming no overtime?
22   What was your shift?
23  A  6P to 6A.
24  Q  6 p.m. to 6 a.m.?
25  A  Yes.

Page 169

1 Q  And then you would get off, and then would you
2 then go to sleep at that point?
3 A  Yes, most times.
4 Q  And get up when?
5 A  It depends if I had to work or not.
6 Q  Do you know if you were scheduled to work on
7 February 14th, the day Donnie came over?  Did
8 you work that prior day?
9 A  No, I believe I was on vacation.
10 Q  And then were you also on vacation that
11 Monday, the 15th?
12 A  I know I was on vacation the date of the
13 initial hearing with Votypka.
14 Q  Were you on vacation that whole week?
15 A  Part of it, yeah.  I don't remember how many
16 days.  It was a short -- it wasn't like a two
17 week vacation.  It was short.
18 Q  So now on February 15th, the day you found out
19 about the text messages, you texted
20 Commissioner Carlton; is that right?
21 A  Yes, I did.
22       (Defendants' Exhibit 22
23       marked for identification.)
24 Q  Handing you what I've marked as Exhibit 22.
25 When you get a chance, can you please identify

Page 170

1 what Exhibit 22 is for me, sir?
2 A  It appears to be a partial post between me and
3 Commissioner Carlton.
4 Q  These were text messages that you provided?
5 A  Yes, some of them are cut off.  Okay.  Yeah.
6 Yes.
7 Q  Okay.  And then anything that is cut off, is
8 the full text on the next page?
9 A  That's what I was looking at.  Okay.
10 Q  So they are complete?
11 A  Okay.
12 Q  The best you recall; is that right?
13 A  Yes.
14 Q  The time for the first text here, the time
15 that you sent that, is that below the text or
16 is the time above the text; if you know?
17 A  I don't know.
18 Q  What kind of phone did you have at the time;
19 do you remember?
20 A  H -- what is this.  It's three letters.  I
21 can't remember.  It's H something something.
22 HTC.  That's what it was.
23 Q  That was the phone you had?
24 A  Yes, at the time.
25 Q  So the first text here, let's just go through

Page 171

1 that.  If you read it into the record so we
2 have it.  And that is a text from you to
3 Nicole, correct?
4 A  You want me to read it?
5 Q  Yeah, just the first one.
6 A  "Before the word gets to you I have to tell
7 you.  A jerk of a friend grabbed my phone last
8 night as I ran an errand and trying to be
9 funny made some awful Facebook posts.  My
10 friends called me today to let me know and I
11 was horrified when I read them.  These are not
12 my beliefs and I certainly did not write them.
13 I posted an apology, but I feel the damage may
14 already have been done.  Again, I just wanted
15 you to know I did not post what was written."
16       So the jerk of a friend, who are you
17 referring to there?
18 A  Donnie.
19 Q  And what errand did you run?
20 A  That's the laundry.
21 Q  That's when you were getting laundry?
22 A  Yeah, doing the laundry.
23 Q  So is that when he posted these, when you were
24 doing laundry?
25 A  That's when I originally thought he did.

Page 172

1 Q  And when did you -- and now you believe that
2 he posted them when?
3 A  When I first read them I deleted them so I had
4 no idea what time they were posted so I
5 believe he did it when I was doing laundry.
6 Then when I got copies of the actual posts, a
7 hard copy, then I realized that they were done
8 later in the day.
9 Q  Who did you get a hard copy of the posts from?
10 A  I asked a couple people.  I don't remember who
11 said.  I asked Wearstler and -- I think
12 Wearstler may have sent it to me.  John
13 Wearstler.
14 Q  How did he send those to you; do you recall?
15 A  No, I don't.
16 Q  Do you still have those complete posts?
17 A  No.
18 Q  What did you do with them?
19 A  Probably deleted them.
20 Q  Do you recall when you deleted them?
21 A  No.
22 Q  Before or after your separation?
23 A  It would have been before.
24 Q  Why did you delete them?
25 A  Cuz space reasons.  I delete all my stuff.

Page 177

1 Q   Do you recall beginning with after "Is your
2       friend able to send a letter; that would go a
3       long way," do you recall the text message
4       after that? So the text messages that you
5       provided, they end there.
6 A   Yes.
7 Q   And then Commissioner Carlton has a record of
8       another text message from you where you say,
9       "I will take care of him in my own way. No,
10      he will not do that under any circumstances.
11      Like I said, I'll deal with him." Do you
12      recall texting Commissioner Carlton that?
13 A   No, I don't recall but I don't deny it either.
14 Q   What about the next one, "He is afraid it will
15      end up on the news and he will be labeled as a
16      racist. Although the post was not criminal in
17      any way, it was very insensitive and I do not
18      want anyone attempting to kill him over this."
19      Do you recall sending that text message to
20      Commissioner Carlton?
21 A   No, I don't. I don't deny it either.
22 Q   Same thing with the next text message. At
23      some point you texted Commissioner Carlton
24      what the post was; did you not?
25 A   Yes.

Page 178

1 Q   And you did that that day?
2 A   I believe so, yes.
3 Q   And that post is -- or at least that text
4       appears to be the substance of the post?
5 A   I don't remember if she asked for it or if I
6       just sent it to her.
7 Q   Okay. But you recall texting her?
8 A   I believe I did, yes.
9 Q   How about "That was the post..... I feel so
10      bad right now;" do you recall texting her
11      that?
12 A   No, but I may have.
13 Q   Don't deny sending her that text?
14 A   Right, I'm not denying it.
15 Q   And then the next one, "Do you now understand
16      why I am so upset?"; do you recall texting her
17      that?
18 A   I kind of remember that, yes.
19 Q   And then on March 19th presumably 2016 did you
20      text Commissioner Carlton about a story that
21      aired on Channel 19 about her? Take your
22      time. It's the second to last text.
23 A   Yes, I believe I texted her that, yes.
24 Q   Is that how you felt at the time?
25 A   Yes.

Page 179

1 Q   It says "My girls respect you," that your
2       girls respected Commissioner Carlton; is that
3       accurate?
4 A   Yes, they went to the same school with her
5       daughter.
6 Q   And did you respect Commissioner Carlton?
7 A   Yes.
8 Q   Did you have a good relationship with
9       Commissioner Carlton?
10 A   Yes.
11 Q   And was that true as of through your
12      separation, or as of your separation?
13 A   Before the separation.
14 Q   Okay. So up until the point you were
15      separated you had what you would classify as a
16      good relationship with Commissioner Carlton?
17 A   Yes.
18 Q   Do you have any reason to believe that
19      Commissioner Carlton hated you for any reason?
20 A   No.
21 Q   Any reason to believe that Commissioner
22      Carlton would act maliciously towards you?
23 A   I don't have any evidence of that.
24 Q   Any reason to think that Commissioner Carlton
25      acted with ill will toward you?

Page 180

1 A   I believe it was an overreaction is what I
2       believe.
3 Q   But not necessarily out of ill will toward you
4       as a person?
5 A   I don't think it was a personal attack.
6 Q   And then Thursday, March 17, that was I
7       believe the day after you received notice of
8       your separation. Thursday, March 17, 2016.
9       Do you recall sending that text message to
10      Commissioner Carlton?
11 A   Yes, I do.
12 Q   Flipping back to the first page, the second
13      text from the bottom, it says "He's afraid it
14      will end up on the news and he will be labled
15      as a racist." Labeled spelled a little wrong
16      but I'm assuming that's what was meant. He,
17      is that referring to Donnie?
18 A   It appears so, yes.
19 Q   And did Donnie express this to you at any
20      point in time?
21 A   I don't recall it but if I wrote it he must
22      have.
23 Q   When we talked earlier you didn't testify that
24      he had said anything along these lines; do you
25      recall that?

Page 181

1 A    Yes.
2 Q    So do you have a different memory now what you
3      spoke to him about at McDonald's?
4 A    This is going to be clearer because this is
5      right when it happened, as opposed to my
6      memory today.
7 Q    Unless, of course, this is untruthful in which
8      case then it would not be accurate?
9 A    I have no reason to believe this is
10     untruthful. I would say I just don't remember
11     it.
12 Q   But you have no recollection of Donnie ever
13     saying anything like that?
14 A   I have no recollection, no.
15 Q   And you're not even sure whether or not this
16     was texted before or after you saw Donnie at
17     McDonald's; do you know?
18 A   I want to say -- I can't say with 100 percent
19     certainty but I want to say the text to Nicole
20     came afterwards.
21         (Defendants' Exhibit 24
22         marked for identification.)
23 Q   Handing you what we have marked as Exhibit 24.
24     What is Exhibit 24, sir?
25 A   Termination letter.

Page 182

1 Q    That's dated March 16, 2016?
2 A    Yes.
3 Q    And you received this?
4 A    Yes.
5 Q    And did you grieve your discharge?
6 A    Yes. Yes.
7 Q    And you had an arbitration. There was an
8      arbitration conducted before a neutral
9      arbitrator that was selected by the City and
10     your union?
11 A   Yes.
12 Q   And during that arbitration you had a full
13     opportunity to present your side of the story
14     to the City?
15 A   Yes.
16 Q   And you testified during that arbitration?
17 A   Yes.
18 Q   And were you required to testify truthfully
19     during that arbitration?
20 A   Yes.
21 Q   Were you truthful during that arbitration?
22 A   To the best of my knowledge, yes.
23 Q   And that was closer in time to the incident
24     than we are today. So is it fair to say,
25     based on your comments earlier, that your

Page 183

1      testimony during your arbitration would be
2      more accurate than what you can recall right
3      now?
4 A    I didn't say that.
5 Q    You suggested that the text message that was
6      on the last exhibit would likely be more
7      accurate than what you recall today because
8      that was closer in time.
9 A    I was talking about that one, not a general.
10 Q   As a general matter you don't believe your
11     arbitration testimony would be more accurate
12     than your testimony here today?
13 A   Not necessarily. Depends on the question.
14 Q   And the Arbitrator ultimately decided to
15     uphold your discharge?
16 A   Yes.
17 Q   And you received Exhibit 24, correct?
18 A   What? I'm sorry.
19 Q   Exhibit 24, you received this document, right?
20 A   Yes, I did. I signed for it.
21 Q   And did you text anyone following your receipt
22     of this decision?
23 A   I'm sure I did.
24 Q   Why was that?
25 A   Because I lost my job.

Page 184

1 Q    Did you text anyone at the City?
2 A    I'm sure I did.
3 Q    Do you remember who you texted at the City?
4 A    Probably a lot of people.
5 Q    Anybody you recall specifically?
6 A    I'm sure I texted my friends.
7 Q    Okay. Anyone else?
8 A    I said probably. Probably a lot of people.
9 Q    Anybody else that you can recall that you
10     think you texted?
11 A   Like I said, I don't know exactly who.
12 Q   Do you still have any of those text messages?
13 A   No.
14         (Defendants' Exhibit 25
15         marked for identification.)
16 Q   Handing you what has been marked as Exhibit
17     25. I wanted to ask you a few specific
18     questions about 25. First, what is Exhibit
19     25, sir?
20 A   It appears to be an arbitration decision by
21     the Arbitrator.
22 Q   That arbitrator was Robert Stein?
23 A   Yes.
24 Q   And this was the decision relative to your
25     termination grievance, correct?

Page 185

1 A    Yes.
2 Q    And have you seen this decision before?
3 A    Yes, I have.
4 Q    Would you agree with me that the Arbitrator
5      determined you refused to accept any personal
6      responsibility for the loathsome and racist
7      remarks on Facebook?
8 A    That's what he wrote.
9 Q    Would you agree with me that the Arbitrator
10     determined your testimony about Donnie was
11     implausible in light of the evidence and what
12     is at stake?
13 A   That was his opinion, yes.
14 Q   Would you also agree with me that the
15     Arbitrator found that you made the post?
16 A   That was his opinion, yes.
17 Q   Now, before the arbitration determination came
18     out you filed a complaint in federal court,
19     correct?  That's why we're here today?
20 A   Before the arbitration?
21 Q   Yeah, before the arbitration decision.
22 A   Yes, sir, I believe it was before.
23 Q   The arbitration decision, just so the record
24     is clear, was dated, it appears to be the
25     April 23, 2018; is that accurate?

Page 186

1 A    Yeah, I have no reason to believe it's not.
2          MR. VANCE: Mark Exhibit 26.
3          (Defendants' Exhibit 26
4          marked for identification.)
5 Q    What is Exhibit 26, sir?
6 A    Seems to be a notice of a federal court
7      hearing.
8 Q    Is this your complaint you filed relative to
9      this lawsuit?
10 A   Let's see.
11 Q   Look at the first page, if you can.  The
12     caption.
13         MR. LIVINGSTON: I'll object to the
14     extent that he's not a lawyer and he did not
15     prepare this document.
16         MR. VANCE: This is a complaint
17     that was filed on his behalf.  I would expect
18     that he would at least have been aware of it
19     and seen it before today.
20 A   Yeah, I'm aware of it.
21 Q   Have you seen this document before today?
22 A   Yes.
23 Q   And you understand that this complaint puts
24     forth facts as if they were true; is that
25     correct?

Page 187

1 A    Yes.
2 Q    Is that your understanding?
3          Let's flip to Paragraph 15, if we
4      could.
5 A    Which one?  Which document are you on?
6 Q    Same document, Exhibit 26.
7 A    Which page?
8 Q    Paragraph 15.  So it's on Page 3.
9 A    Okay.  Sorry.
10 Q   Paragraph 15, do you see that?
11 A   Yes.
12 Q   It says, "Specifically, on the evening of
13     February 13, 2016, an acquaintance of
14     Plaintiff's known to him only as Donnie
15     arrived unannounced at Plaintiff's home,
16     seeking help."  Do you see that?
17 A   Yes.
18 Q   We established earlier that Donnie actually
19     arrived unannounced at your home on February
20     14th, correct?
21 A   Yes.
22 Q   So for Paragraph 15 the reference to February
23     13 is incorrect?
24         MR. LIVINGSTON: Objection.
25 A   Yes.

Page 188

1 Q    Paragraph 17 states that you stayed up through
2      the night of February 13th and into the
3      morning of February 14th with Donnie.  Again,
4      February 13th is incorrect?
5 A    Yes.
6 Q    And February 14th is incorrect?
7 A    Yes.
8 Q    That should actually read, according to your
9      testimony, February 14th and into the morning
10     of February 15th, correct?
11         MR. LIVINGSTON: Objection.
12 A   It appears to be, yes.  That's what -- judging
13     from the evidence, the stuff that was
14     submitted, yes.
15 Q   Your testimony from what we've discussed
16     earlier, correct?
17 A   Yes.
18 Q   Okay.  Paragraph 18, talks about "During the
19     early morning hours of February 14, 2016,
20     while assisting Donnie..." That was actually
21     the early morning hours of February 15, 2016,
22     correct?
23 A   Yes.
24 Q   So that reference in Paragraph 18 to February
25     14th is inaccurate?

Page 193

1　way to your employment or your separating from
2　the City?
3　A　That she's been charged with a crime?
4　Q　Yes, that's what the question is.
5　A　I have no idea.
6　Q　Are you aware of whether or not Ms. Carlton
7　has been convicted of any crime related to
8　your employment or separation?
9　A　Not that I'm aware of.
10　Q　Are you aware of anyone at the City of
11　Cleveland that's been convicted of a crime
12　related to your separation?
13　A　Not that I'm aware of.
14　Q　Are you aware of anyone at the City of
15　Cleveland that's been convicted of a crime
16　related in any way to your employment with the
17　City?
18　A　Not that I'm aware of.
19　Q　Do you have any reason to believe that
20　Commissioner Carlton's discharge or that your
21　discharge was a crime?
22　A　Yes, I do believe it was.
23　Q　What crime do you believe was violated?
24　A　Violation of my civil rights.
25　Q　It's a criminal violation you're suggesting?

Page 194

1　A　I'm not sure if it's criminal or civil.
2　Q　Do you have any reason to believe that
3　Commissioner Carlton thought your discharge
4　was a crime?
5　　　MR. LIVINGSTON: Objection.
6　A　I don't know what she was thinking.
7　Q　You can't speak to Commissioner Carlton's
8　thoughts?
9　A　Yes.
10　Q　Or what she may have believed, correct?
11　A　Right. I don't want to do that.
12　Q　Go to Page 9. See where it says Count 6?
13　A　Yes.
14　Q　Paragraph 53 refers to rules and regulations;
15　do you see that?
16　A　Yes.
17　Q　What rules and regulations are you referring
18　to there?
19　　　MR. LIVINGSTON: Objection. He's not
20　a lawyer. He didn't draft the complaint.
21　　　You can answer.
22　A　I'm not sure what I meant.
23　Q　Okay. So you don't know offhand what rules
24　and regulations you claim are violated?
25　A　I'm trying to think if this was City rules and

Page 195

1　regulations it was referring to. In that case
2　it would be progressive discipline and stuff
3　like that.
4　Q　Anything other than progressive discipline
5　that you know of?
6　A　No, I don't know.
7　Q　What about in 53, Subparagraph A, it talks
8　about, "The policies operate as an
9　unconstitutional prior restraint on the
10　dissemination of constitutionally protected
11　expression." What policies are you referring
12　to there?
13　A　I didn't write this.
14　Q　So do you know what policies are being
15　referenced there?
16　A　No.
17　Q　Do you know what policies or do you have an
18　understanding of what policies that you're
19　alleging are unconstitutional?
20　　　MR. LIVINGSTON: Objection. Asked and
21　answered.
22　A　I would -- I mean, I can speculate.
23　　　MR. LIVINGSTON: You don't have to
24　speculate.
25　A　No, I don't.

Page 196

1　Q　So as you sit here today it's unclear to you
2　what policies you're alleging violate the 1st
3　and 14th Amendment, correct?
4　A　Yes.
5　Q　Do you want to go to work for the City again?
6　A　Yes.
7　Q　Do you have any other claims that you're
8　alleging against the City other than those
9　that are outlined in Exhibit 26?
10　A　Everything is in here.
11　Q　So any claim that you may have is in Exhibit
12　26, your complaint?
13　A　Yes.
14　Q　Real quick, as to Count 5, it's going to be on
15　Page 8. You see Paragraph 50 there?
16　A　Yes.
17　Q　It alleges that, "The City has failed to train
18　or inadequately trains its supervisory
19　employees, including but not limited to
20　Defendant Carlton..." And it goes on to say
21　training as to constitutionally protected
22　speech. Do you see that?
23　A　Yes.
24　Q　What other supervisory employees are you
25　referring to? Are there any others?

Page 197

1    MR. LIVINGSTON: Objection. He didn't
2    prepare this document. He's not a lawyer.
3    You can answer if you know.
4  A  Are you talking -- could you ask me that one
5    more time?
6  Q  Paragraph 50 refers to supervisory employees,
7    including but not limited to Defendant
8    Carlton. Who are the other supervisory
9    employees, if any, that you're referring to in
10   Paragraph 50?
11 A  It was a number of employees. There is admin
12   supervisors and field captains.
13 Q  Which ones did you feel that the City of
14   Cleveland failed to train or inadequately
15   trained other than Commissioner Carlton?
16   MR. LIVINGSTON: Same objection.
17 A  I don't think there is any training, so all of
18   them.
19 Q  So your testimony is all EMS supervisors?
20 A  I don't recall -- I don't recall who exactly I
21   was referring to in here.
22 Q  Okay. So your Facebook information that was
23   provided, I know you suggested that your
24   attorney downloaded that for you. Do you have
25   any reason to believe that what Facebook would

Page 198

1    have provided your attorney was inaccurate?
2  A  I haven't read it so I don't know, but I
3    don't --
4    MR. VANCE: Maybe, Bill, you can
5    answer this for me. Was anything withheld
6    from what was downloaded from Facebook?
7    MR. LIVINGSTON: I didn't have any
8    role in producing it. I believe that was
9    Mr. Shafron's purview.
10   MR. VANCE: Will we be able to
11   find that out?
12   MR. LIVINGSTON: Of course. I know he
13   would have handed over everything that he was
14   required to.
15   MR. VANCE: Let's take a quick
16   break here.
17   (Short recess.)
18   MR. VANCE: Back on the record
19   please.
20 By Mr. Vance:
21 Q  Mr. Marquardt, what I'd like to do now is I'd
22   like to go through documents that were
23   received from Facebook and subsequently
24   produced by your counsel, okay?
25 A  Yes.

Page 199

1  Q  These are all from the information that was
2    downloaded and provided to us from your
3    Facebook page.
4    Remind me when you update your status,
5    that's public; it's on your page, or at
6    least --
7  A  It's just your friends.
8  Q  To your friends on your page, correct?
9  A  Right. It's not public.
10   MR. VANCE: This is 27.
11   (Defendants' Exhibit 27
12   marked for identification.)
13 Q  Do you see these two status updates?
14 A  Yes.
15 Q  Do you recall making these status updates to
16   to your Facebook page?
17 A  I remember the first one. The second one I
18   don't recall.
19 Q  The OMG one you don't recall?
20 A  No.
21 Q  And did you shut down your Facebook page for a
22   while?
23 A  For a short time, yes.
24 Q  Do you have any reason to believe that you did
25   not make the status update, the second one?

Page 200

1  A  I can't say definitively truly I believe that
2    I did it.
3  Q  So your interview with Jim Votypka was also on
4    February 18, 2016. Do you recall whether or
5    not this status update was before or after
6    that interview?
7  A  I don't recall.
8  Q  Okay.
9  A  I don't remember if my hearing was in the
10   morning or the afternoon.
11   (Defendants' Exhibit 28
12   marked for identification.)
13   MR. VANCE: Mark this is 28.
14 Q  This wasn't actually part of what came from
15   counsel. This was something that was printed
16   off I believe by you on the day of your
17   meeting with Jim Votypka. Do you recall
18   printing that? I know you said you gave
19   access or you and Sergeant Chumita looked
20   through your Facebook page that day?
21 A  Yes.
22 Q  Do you recall that?
23 A  Yes, I did that.
24 Q  And do you recall if Sergeant Chumita printed
25   out that Facebook page that day?

Page 205

1 Q   Do you ever make any inconsiderate posts?
2 A   I'm sure I have.
3 Q   Go to the next page please. Bottom comment.
4     "Don't understand why they have to put black
5     in front of panther. There are no other color
6     panthers." What was that about?
7         MR. LIVINGSTON: Objection.
8 A   A panther. The animal. A panther.
9 Q   Would you relate it to the Black Panthers
10    though, I'm assuming?
11 A  No.
12 Q  No, no relation to the Blank Panthers?
13 A  No, none at all.
14 Q  Next page, first full comment. "Jamie
15    Marquardt commented on Shelley Marquardt
16    Nowak's post." Shelley Marquardt Nowak,
17    that's your older sister?
18 A  Younger sister.
19 Q  Younger sister. It says -- I'll read it.
20    "Let us use Cleveland as an example. The last
21    few good shootings by police officers (meaning
22    they did their job right and the shooting was
23    justified) those officers went to court and
24    were cleared of any wrongdoing. The City of
25    Cleveland fired both of them anyways." What

Page 206

1     is that in reference to?
2         MR. LIVINGSTON: Objection.
3 A   I don't remember what shootings it was.
4 Q   Just don't recall?
5 A   I don't recall what shootings they were for
6     sure referring to. And there is no clue in
7     there to tell me.
8 Q   Good shootings by police officers?
9 A   That's a term -- go ahead.
10 Q  Go ahead. What's the term? What's that mean?
11 A  Good shooting means they didn't do anything
12    wrong. It doesn't mean good like happy.
13 Q  That was a comment that you made though?
14 A  I don't recall but I believe I made that.
15 Q  The word queer, is that a derogatory term for
16    a homosexual?
17        MR. LIVINGSTON: Objection.
18 A  No, I don't think so.
19        MR. LIVINGSTON: Do you have any
20    straight relevance to this case in this line
21    of questioning?
22 A  That's my answer. No, I don't believe it
23    specifically refers to homosexuals.
24 Q  You don't believe it's a derogatory term?
25 A  That's not what you asked me.

Page 207

1 Q   I asked you if you thought the term queer was
2     a derogatory term for homosexuals?
3         MR. LIVINGSTON: Objection.
4 A   It could be.
5 Q   Bottom of the next page, you made a comment
6     here to Patrick Semancik. You said, "Did you
7     Hear the NFL announcers try to describe smear
8     the queer this weekend?"
9 A   Where are we at?
10 Q  The bottom of the following page.
11        MR. LIVINGSTON: Objection.
12 A  Okay. What's your question?
13 Q  Did you write that as well?
14 A  I don't recall, but I don't see why I wouldn't
15    have. Smear the queer -- the reason I know I
16    probably wrote it is smear the queer is a game
17    we used to play when we were kids.
18 Q  Same thing as kill the carrier?
19 A  I don't know. Smear the queer was whoever had
20    the ball, you tackled them. Whoever picked it
21    up and ran you tackled them. It didn't have
22    the impact -- the word didn't have the impact
23    it does now it seems to be like. You know,
24    you never hear kids say that today.
25 Q  And you noticed that the NFL was specifically

Page 208

1     trying not to say that, correct?
2 A   I believe so.
3 Q   Because they realize it's probably not the
4     proper thing to say?
5 A   I don't know what I meant by it. Smear the
6     queer is referring to a game we played as a
7     kid.
8 Q   You also talked about in that post, "Agree my
9     man. Back to a time when people were not
10    fucking sensitive." Do you see that?
11 A  Is that on the same page?
12 Q  Same post.
13        MR. LIVINGSTON: Mind if I direct him?
14        MR. VANCE: Sure.
15        MR. LIVINGSTON: Speed things along.
16 A  Yes, I see it.
17 Q  Would you say that?
18 A  I possibly did, yeah.
19 Q  No reason to deny that you did?
20 A  No.
21 Q  Let's go to the next page, middle of the next
22    page. "Jamie Marquardt commentated on Annie
23    Latessa's post." Who is Annie Latessa, first?
24 A  I have no idea.
25 Q  It says, "Tamir Rice is dead. Good." Is that

Page 209

1  a comment you made, sir?
2 A  No.
3 Q  Any reason to believe that that was not a
4  comment you made?
5 A  I don't even know who Annie Latessa is.
6 Q  I don't know how but Facebook produced this as
7  part of your comments, sir.
8 A  I don't recall making that.
9 Q  Do you have any reason to dispute that you
10  made it?
11 A  Yes, I dispute that I would have made that
12  comment.
13 Q  Any explanation for how this comment would
14  have been provided by Facebook, sir?
15 A  I have no -- I can't answer that. I don't
16  know. I wouldn't have said that and I don't
17  have any idea who Annie Latessa is.
18 Q  But no explanation for how this ended up in
19  your comments?
20 A  No.
21 Q  How about the next comment right below that,
22  "Awesome picture guys. By the way Shelly, my
23  daughter ended up a gymnast. Now I know what
24  you went through." Did you make that comment?
25 A  Sure. I mean possible. His daughter is a

Page 210

1  gymnast.
2 Q  Jerry Snyder's is?
3 A  His wife -- we all went to school together and
4  his wife is a gymnast, so obviously they had
5  to have some knowledge. I would say I wrote
6  that.
7 Q  Who is Hodggy? Do you know who Hodggy is, by
8  chance?
9 A  Hodggy?
10 Q  Hodggy. "I just know Hodggy gets to eat this
11  week." H-o-d-g-g-y. It's above the "Tamir
12  Rice is dead, good" post.
13 A  I think Hodggy is a character on South Park,
14  if I remember right. It's possible.
15 Q  Do you believe you made that comment?
16 A  I don't remember making that comment, no.
17 Q  Any reason to deny that you made that comment?
18 A  No, except I don't even know what it's
19  referring to, to be honest with you.
20 Q  Go to the next page please. Who is Rhonda
21  Honeycutt Gregory?
22 A  My best friend from high school.
23 Q  Male, female?
24 A  Female.
25 Q  The first full post there on that page, could

Page 211

1  you read that please?
2  MR. LIVINGSTON: Just to clarify, it's
3  a comment.
4  MR. VANCE: Comment, yes.
5  MR. LIVINGSTON: I'm going to object
6  to this as well.
7 A  "This whole case really pisses me off. If you
8  were a police officer and a suspect reaches in
9  his waistband and grabs a gun, would you say,
10  'excuse me, could I see some ID to see how old
11  you are and examine that gun to see if it is
12  real or not?' These undereducated retards
13  need to worry more about parenting and less
14  about police misconduct. I am talking about
15  the politicians when I say that."
16 Q  When was that comment made?
17 A  I believe -- well, I don't know if the date is
18  before or after the comments. It's June 3rd
19  either at 2:09 p.m. or 1:34 p.m.
20 Q  June 3, 2015?
21 A  2015, yes.
22 Q  Did you make that comment, sir?
23 A  I could have, yes.
24 Q  Any reason to deny that you made that comment?
25 A  No.

Page 212

1 Q  What is this referring to?
2 A  I don't know. A police shooting of some type.
3 Q  The police shooting of Tamir Rice?
4 A  It doesn't say that.
5 Q  But you don't have a recollection?
6 A  I --
7 Q  Hold on a second. We discussed earlier today
8  the Tamir Rice shooting had to deal with
9  whether or not the gun was real, correct?
10 A  We talked about that, yes.
11 Q  And it also had to do with a 12 year old boy?
12 A  Yes.
13 Q  And there was some discussion in the public as
14  to whether or not he truly looked like he was
15  12 years old or not?
16  MR. LIVINGSTON: Objection.
17 A  I don't remember talking about that.
18 Q  Do you recall that being the case --
19 A  No.
20 Q  -- at the time?
21 A  At the --
22 Q  That people say aw, he doesn't look 12, this,
23  that or the other?
24 A  It was on the news, yeah.
25 Q  But you can't confirm that this is related to

Page 213

1     Tamir Rice?
2 A  It sounds like it to me.
3 Q  Let's go to the next page, please, sir.
4     Second post. "Jerry Marquardt commented on
5     Johnny Mac's post." Can you read that for me
6     please?
7         MR. LIVINGSTON: Objection. Go ahead.
8 A  "Liberal judges with light sentences that
9     release violet animals back on the streets.
10    Very rarely do these pistol carrying hood rats
11    not have a long criminal record."
12 Q  Hood rats, that's the same phrase that was
13    used in the post that you were discharged for;
14    was it not?
15 A  It's commonly used.
16 Q  Let's go to the next page. That last post,
17    that was on April 12, 2015?
18 A  If the date follows the comment, yes.
19 Q  It appears that the date follows it.
20 A  If that's the case, then yes.
21 Q  The bottom comment there. It says, "I am
22    tired of the media attacking public safety
23    forces. If you are so good at your jobs, you
24    would do some investigating and find the root
25    cause. Police shootings are the criminals and

Page 214

1     their parents fault." Is that how you feel?
2         MR. LIVINGSTON: Objection.
3 A  It appears at this particular time, yes.
4 Q  And that's something that you had -- this was
5    a comment you made?
6 A  I could have, yes.
7 Q  Any reason to deny that you made this comment?
8 A  No, I don't have any reason to deny it.
9 Q  Let's go to the next page please. The last
10    comment there. That's a comment on your own
11    post. It says --
12 A  Yeah, I'm not sure exactly what that means.
13 Q  It means that you have a post up on your page
14    and then you comment on your own post, right?
15 A  Yeah. That sounds right.
16 Q  Okay. So that's something that you're putting
17    out to all your Facebook people, right?
18 A  Yes, it would.
19 Q  Can you read that post for me, or that comment
20    please?
21 A  "We used to shoot each other with BB guns. I
22    remember having to go home and tell my mom one
23    was under my skin. I got my ass whipped.
24    Yet, I would never dream of going to a park
25    and pointing it at someone. Just my friends."

Page 215

1 Q  "LOL"?
2 A  "LOL".
3 Q  "I would never dream of going to a park and
4    pointing it at someone;" is that in reference
5    to Tamir Rice?
6 A  Sounds like it.
7 Q  Now, you testified and you told Mr. Votypka
8    that you never posted anything publicly about
9    Tamir Rice on your Facebook page.
10 A  I didn't.
11 Q  But if this related to Tamir Rice then this
12    was a comment --
13 A  I forgot about this one.
14 Q  So that testimony to Mr. Votypka was not
15    truthful?
16 A  At the time I did not remember doing this,
17    this post.
18 Q  But now that you've seen it you realize that
19    the testimony to Mr. Votypka was untruthful?
20 A  No, it wasn't untruthful. I forgot about
21    this. I didn't lie to him.
22    It wasn't true though?
23         MR. LIVINGSTON: Objection. Asked and
24    answered.
25 A  Yeah. Like I said, at the time I answered

Page 216

1     that question I was being truthful. Now that
2    you've shown me this I would answer
3    differently.
4 Q  So what you said to Mr. Votypka then was not
5    accurate?
6 A  Not with the facts that you presented me with
7    today, no.
8 Q  Let's go to the next page please, sir. Post
9    that says February 18, 2015 at the top. Again
10    this is you commenting on your own post. It
11    says, "I would kill these people myself given
12    the chance. They are pure evil." Any idea
13    what that is in reference to?
14 A  I have no idea. I'd have to see the original
15    post.
16 Q  Well, this is a reference to you saying you'd
17    kill someone, right?
18 A  Apparently, yes. I don't have any idea.
19 Q  Let's go to -- did you make that post?
20 A  I don't remember.
21 Q  Or that comment?
22 A  I don't remember making it. Maybe if I knew
23    what the reason was or what it was about.
24 Q  Well, any reason to believe you didn't make
25    it?

| | |
|---|---|
| Page 217 | Page 219 |

**Page 217**

1 A   I can't answer that one way or the other
2 because I don't even know what I'm talking
3 about.
4 Q   Go to the next page please. Top comment,
5 "Collinsworth is a throwback faggot. I can't
6 stand his stupid ass."
7      MR. LIVINGSTON: Objection.
8 Q   Is that what it says?
9 A   That's what it says.
10 Q   Is that a comment that you made?
11 A   I don't remember but I'm not denying it.
12 Q   Let's go to the next page please. Top post.
13 This is you commenting on your own post. This
14 is, "Just like downtown Cleveland when they
15 stood in front of the freeway and would not
16 let anyone on. Sorry but there was no
17 crosswalk there, your ass is getting run over
18 unless you move. We will have it out in court
19 while you sit all busted up in your wheelchair
20 with Friedman, Domiano & Smith. I will be on
21 the other side saying, 'Stay the fuck out of
22 the middle of the road. It is for cars, not
23 liberal castrated college students. December
24 11, 2014." Do you see that?
25 A   Yes.

**Page 218**

1 Q   Is this a comment that you made on your own
2 post?
3      MR. LIVINGSTON: Objection.
4 A   Probably. I was just being funny. It was
5 nothing serious.
6 Q   And this was --
7 A   This was about the protest downtown.
8 Q   About the Tamir Rice protest, right? There
9 was a protest about Tamir Rice and they
10 blocked off the Shoreway?
11 A   I don't recall what the protest was about.
12      MR. LIVINGSTON: Objection.
13 Q   So you're suggesting you would run these
14 people over, that was a joke?
15 A   It was a joke, yes.
16 Q   Were you upset by the protests that were being
17 had?
18      MR. LIVINGSTON: Objection.
19 A   I don't recall at the time. I don't agree
20 with them.
21 Q   Do you feel that people shouldn't have been
22 protesting?
23 A   No, I believe the people should be lawfully
24 protesting. That was not lawful.
25 Q   Let's go to the next page please.

**Page 219**

1      By the way, so that last post, that was
2 December of 2014, that was the month after
3 Tamir Rice had passed away, correct?
4 A   I don't recall.
5 Q   We established earlier that he passed away
6 November of 2014; do you recall that?
7 A   Yes.
8 Q   Okay. First full comment on the next page
9 there. December 5, 2014. It says, "Protest
10 the guy choked by police. I agree. But,
11 people want to protest the kid in Cleveland
12 that clearly reached for his gun and began to
13 pull it out of his waistband after being told
14 to put his hands up. Yes, the kid was 12
15 years old, but he did not look 12 and he had a
16 gun. Anyone with a gun can kill someone
17 whether they are 12 or 90. Police have a
18 second to decide." Is that related to Tamir
19 Rice, sir?
20 A   It sounds like it.
21 Q   Any reason to believe it did not relate to
22 Tamir Rice?
23 A   I have no reason to believe it.
24 Q   Did you make this comment, sir?
25 A   I could have.

**Page 220**

1 Q   Any reason to believe you did not?
2 A   What's that?
3 Q   Any reason to believe that you did not?
4 A   I just don't remember it but I'm not saying I
5 didn't do it.
6 Q   Let's go to the next page please. It's the
7 first full post. This is comment on your own
8 post. Do you see that?
9 A   Yes.
10 Q   And it was made on November 24, 2014,
11 2:15 a.m. Do you see that?
12 A   Yes.
13 Q   That's the day after Tamir Rice died?
14 A   Okay.
15 Q   It says, "Baby" -- how do you pronounce that?
16 A   Bebe.
17 Q   "Bebe, fuck these little ghetto rats that kill
18 innocent people."
19      ghetto rats. That sounds familiar.
20 I've seen that before. That's also in the
21 post that you were discharged for; was it not?
22 A   Yeah, it's a common term.
23 Q   Let's start from the beginning. "Bebe, fuck
24 these little ghetto rats that kill innocent
25 people." Who were you ever referring to

Page 221

1    there?

2 A   I don't remember.

3 Q   The day after Tamir Rice died and you don't

4    know who that was about?

5        MR. LIVINGSTON: Objection.

6 A   He didn't kill anybody, so I'm not referring

7    to him. I don't know who I was referring to.

8 Q   "You, as I would, would bust our kids asses

9    before they reached that point. Whatever

10   happening in cracking a board across their

11   kids ass if they got out of pocket."

12       So is this post in any way related to

13   Tamir Rice, sir?

14 A  I don't see that at all.

15 Q  Do you recall whether or not it was?

16 A  There is nothing in there that says anything

17   about it.

18 Q  And we don't have your actual posts because

19   you have not produced them, correct?

20 A  Because what?

21 Q  Your posts.

22 A  I don't know what the original post said.

23 Q  Okay. Let's go to the next page please.

24   Bottom of that. This is Jamie Marquardt

25   commented on his own post?

Page 222

1 A   Okay.

2 Q   This is actually on the day Tamir Rice died,

3    November 23, 2014. It says, "Certain acts as

4    a criminal will get you killed no matter what

5    color you are. Pulling a gun on a police

6    officer is one of them." That relate at all to

7    Tamir Rice, sir?

8 A   I don't know. I would make that statement,

9    but --

10 Q  Beg your pardon?

11 A  I would -- I mean, I'm not saying, I just

12   don't know who it was referring.

13 Q  Coincidental that it happened to be the same

14   day?

15 A  I don't know if it's coincidental or not.

16 Q  It may actually refer to Tamir; you just don't

17   remember?

18 A  It may.

19 Q  Go to the next page, sir. The second full

20   post is a Jamie Marquardt comment on Cleveland

21   19 New's photo. Do you see that?

22 A  Yeah.

23 Q  Also on November 23, 2014, the day Tamir Rice

24   passed away. Terri Lewis you are a fucking

25   illiterate and stupid. Did you see the gun?

Page 223

1    It is an exact replica and you cannot tell the

2    difference during the day, let alone at night.

3    You are the whole problem. Blame the police.

4    Let black people do whatever they want with no

5    consequences. Racist bitch."

6        MR. LIVINGSTON: Objection. Asked and

7    answered.

8 Q   Did you make that comment?

9 A   I don't remember. This is only one of the

10   comments looks like.

11 Q  Any reason to believe you did not make that

12   comment?

13 A  I don't feel that way so I'm not going to say

14   I did.

15 Q  Any reason to believe you did not make that

16   comment, sir?

17 A  Yes.

18 Q  Okay. Do you have any explanation for why

19   Facebook produced this to your counsel who in

20   turn produced it to me?

21 A  Well, you have to have -- you have to be

22   logged into 19 News to make a comment. I'm

23   not logged into 19 News, so I don't know what

24   to say.

25 Q  So somehow this is just another one of those

Page 224

1    unexplainable posts?

2 A   Not unexplainable. I don't know, I could have

3    made it but I'm just telling you I don't have

4    a 19 News account.

5 Q   You commented on a photo by Cleveland 19 News.

6 A   Oh, okay. Whatever. Yeah.

7 Q   You believe you made that comment, sir?

8 A   I don't believe I did, but I could have. I

9    don't know.

10 Q  Does this relate to Tamir Rice, sir?

11 A  I don't know. It doesn't say that. Sounds

12   like it.

13 Q  A replica gun?

14 A  Sounds like it, yes, it does.

15 Q  Let's me ask you -- let's do the next one

16   first. There is another comment, same day but

17   this one is on Dee McNamara's. Is that John

18   McNamara's wife?

19 A  Yeah.

20 Q  And this comment is also on November 23, 2014.

21   It says, "What does the kids father have to

22   say about all this? Oh, that's right, there

23   is none. I agree, they keep using the word

24   'rookie,' like that played a role. I have

25   seen the gun. The orange plug at the end of

Page 225

1    the barrel to indicate it is a toy was removed
2    and it is an exact replica otherwise. At
3    night, how would one know it was a toy? Not
4    to mention, this criminal had a gun pointed at
5    him and was ordered to raise his hands above
6    his head. I stand behind this officer. No
7    one mentions how scared he must have been in
8    this situation." Did you make that comment,
9    sir?
10 A  It's possible.
11 Q  Any reason to deny you made that comment?
12 A  No.
13 Q  Was this related to Tamir Rice, sir?
14 A  It also sounds like it, yes.
15 Q  Now you told Mr. Votypka that you had never
16   made any comments or posts about Tamir Rice.
17   That was inaccurate?
18       MR. LIVINGSTON: Objection.
19 A  Again, at the time of the hearing I do not
20   remember making any posts about Tamir Rice.
21 Q  Okay. So since you didn't remember that at
22   the time of the hearing with Votypka you
23   classify that as not being a lie?
24 A  Right, I wasn't being deceitful.
25 Q  But it wasn't accurate though, correct?

Page 226

1 A  As of today, no, it apparently was inaccurate.
2       MR. VANCE: Move on to Exhibit
3    31.
4       (Defendants' Exhibit 31
5       marked for identification.)
6 Q  So now these are your posts from Facebook; is
7    that correct?
8 A  It appears to be, yes.
9 Q  Compilation of them. Let's start with the
10   first big one on the first page.
11 A  Okay.
12 Q  If these are your posts then that means they
13   are public to those people that you are
14   friends with?
15 A  Yes, my friends.
16 Q  It says, "Jamie Marquardt updated his status."
17   This on March 23, 2015. It says, "Parents let
18   kids decide" -- this is starting in the
19   middle. "Parents let kids decide whether or
20   not they want to go to school or pursue crime.
21   Last but not least, if a thug dies, all the
22   mother has to say is, 'Why did my baby have to
23   die?' or 'He was just getting his life
24   together,' and he is a hero and the mother is
25   off the hook for poor parenting skills."

Page 227

1       So here you make this connection
2    between criminal being a hero. Do you see
3    that?
4 A  Uh-huh.
5 Q  I'm sorry, is that a yes?
6 A  Yes. I'm sorry.
7 Q  And that similar connection is made in Exhibit
8    5, the Facebook post that ultimately resulted
9    in your separation, correct?
10       MR. LIVINGSTON: Objection.
11 A  I don't -- I don't see the connection between
12   the two.
13 Q  The post talks about, "Cleveland sees this
14   felony hood rat as a hero." Do you see that?
15 A  Yes.
16 Q  Similar content?
17 A  A lot of people feel that way, yes.
18 Q  And that was a similar concept that you
19   conveyed on March 23, 2015?
20 A  If you want me to say I'm connecting the post
21   to that, I don't see it.
22 Q  I'm just asking whether or not your post on
23   March 23, 2015 connected this idea that people
24   see criminals as hero?
25 A  The concept of the two, I guess, yeah. I mean

Page 228

1    yeah, you can say that.
2 Q  Let's go to the next page, sir.
3       Remind me again where was Tamir Rice
4    shot, that 12 year old boy?
5 A  What area?
6 Q  Where was it specifically he was shot?
7 A  At a park on the west side.
8 Q  What park?
9 A  I don't remember.
10 Q  Cudell Park?
11 A  That sounds familiar, yeah. It's off 98th.
12 Q  Let's go to the bottom post on that page. And
13   this is a post made on November 28, 2014. So
14   same week as Tamir Rice passed away. Starting
15   toward the bottom it says, "Time for the
16   community to start rallying and marching in
17   support of the police force!" Is that how you
18   felt?
19 A  I always feel that way.
20 Q  "The minority seems to have the biggest mouths
21   and the smallest brains. CNN would also cover
22   a march and protest for the police department
23   if the majority organized it. We need to
24   stand behind the men and women in blue and
25   Thank them for protecting us everyday from

Page 229

1 these street thugs like the one shot at
2 Cudell."
3 A I think this is a cut and paste.
4 Q I'm sorry, how is this a cut and paste, sir?
5 A There is a link above it.
6 Q Okay.
7 A And this looks like a cut and paste. I don't
8 know who Oscar Grant is.
9 Q It says here "Jamie Marquardt shared a link."
10 A But you can cut and paste a post.
11 Q So this was something that you cut and pasted
12 into your page?
13 A Yes, but I didn't write it.
14 Q But it was something that you cut and pasted
15 on your page?
16 A Yeah.
17 Q You don't believe that you said or put these
18 words to this?
19 A I didn't put these words on there. I cut and
20 pasted them. So yes, some of it I agree with.
21 Q Do you agree that "so the street thug like the
22 one shot at Cudell," that's a reference to
23 Tamir Rice; is it not?
24 A Yeah.
25 Q And that was on your page, correct?

Page 230

1 A This was on -- yeah, you gave it to me. Looks
2 like it was on my page.
3 Q Publicly, correct?
4 A Public?
5 Q Publicly to those that you're friends with?
6 A Just my friends. It doesn't go public.
7 Q Let's go to the next page please. November
8 27, 2014. There is a post in the middle
9 there, "Jamie Marquardt updated his status,"
10 talking about the police and the military.
11 You state, "If you insult them, you are
12 insulting me and I will lash out."
13 A Yes.
14 Q Is that something you stated in a status on
15 your Facebook page?
16 A Yeah, I believe I did.
17 Q Let's go to the next page please. This is on
18 November 23, 2014 updated to your status. And
19 the status update is, "I have to say, I am so
20 angry I cannot see straight. All the violence
21 that happened this weekend in Cleveland and
22 the media and politicians can only blame gun
23 legislation and the police. Someone in the
24 public eye needs to take a stand and blame the
25 parent because there is no father, a general

Page 231

1 lack of respect for authority, and the weak
2 justice system we now have in the country.
3 Please pray we can start pointing fingers in
4 the right direction."
5 Who is the -- what exactly is this in
6 reference to?
7 A I think it's just a general statement.
8 Q What was the violence this weekend in
9 Cleveland?
10 A I don't recall.
11 Q Tamir Rice was part of that violence, I'm
12 assuming?
13 A If that was the same weekend, yes, it would
14 have been.
15 Q And is this an assumption on your part that
16 there was no father involved in Tamir Rice's,
17 life?
18 A I think it's a common problem. I don't think
19 it's just Tamir Rice.
20 Q Is it limited to any particular group of
21 people --
22 MR. LIVINGSTON: Objection.
23 Q -- you're using that for?
24 A No. Criminals.
25 Q Criminals?

Page 232

1 A Yes.
2 Q So your position is that criminals as a
3 general matter lack a father figure?
4 A No. It says common. It's common.
5 Q So it's common for criminals to lack a father
6 figure?
7 A It's common for a lot of people, but it just
8 seemed more so in the criminal population.
9 Q Any other population?
10 MR. LIVINGSTON: Objection.
11 A No, that's not -- no, criminals is what I was
12 referring to.
13 Q Are you sure about that?
14 MR. LIVINGSTON: Objection. Asked and
15 answered.
16 A I already answered you.
17 Q And I'm asking are you sure that that's what
18 you're referring to is criminals?
19 A Yes.
20 MR. VANCE: Let's go to Exhibit
21 32.
22 (Defendants' Exhibit 32
23 marked for identification.)
24 Q Update to your status. Do you see that?
25 A Yes.

Page 249

```
 1  A   Just messing around.  I've never taken a
 2      picture on a call so I know it wasn't from any
 3      of my calls.
 4  Q   Never even had a picture from any of your
 5      calls?
 6  A   No, just a car.  I'll take a picture of a car
 7      that is smashed, but never a face or anything
 8      like that.
 9  Q   And she goes on to say, "All I can say is it's
10      a good thing he did it the bathtub so he
11      didn't make a mess."
12          MR. LIVINGSTON:  Objection.
13  A   Yeah, sounds like there was a picture on the
14      Internet that was going around of a guy that
15      blew his head off.  I think that's what that
16      is referring to.
17  Q   Is that in Cleveland?
18  A   No.
19  Q   Let's keep going.  I'm going to go to Page 23.
20      I have a post here the top of 23, or not a
21      post, excuse me, it's another message to
22      Ms. Honeycutt Gregory.  "Closely related to
23      the Jessie Jackson guilty, but playing the
24      race card, nigger fund;" do you see that?
25  A   Yes.  Yes.
```

Page 250

```
 1  Q   Is that one of your N word jokes?
 2          MR. LIVINGSTON:  Objection.
 3  A   I don't know.  I don't know what I was
 4      referring to.
 5  Q   Well, you had previously in a prior message
 6      said the Al Sharpton guilty nigger fund.  Do
 7      you see that?
 8  A   Yes.
 9  Q   Any idea what that was in reference to?
10  A   No.
11  Q   Was that a joke?
12  A   It could have been.  I'm not sure what it's
13      referencing.
14  Q   Did you these messages, sir?
15  A   I could have.
16  Q   And this is the same page.  "They are fucking
17      retards."  Do you see that?
18  A   Yeah.
19  Q   Retards, that's a derogatory term as well,
20      isn't it?
21          MR. LIVINGSTON:  Objection.
22  A   Uh-huh, yes.
23  Q   Yeah?
24  A   Yes.
25  Q   Derogatory term?
```

Page 251

```
 1  A   It is nowadays.
 2  Q   It was back in 2014?
 3  A   To some people, yes.
 4  Q   Is it to you?
 5  A   No.
 6  Q   No.  To this day it's not?
 7          MR. LIVINGSTON:  Objection.
 8  A   A lot of people use that word about -- it's
 9      just when you use it your whole life it's
10      nothing.  It doesn't mean anything.  It's not
11      like it's attacking people with, you know,
12      disabilities and stuff.
13  Q   Let's go to the last message there on that
14      day, the bottom one here.  This goes on to the
15      next page.  This was on December 7, 2014.  So
16      about two weeks after Tamir Rice unfortunately
17      passed away.  This is your message to
18      Ms. Honeycutt Gregory:  "I had one of our
19      black dispatchers ask me the other day why the
20      police car had to pull the car up so  close to
21      Tamir.  (Tamir is the African name for pistol
22      holding criminal nigger with no parental
23      supervision.) I told her the police should
24      have bounced his skull off the under carriage
25      of the police car.  She filed racist charges
```

Page 252

```
 1      against me.  I had to laugh."  Did you send
 2      that message, sir?
 3  A   It is, but it's a lie.
 4  Q   Did you send that message, sir?
 5  A   I don't know, but it's a lie.  I could have.
 6  Q   What do you mean it's a lie?
 7  A   None of this is true.  I didn't have any
 8      charges filed against me and this conversation
 9      never happened.
10  Q   So did you just tell --
11  A   I think I was just messing with her.
12  Q   You were just messing with her?
13  A   Yeah.  This is a private conversation between
14      two friends.
15  Q   A private conversation speaks to the type of
16      person you are I would say, wouldn't you?
17          MR. LIVINGSTON:  Objection.
18  A   No.
19  Q   No?
20  A   No, because it's -- you're taking jokes and
21      making it sound like it's some type of --
22      never mind.  I'm not going to say it.
23  Q   Go ahead, say what you were going to say
24      please.
25  A   No, I'm done.
```

Page 261

1 A    Yes.
2 Q    And he worked with you at EMS?
3 A    Yes.
4 Q    And he still works for EMS?
5 A    Yes.
6 Q    And here on June 7, 2017 you're exchanging
7      messages with Mr. Flores; do you see that?
8 A    Yes.
9 Q    And you're joking around, it appears, or your
10     talking about as long as -- he says, "As long
11     as the women are in the kitchen, it would be a
12     great field trip." Did you see that?
13 A   Yes.
14 Q   And you say in response, "They are allowed to
15     leave the kitchen to clean up the bedroom and
16     make the bed"?
17 A   Yes.
18 Q   Just joking around?
19         MR. LIVINGSTON: Objection.
20 A   Yes.
21 Q   We'll use the same page numbers that we did
22     before, top right-hand corner. Do you see
23     that?
24 A   Which page?
25 Q   We're going to go now to Page 7 please. And

Page 262

1      here on February 15, 2016 at 12:46 p.m.
2      Mr. Flores sends you a message, "Yo, did you
3      really write that stuff on FB about Tamir?" Do
4      you see that?
5 A    Yes.
6 Q    And then the response from you at 3:27 p.m. on
7      February 15, 2016, "No. I just saw it. Shit
8      I am so pissed. I will get him back. I went
9      to take leak and....." Do you see that?
10 A   Yeah.
11 Q   So what did you mean by that, your response?
12 A   Which part?
13 Q   "I went to take a leak."
14 A   Well, this is when I first found it, the post,
15     so I didn't know what happened, when he did
16     it.
17 Q   Okay. So you're at least explaining to
18     Mr. Flores you thought maybe it was when you
19     were taking a leak?
20 A   Yeah. I don't know if it was that or, like I
21     said earlier, when I went to do laundry or I
22     hadn't -- this was one of the posts I told you
23     earlier when my friends were notifying me that
24     the post was there.
25 Q   Got you.

Page 263

1         MR. VANCE: Mark this 38.
2         (Defendants' Exhibit 38
3         marked for identification.)
4 Q    These are more comments that were made by you.
5      Do you see that?
6 A    Yes.
7 Q    If you can go to second page here. And toward
8      the bottom there there is one on February 15,
9      2016 at 8:31 p.m. You're commenting on your
10     own post. Do you see that?
11 A   Yes.
12 Q   "I am tired of it right now. I am ready to
13     get rid of Facebook." Then you say --
14     basically ask people to call you if they have
15     issues and if not don't you dare let me hear
16     you running your mouth about me?
17 A   Yes.
18 Q   What was that in relation to?
19 A   Well, apparently the Facebook post.
20 Q   The Exhibit 5?
21 A   Yeah.
22 Q   The post about Tamir?
23 A   I mean judging by the time it would be safe to
24     assume that.
25 Q   And then next page you've got another post,

Page 264

1      February 15, 2016 at 6:26 p.m. saying, "You
2      know how this will be dealt with if you know
3      me." Do you see that?
4 A    Yes.
5 Q    There has been a handful along those lines.
6      Did you ever take or seek any retribution from
7      Donnie?
8 A    No.
9 Q    This is kind of just talk?
10 A   Yeah.
11 Q   On the next one it's got 191 of 466 at the
12     bottom. Do you see that, on the bottom left
13     corner?
14         MR. LIVINGSTON: He's there.
15 A   Which one?
16 Q   It says "Kevin Poplar yes" in the middle.
17     It's a reply to Samuel Grigg's comment.
18 A   Yes.
19 Q   Any idea what that was related to?
20 A   No, I don't.
21 Q   Next page, do you know who John Shreve is?
22 A   Yes.
23 Q   Who is that?
24 A   My friend from high school.
25 Q   Ever talk with Donnie about John Shreve?

Page 318

1  saying there is not anybody else out there.
2  Q   Okay. Did you talk to your cousin at all,
3     Kevin Poplar?
4  A   Have I talked to him? No.
5  Q   Have you talked to him at all since these
6     posts?
7  A   I saw him at my aunt's funeral.
8  Q   Did you two talk about the posts at all?
9  A   Yes.
10 Q   What did the two of you discuss?
11 A   He said that he saw -- he was watching the
12    news and it came on the news and he spit his
13    coffee across the table. Kind of joked about
14    it.
15 Q   Anything else?
16 A   No, that's it. Just, you know, I don't
17    remember the rest of the conversation. That's
18    the one thing I remember him saying.
19 Q   Any idea how old Donnie is?
20 A   Who?
21 Q   How old Donnie is?
22 A   I would say maybe six years younger than me.
23 Q   So how old does that put him?
24 A   Probably about -- no, I'd say he's younger
25    than that. Maybe 41, 42.

Page 319

1  Q   Any idea what he does for a living?
2  A   No.
3  Q   Anything else that you know about Donnie that
4     would help contact or identify him?
5  A   I told you everything I know. He lives in the
6     Parma area. He's in AA, you know.
7  Q   You still go to meetings?
8  A   Does he?
9  Q   Do you?
10 A   Yes.
11 Q   Same meetings that you used to see Donnie at?
12 A   No.
13 Q   Don't go to those meetings anymore?
14 A   Not -- no. One of them I do, the rest I
15    don't. But I did go back there when I was
16    looking for him.
17        MR. VANCE: Let's take a brief
18    break if we can here.
19        (Short recess.)
20        MR. VANCE: We're back on the
21    record.
22 By Mr. Vance:
23 Q   Mr. Marquardt, I don't have any additional
24    questions for you. The only thing I would do
25    is I'd give you an opportunity if there is

Page 320

1  anything you'd like to add right now you have
2  the floor.
3  A   No, I don't have anything to add.
4  Q   Okay. Then the only thing to say as we
5     conclude is there are some issues -- there are
6     some documents that are outstanding. I know I
7     sent an email about some medical records that
8     are in dispute.
9         MR. LIVINGSTON: Do you want to go off
10    the record for this?
11        MR. VANCE: Well, just briefly we
12    are going to have to have a conversation about
13    that. There is also some records from
14    Verizon. So I'd just like to leave the
15    deposition open subject to receipt of
16    additional documents eventually.
17        MR. LIVINGSTON: Okay. We'll read.
18        (Deposition concluded at 4:27 p.m.)
19        (Signature not waived.)
20            - - -
21
22
23
24
25

Page 321

1            SIGNATURE PAGE
2
3  In Re:     Jamie Marquardt v. Nicole Carlton, et al
4  Case Number: 1:18-CV-003330-SO
5  Deponent:   Jamie Marquardt
6  Date:       Wednesday, December 12, 2018
7
8  To the Reporter:
9        I have read the entire transcript of my
10 Deposition taken in the captioned matter or the same
11 has been read to me. I request that the following
12 changes be entered upon the record for the reasons
13 indicated.
14      I have signed my name to the Errata Sheet and the
15 appropriate Certificate and authorize you to attach
16 both to the original transcript.
17
18
19
20            Jamie Marquardt
21    Subscribed and sworn to before me this
22 _____ day of _____ , 2019.
23
24            Notary Public
25 My commission expires:_____.

```
 1  State of Ohio,          )
                            )  SS:   CERTIFICATE
 2  County of Cuyahoga,     )

 3       I, Karen A. Toth, Notary Public in and for the

 4  State of Ohio, duly commissioned and qualified, do

 5  hereby certify that the within named witness,

 6  Jamie Marquardt, was by me first duly sworn to

 7  testify the truth, the whole truth, and nothing but

 8  the truth in the cause aforesaid; that the testimony

 9  then given by him was by me reduced to

10  stenotypy/computer in the presence of said witness,

11  afterward transcribed, and that the foregoing is a

12  true and correct transcript of the testimony so

13  given by him as aforesaid.

14       I do further certify that this deposition was

15  taken at the time and place in the foregoing caption

16  specified and was completed without adjournment

17       I do further certify that I am not a relative,

18  counsel, or attorney of either party, or otherwise

19  interested in the event of this action.

20       IN WITNESS WHEREOF, I have hereunto set my

21  hand and affixed my seal of office at Cleveland,

22  Ohio on this 27th day of December, 2018.

23

24  Karen A. Toth, Notary Public in
    and for the State of Ohio.
25  My Commission expires May 6, 2023.
```