Page 1

AMERICAN ARBITRATION ASSOCIATION

- - -

In the Matter of )
Arbitration Between: )
)
Communication Workers )
of America, Local 4340, )
)
    and )Case No.: 01-16-0004-6966
)
City of Cleveland )

- - -

    Transcript of proceedings before Robert J. Stein, Arbitrator, held at the Burke Lakefront Airport, 1501 North Marginal Road, Cleveland, Ohio 44114 on Thursday, January 18, 2018, commencing at 10:00 a.m.

- - -

**EXHIBIT 6**

**EXHIBIT 8**

## Page 2

```
 1   APPEARANCES:
 2   On behalf of the Union:
 3       David Passalacqua
         Executive Vice President
 4       Communications Workers of America
         1400 East Schaaf Road
 5       Brooklyn Heights, Ohio 44131
 6
 7   On behalf of the City:
 8       Patrick J. Hoban, Esq.
         Zashin & Rich
 9       Ernst & Young Tower
         950 Main Street
10       4th Floor
         Cleveland, Ohio 44113
11
12   Also present:
13       Jamie Marquardt, Grievant
         Leonard Brooks, Business Agent
14       Nicole Carlton, Commissioner of EMS
15              - - -
```

## Page 3

```
 1                    INDEX
 2   CITY WITNESSES:  DIRECT  CROSS  REDIRECT  RECROSS
 3   Mark Barrett      15      23     30       31
 4     By The Arbitrator 31
 5   Gregory Hyde      33      51/63  66       68
 6     By the Arbitrator 60
 7   Michael Threat    70      81     90       94
 8     By the Arbitrator 96
 9   Ellen Kazimer     98     107    110
10     By the Arbitrator 111
11   Nicole Carlton   113     142    166      171
12     By the Arbitrator 174
13              - - -
14   UNION WITNESSES:
15   James Marquardt  180     195  221/227/234  223/232
16     By the Arbitrator 228
17   Linda Burns      237     239
18              - - -
```

## Page 4

```
 1                    EXHIBITS
 2   JOINT                    MARKED
 3   A through K              premarked
 4   CITY
 5    1                        19
 6    2                        41
 7    3                        45
 8    4                       123
 9    5                       124
10    6                       128
11    7                       166
12    8                       214
13    9                       223
14   UNION
15   1 through 11             Premarked
16              - - -
```

## Page 5

```
 1              PROCEEDINGS
 2       THE ARBITRATOR: Good morning,
 3   everybody. We're here on January 18, 2018,
 4   for a case with the City of Cleveland and CWA,
 5   Local 4340. The case is AAA case
 6   01-16-0004-6966. The Grievant in this case is
 7   Jamie Marquardt, and this is a discharge case.
 8       The parties have, in a very diligent
 9   fashion, and I congratulate them for this,
10   done their homework. They've identified
11   several Joint Exhibits. Joint Exhibit A being
12   the collective bargaining agreement running
13   from 14-1-13 through 3-31-16. Joint Exhibit
14   B, which is the citizens complaint which I
15   believe probably started the investigation of
16   this case dated 2-15-16. Joint Exhibit C is
17   the -- this is the citizens what? Report of
18   the commission is it? Can you identify that
19   again?
20       MR. HOBAN:    The report of the --
21       THE ARBITRATOR: OCC.
22       MR. HOBAN:    -- Office of
23   Integrity Control, Compliance and Employee
24   Accountability.
25       THE ARBITRATOR: They are the ones
```

                                    2 (Pages 2 to 5)

Page 14

1  Union believes to be unfair and disparate
2  treatment. Two union members contacted a CWA
3  Local 4340 chief steward to discuss alleged
4  issues with a CWA 4340 union member.
5       After the City received information
6  regarding the issue and with substantial media
7  pressure took action against the Grievant
8  Jamie Marquardt, an action that the Union
9  believes to be unfair and disparate from
10 previous actions taken by the City against
11 other city employees.
12      The Grievant had over 20 years of
13 service at the time of the incident and no
14 history of similar infractions. The Union
15 intends to show that the Employer has
16 historically taken no or lesser actions on
17 multiple occasions against city employees for
18 similar occurrences. The harshest action
19 taken by the City for a similar offense was a
20 ten day suspension that was later reduced to
21 three days. But here in this case the
22 Grievant was terminated.
23      The Union believes that what we're
24 discussing today is a sensitive subject, and
25 while the Union does not agree with what is

Page 15

1  stated in the posts on social media we can
2  argue over the difference in treatment between
3  our member and several other city employees.
4       THE ARBITRATOR: Thank you very much.
5  Are you ready to move forward?
6       MR. HOBAN: I am indeed, sir.
7       MARK BARRETT
8  Of lawful age, being first duly sworn, was examined
9  and testified as follows:
10      DIRECT EXAMINATION
11 By Mr. Hoban:
12 Q  Good morning, Mark. How are you?
13 A  Good.
14 Q  Mark, could you do me a favor and please state
15    your full name for the record and spell your
16    last name for the court reporter?
17 A  Mark Patrick Barrett, B-a-r-r-e-t-t.
18      THE ARBITRATOR: Is that M-a-r-c or
19 K?
20      THE WITNESS: K.
21      THE ARBITRATOR: Thank you.
22 Q  And, Mark, where are you currently employed?
23 A  City of Cleveland.
24 Q  And in what position?
25 A  Paramedic.

Page 16

1  Q  How long have you been employed by the City of
2     Cleveland?
3  A  Since 2007.
4  Q  And how long have you been a paramedic?
5  A  Eight, nine years.
6  Q  And what are your duties; primarily EMS
7     response?
8  A  Correct.
9  Q  So you respond with the squad to EMS calls?
10 A  Yes.
11 Q  Can you describe for me your understanding of
12    what the relationship of EMS to the community
13    is; what the nature of it is?
14 A  Taking care of injured, ill patients,
15    physically, emotionally. I mean, just
16    responding, helping people.
17 Q  Do you try to maintain a relationship with the
18    citizens that you serve?
19 A  Yes.
20 Q  And what is the nature of that relationship
21    that you try to maintain?
22 A  What do you mean? Like positive. Positive --
23    I mean, good standing. I mean, we go in their
24    houses and we interact with them and we try to
25    get along with them.

Page 17

1       THE ARBITRATOR: What was that last
2  part?
3       THE WITNESS: Try to get along with
4  them.
5       THE ARBITRATOR: Keep your voice up.
6       THE WITNESS: I'm sorry.
7  Q  So we can capture everything you're saying.
8  A  I'm actually quite loud.
9  Q  You're doing good.
10    Are you familiar with Jamie Marquardt?
11 A  Yes.
12 Q  And how are you familiar with him?
13 A  He was a -- when I started he was in the field
14    and he became sergeant and then later became a
15    captain.
16 Q  Had you ever worked under his supervision?
17 A  I believe so, yes.
18 Q  What was the nature of your relationship? Was
19    it just a work acquaintance or were you good
20    friends?
21 A  Just work acquaintance.
22 Q  Were you a friend of Mr. Marquardt's on
23    Facebook?
24 A  No.
25 Q  I'm going to direct your attention to events

Page 18

1 of February 15th of 2016.
2 A Okay.
3 Q Did you report for duty that morning?
4 A Yes.
5 Q So you worked that day?
6 A Yes.
7 Q What time do you typically report?
8 A Seven. Between six and seven.
9 Q And where were you working that day?
10 A Medic 7, 37th and Woodland.
11 Q At any time on February 15, 2016 were you made
12 aware of a Facebook post that was attributed
13 to Mr. Marquardt?
14 A Yes.
15 Q By whom were you made aware of that post?
16 A The crew before. Again, I believe it was Matt
17 Sykes and his partner, but I'm not sure. It
18 was whoever the night shift crew was.
19 Q Were the night crew shift discussing the post?
20 A Yes.
21 Q Were they discussing it with anybody else
22 other than you?
23 A I believe Fire was at the table because
24 that's -- typically sometimes there is firemen
25 at the table in the morning. So there is a

Page 19

1 chance that yes, there could have been firemen
2 and probably another EMS and my partner and I.
3     (City Exhibit 1
4     marked for identification.)
5 Q I'm handing you what I've marked for
6 identification purposes as CX-1, that's for
7 City Exhibit 1. I'll ask you to take a look
8 at that and tell me whether you're familiar
9 with it.
10 A Yes.
11 Q How are you familiar with it?
12 A This was the post that I was shown by that
13 leaving crew, the night crew.
14 Q And how were you shown this?
15 A Except for the bottom.
16 Q Except for the bottom part. You were just
17 shown the top part?
18 A Yeah.
19 Q How were you shown it, on a phone or a laptop?
20 A A phone.
21 Q What was your reaction to the post when you
22 first saw it?
23 A It was surprising.
24 Q And why was it surprising?
25 A Just because of the nature of it and what it

Page 20

1 said.
2 Q What effect did the post have on you?
3 A I mean, I think I read it and I was like just
4 surprised that it said that.
5 Q Did it give you any concerns?
6 A That he could get fired for writing that.
7 Q Anything else? Anything related to your
8 duties?
9 A I mean, as far as like what I did after that?
10 Q Well, in terms of how you conducted your
11 duties with a post like this being made?
12     I'll withdraw the question.
13     Was there any other discussion after
14 you first saw this post with other EMS
15 members?
16 A Throughout the day.
17 Q On that day?
18 A Yeah. It was something that people talked
19 about.
20 Q Were they just talking about it at Medic 7?
21 A No, I mean, it was throughout the day. I
22 mean, it's somewhat surprising, so --
23 Q Did you take any actions after you saw the
24 post?
25 A Yes.

Page 21

1 Q What did you do?
2 A I tried to make contact on an untaped line
3 with -- well, let me back up. I called Ellen
4 to get --
5 Q Ellen is Captain Kazimer?
6 A I'm sorry, yes, Captain Kazimer to get Mike's
7 private number.
8 Q Mike is Captain Threat?
9 A Yes. His union rep, to try to have Mike get
10 in contact with Jamie because I personally
11 didn't have that capability, to have Mike have
12 Jamie remove the post so he didn't get in
13 trouble.
14 Q Did you ultimately speak with Captain Threat?
15 A Yes.
16 Q And what was the nature of your conversation?
17 A Just explaining to him what had been posted
18 and that he should get in contact with him,
19 and as I said before, he talks a lot so there
20 -- it was probably -- it could have been a
21 long conversation, but the gist of it was to
22 have him take it down so he didn't get in
23 trouble because it looked bad.
24 Q You say it looked bad. Did you tell Captain
25 Threat that?

### Page 22

1  A  Yeah.
2  Q  Why did you conclude it looked bad?
3  A  Just because of what it said. I mean --
4  Q  If you're finished that's fine.
5  A  Yeah, I mean just because it looked bad.
6  Q  Did you express any concerns about safety
7     issues to Captain Threat as a result of the
8     post?
9  A  I mean, again, I'm not -- my point of calling
10    was so it would be removed. As far as
11    specific safety issues, I don't remember, no.
12 Q  Okay. All right. Do you recall if Captain
13    Threat had seen the post at the time you spoke
14    with him?
15 A  I don't think so. I mean, if he had he didn't
16    say he had. He seemed surprised. I don't --
17    I don't remember if I read it to him or gave
18    him the gist, because I wouldn't have had
19    access to it.
20    MR. PASSALACQUA: The Union has an
21    objection. The conversation that took place
22    between the witness and Mr. Threat was between
23    union members. He identified that he was
24    contacting Mr. Threat because he was a union
25    official not because of his affiliation with

### Page 23

1     the City of Cleveland employment, therefore
2     it's Union conversation.
3     THE ARBITRATOR: Go ahead.
4     MR. HOBAN: There are two
5     different unions, one is the C.A.R.E. Union
6     and the other one is CWA.
7     MR. PASSALACQUA: But he identified
8     that he was contacting Captain Threat because
9     of his position as a union rep.
10    MR. HOBAN: But he wasn't his
11    union rep, number one. Number two, I'm not
12    aware of any Union confidentiality or union --
13    what's the word I'm looking for -- privilege
14    that exists, at least in the State of Ohio.
15    THE ARBITRATOR: Yeah, I'm not aware
16    of any either. And, you know, I'm going to
17    allow the testimony. Overrule the objection.
18    I mean, I think it was a matter of what he
19    thought should happen rather than any
20    necessarily privileged conversation about
21    defending anyone. Just take it down I guess.
22    Go ahead.
23 Q  I'm sorry, Mark. I'll restate the question
24    very quickly. Did you understand, was it your
25    conclusion that Captain Threat had seen the

### Page 24

1     post when you called him?
2  A  No.
3  Q  Okay. Thank you. I have nothing further.
4     Thank you, Mark.
5     CROSS-EXAMINATION
6  By Mr. Passalacqua:
7  Q  Good morning.
8  A  Good morning.
9  Q  Do you have Facebook?
10 A  Yes.
11 Q  Okay. On Facebook does an individual when
12    they make a post have to type in their name or
13    is that something that just automatically
14    happens?
15 A  Just automatically happens.
16 Q  So someone could make a post but they don't
17    type in the individual's name to show
18    ownership? Someone could posts on another
19    person's account; it's a potential if you have
20    access to it?
21 A  Yes.
22 Q  And you stated that you used Facebook through
23    a phone?
24 A  The way I saw it was through somebody's phone.
25    I was one of the later people to get a smart

### Page 25

1     phone.
2  Q  I understand. So do you use your Facebook
3     through your phone?
4  A  I do now, yes.
5  Q  When you use Facebook through your phone do
6     you have to sign in each time or is it
7     automatically signed in for you?
8  A  Now it's automatically signed in for you.
9  Q  Because you have that?
10 A  Yes.
11 Q  Are you a friend of Jamie Marquardt on
12    Facebook?
13 A  No.
14 Q  So you had no access to see any post on Jamie
15    Marquardt's Facebook page?
16 A  I don't believe so, no. It's not a public
17    post, no.
18 Q  Are you aware if Jamie Marquardt was
19    identified as a City of Cleveland employee, an
20    EMS captain or anything identifying him
21    associated with the City of Cleveland?
22 A  I don't know. I don't think so. I mean, this
23    is -- this is the post. (Indicating.)
24 Q  Okay. Have you worked with Jamie before in
25    the field?

Page 30

1  By Mr. Hoban:
2  Q  Mark, sort of taking from the question that
3     Dave asked.
4  A  About Guy?
5  Q  No, I'll explain.
6  A  Okay.
7  Q  Are you aware of any City of Cleveland
8     employee who posted that they were upset that
9     they didn't get the chance to kill a 12 year
10    old boy on Facebook?
11 A  No.
12 Q  Did, to your knowledge, Sergeant Woyma ever
13    post --
14 A  The police officer?
15 Q  The police officer ever post that he was
16    disappointed or upset that he didn't get to
17    kill a 12 year old boy?
18 A  No.
19 Q  To your knowledge, did Mr. Estergall ever post
20    on Facebook or Twitter or any social media
21    that he was disappointed that he didn't get
22    the chance to kill a 12 year old boy?
23 A  No. I'm friends with Guy.
24 Q  Thank you.
25       THE ARBITRATOR: Anything else?

Page 31

1        RECROSS-EXAMINATION
2  By Mr. Passalacqua:
3  Q  There was conversation regarding the remainder
4     of the day that the posts that were on Jamie's
5     Facebook page were being discussed. Was there
6     any hindrance of service that day? Was there
7     any interaction with the public that day
8     regarding service? Was there any loss of
9     quality of service because of that?
10 A  No.
11 Q  Okay. Thank you.
12        EXAMINATION
13 By The Arbitrator:
14 Q  Just a real quick question because you
15    testified to this, I want to make sure I
16    understand how it occurred. On the 15th of
17    February, 2016, what shift -- do you remember
18    what you were working?
19 A  I would have been A shift.
20 Q  A shift meaning?
21 A  We start at seven and we continue until seven.
22 Q  Seven to seven?
23 A  At times I came in a little bit early and
24    worked out.
25 Q  So that day did you come in and work out, do

Page 32

1     you think?
2  A  I believe so. I'm usually early.
3  Q  Now, I think you testified -- I want to make
4     sure I understand this -- that at that time
5     your phone wasn't smart enough to have social
6     media?
7  A  I don't think I had a smart phone at the time
8     because I was one of the late arrivers. I had
9     a flip phone for a long time. So I don't
10    believe I had a smart phone, but I can't say
11    one way or the other. But it wasn't on my
12    phone, that I can --
13 Q  I understand. So how did you become aware of
14    this post? The top half you mentioned too of
15    that posting?
16 A  It was -- again, I believe it was Matt Sykes
17    but I'm not sure. At the time he would have
18    been on night shift.
19 Q  Okay.
20 A  And I think that's the person that showed me
21    it.
22 Q  Was it printed out like that?
23 A  No. No, it was --
24 Q  On his phone?
25 A  Yeah.

Page 33

1  Q  On his phone?
2  A  Again, I'm not sure it was Matt Sykes.
3  Q  But someone showed you the posting on the
4     phone?
5  A  Correct.
6  Q  Okay. That's how you became aware?
7  A  Correct.
8  Q  Okay. All right. That's what I wanted to
9     know. That's all. I wanted to make sure I
10    understood that. Thank you.
11 A  I have a smart phone now.
12       MR. HOBAN:    Nothing further.
13    Thank you, Mark.
14       (Witness excused.)
15       THE ARBITRATOR: Off the record.
16    (Discussion off the record.)
17       GREGORY HYDE
18 Of lawful age, being first duly sworn, was examined
19 and testified as follows:
20       DIRECT EXAMINATION
21 By Mr. Hoban:
22 Q  Greg, good morning.
23 A  Good morning.
24 Q  Greg, could you do me a favor and please spell
25    your first and last name for the record, state

### Page 34

1  and spell your first and last name.
2  A   First name is Gregory, G-r-e-g-o-r-y, Hyde,
3      H-y-d-e.
4  Q   Greg, where are you currently employed?
5  A   City of Cleveland Division of EMS.
6  Q   And how long have you been employed with the
7      Division of EMS?
8  A   Twenty-eight years.
9  Q   And what position do you currently hold?
10 A   I'm a field paramedic and field training
11     officer.
12 Q   How long have you been a paramedic?
13 A   Twenty-seven years.
14 Q   Where are you currently assigned?
15 A   Medic 23.
16 Q   And is that where you were assigned on
17     February 15, 2016?
18 A   That would have been. I believe that
19     particular day was an overtime shift for me,
20     but normal base is there at Madison. I cannot
21     recall which overtime shift I would have been
22     on that day. I work a fair amount of
23     overtime.
24        THE ARBITRATOR: For the record, is
25     that west side?

### Page 35

1        THE WITNESS:  Yes, it's West 98th
2     and Madison. It's Fire Station 23.
3        THE ARBITRATOR: I just wanted to get
4     my geographic bearings here. I got it.
5  Q   In your almost three decades with EMS -- and I
6      say that with congratulations, can you
7      describe -- or based on your almost three
8      decades aches with EMS can you describe the
9      relationship between EMS and the community?
10 A   It's always been one of trust. The community
11     trusts us to take care of them and do that
12     well. It's always been an impartial
13     relationship. We don't take sides or judge.
14     We are there for the community, to take care
15     of the community as best as we can.
16        It's one where we, you know -- like I
17     say, you don't take sides with things. We're
18     just there to impartially take care of folks.
19     They have a trust that they know we're there
20     to take care of them no matter what their
21     station or position in life is or what
22     transpired.
23 Q   Is there any relationship between that trust
24     and the safety of EMS members, in your
25     experience?

### Page 36

1  A   There is. I mean, in my experience if you go
2      in as a nonthreatening impartial type person
3      your people tend not to be as aggressive with
4      you. There have been incidents where we've
5      been in places where people have been a little
6      hostile. Other people as bystanders tell them
7      to knock it off. Hey, they are there to help
8      you, leave them alone. So that lends itself
9      to, you know, the community perception that
10     they understand we're there not to cause them
11     grief but just to help them as much as we can.
12 Q   Are you familiar with Jamie Marquardt?
13 A   I am.
14 Q   How are you familiar with him?
15 A   When he was a field paramedic we worked
16     overtime shifts together. Then he became a
17     sergeant through the office with supplies,
18     other things with that. Then he was promoted
19     to captain and he was on my shift. He was one
20     of our shift supervisors.
21 Q   Are you a Facebook friend or have you been a
22     Facebook friend with Jamie Marquardt?
23 A   We were Facebook friends at a period of time,
24     yes.
25 Q   Have you ever had sort of casual conversations

### Page 37

1      with Mr. Marquardt?
2  A   Oh, many conversations with him.
3  Q   And what were the nature of those
4      conversations, just generally?
5  A   They ran the gamut from how is the weather
6      today. We always had a good-natured
7      relationship with teasing and joking and
8      stuff. And then we also had conversations
9      about our various views on politics or life or
10     different things. He was at one end, I was at
11     the other end. I think we always had a mutual
12     agreement that we agreed to disagree for most
13     of those, but I would always say it has been a
14     cordial relationship.
15 Q   Drawing your attention to February 15, 2016,
16     did you have a Facebook post of
17     Mr. Marquardt's brought to your attention on
18     that day?
19 A   Yes.
20 Q   I'll direct your attention to right there on
21     the table in front of you there is something
22     marked as CX-1. I'll ask you to take a look
23     at that. Do you recall seeing or being made
24     aware of that particular post on February 15,
25     2016?

Page 38

1  A  I do.
2  Q  And do you know how you became aware of it?
3  A  In all honesty, it was either somebody had
4     sent me a screen shot of it or I seen it on my
5     Facebook page. One or the other. I don't
6     remember exactly how it came to my attention
7     but I know eventually I did see it on my --
8     when I saw it I was able to see it on my
9     Facebook as well. I'm not sure if somebody
10    sent it to me and said did you see this or in
11    general looking through your Facebook each
12    morning like half the world does I ran across
13    it.
14 Q  Now, you testified previously that you were
15    working on February 15th; is that correct?
16 A  Yes.
17 Q  Were you working an a.m. shift or a p.m.
18    shift?
19 A  It was a day shift. It was an overtime shift.
20 Q  So starting at 7:00 in the morning?
21 A  Yes. I'm not a day shifter by nature. I like
22    my nights.
23 Q  Do you recall if you saw or were made aware of
24    City Exhibit 1 early in the shift or later in
25    the day?

Page 39

1  A  It was early. It was near 7:00, 7:30. It was
2     right at the start of the day.
3  Q  What was your reaction when you saw it?
4  A  I was -- it was mixed. One, I definitely do
5     not agree with the content of what the message
6     was. I was kind of concerned about what the
7     message was, and then I was concerned for
8     Mr. Marquardt in that if he had put something
9     up like that, because he was usually a little
10    better about what he would put up there about
11    what his state of mind was when he had placed
12    it up there. So I reached out to one of the
13    shift captains for a couple concerns.
14 Q  So you had concerns about Mr. Marquardt's
15    well-being?
16 A  Yes.
17 Q  In the first instance, did you have any
18    concerns about the effects of the post on EMS?
19 A  Yes, my concern was because that was such a
20    hot topic at the time if the community had
21    seen that somebody from the Division had those
22    thoughts what would the community's response
23    be to that. How would it translate into how
24    they perceive us, how do they deal with us,
25    would there be some aggression or animosity?

Page 40

1     Because again, once you're in that uniform
2     it's the same, it's not -- you know, my
3     opinion is going to be what her opinion is,
4     what his opinion is. They don't see the
5     Division has differences of opinion. You're
6     just the EMS person and they kind of see that
7     uniform and that's everyone's opinion.
8  Q  My understanding of your response is that EMS
9     could be painted with the sort of broad brush?
10 A  The broad brush of this is the consensus of
11    opinion among the members of EMS.
12 Q  Did the content of the post give you any
13    concerns about the performance of your duties?
14 A  Just in that I would want to be more aware of
15    my surroundings and stuff. The potential that
16    if somebody had seen this or knew of this,
17    could we face potential aggression with
18    families or people that we interact with?
19        Basically in that neighborhood where I
20    generally work is the neighborhood where the
21    shooting had transpired and family members of
22    Tamir Rice lived in that area.
23 Q  Were you familiar with the other people who
24    were friends of Mr. Marquardt's on Facebook in
25    February of 2016?

Page 41

1  A  Yes.
2  Q  Were there other EMS members among his
3     Facebook friends?
4  A  Yes.
5  Q  Were there police or fire employees of the
6     City among his Facebook friends?
7  A  As far as I know, yes. Most of us have
8     friends within all the divisions and in the
9     civilian spectrum as well.
10 Q  Now, you mentioned speaking or contacting an
11    EMS captain. Before we get there, let me ask
12    you this question.
13         (City Exhibit 2
14         marked for identification.)
15 Q  You testified that you saw City Exhibit 1
16    fairly early on the morning of February 15th.
17    I'm handing you what I've marked for
18    identification purposes as City Exhibit 2.
19    That's CX-2. I'm going to ask you to quickly
20    take a look at that and, Greg, if you can tell
21    me, did you see this post?
22 A  This particular post I did not. And as we had
23    talked, most likely the individual who had
24    made a previous post, there is various levels
25    of -- they call it security or privacy with

Page 42

1 Facebook.
2   MR. PASSALACQUA: I would have an
3 objection because he did not previously see
4 this. He's making an opinion.
5   THE ARBITRATOR: Yeah, well —
6 A The particular reply —
7   THE ARBITRATOR: Hold on. Are you
8 going to get it through another witness?
9   MR. HOBAN: I'll get it through
10 another witness. I'm just showing that this
11 was all he saw and that's all I need.
12 Q Thank you, Greg. That's on me, not on you.
13   THE ARBITRATOR: Okay.
14 Q After you saw the post did you discuss it with
15 any other EMS members on the 15th of February?
16 A We did.
17 Q How many would you say?
18 A Roughly half dozen, dozen folks that we — I
19 remember the bulk of the conversations
20 occurred at Metro. That's a hospital that
21 receives a lot of our ambulances. It was the
22 hot topic all morning and afternoon long.
23 Q So it's your recollection that many EMS
24 members had seen it?
25 A Yes.

Page 43

1 Q And were aware of it?
2 A Yes.
3 Q What was the nature of discussions you were
4 involved with with other EMS members about the
5 post?
6 A Our discussions were — and everybody pretty
7 much had the same mindset — what was he
8 thinking when he put that up and what happens
9 if people see this and know that it came from
10 somebody that works for us.
11 Q You testified previously that you contacted
12 the supervisor about the post?
13 A Yes.
14 Q Can you describe that for us please?
15 A I had sent a text to Captain Kazimer to give
16 me a call on an untaped line because I wanted
17 to have a private conversation with her. And,
18 again, my first concern was for Jamie, to make
19 sure what he had said — what was his mindset
20 when he was saying that. Being somebody on
21 his shift I wasn't comfortable trying to get
22 ahold of him to say hey, are you okay. I
23 figured one of his co-workers, peers would be
24 better for that. So we brought up our concern
25 for him. And in the course of that discussion

Page 44

1 we talked at fair length about what happens if
2 people find out that one of our supervisors
3 had that opinion or that was the thought of
4 the moment.
5 Q Did you express specific safety concerns to
6 Captain Threat?
7 A I did. And Captain Kazimer. They were both
8 on the phone. They were on speaker phone at
9 one location and I was talking to them. They
10 were both at that conversation, or party to
11 that conversation.
12 Q What do you recall that either Captain Kazimer
13 or Captain Threat said to you during the
14 course of that conversation?
15 A The summary or the gist of what I remember
16 from it is that they shared the concerns for
17 Mr. Marquardt's well-being, and we talked
18 about community perception of how that would
19 break a considerable amount of the trust that
20 we have with the community, and the potential
21 of people see that and they are upset, what is
22 the backlash or repercussions toward our field
23 personnel.
24 Q You testified previously that you had been a
25 Facebook friend of Mr. Marquardt's for some

Page 45

1 period of time some years ago?
2 A Correct.
3 Q And you have seen other of his Facebook posts?
4 A I have.
5   (City Exhibit 3
6   marked for identification.)
7 Q I'm handing you what I've marked for
8 identification purposes as CX-3, that's City
9 Exhibit 3. CX-3 is a three page document.
10 Front page says, "Jamie Marquardt" at the top.
11 Well, actually at the top it says, "Like,
12 comments, share." It appears to be a screen
13 shot of Facebook posts. The top post says
14 "Jamie Marquardt," says "February 8 at
15 12:54 a.m." Are you familiar with City
16 Exhibit 3?
17 A I am.
18 Q And what is it?
19 A It's a series of screen shots that I forwarded
20 to you that I had taken from — of posts from
21 Mr. Marquardt's Facebook posts.
22 Q There is no year in the dates but there are
23 months. Are these posts from 2016?
24 A They would be.
25 Q So the February 8th post is approximately a

12 (Pages 42 to 45)

Page 70

1  relationship with them.
2      THE ARBITRATOR: As long as you stay
3  within the facts it's overruled from that
4  standpoint.
5      I understand your objection but let's
6  deal with just facts as a supervisor.
7      MR. PASSALACQUA: I understand but I'd
8  be remiss if --
9      MR. HOBAN:   No, got you.
10     THE ARBITRATOR: You're doing your
11 job.
12     MR. HOBAN:   No worries.
13         MICHAEL THREAT
14 Of lawful age, being first duly sworn, as
15 hereinafter certified, was examined and testified as
16 follows:
17         DIRECT EXAMINATION
18 By Mr. Hoban:
19 Q  Good morning, Captain.
20 A  Good morning.
21 Q  Captain could you please state your full name
22    and spell your last name for the record?
23 A  Michael Threat, T-h-r-e-at.
24 Q  Captain, where are you currently employed?
25 A  City of Cleveland in the Emergency Medical

Page 71

1  Service.
2  Q  How long have you been employed with Cleveland
3     EMS?
4  A  Since July 2, 1992.
5  Q  So going on 26 years?
6  A  Yes.
7  Q  And are you a paramedic?
8  A  Yes, I am.
9  Q  And how long have you been a paramedic?
10 A  Since July of 1993.
11 Q  You're an EMS captain. When were you promoted
12    to the rank of captain?
13 A  Very difficult career here. I have -- I got
14    promoted to captain the first time -- or
15    excuse, EMS supervisor the first time in '94.
16    October 4, 1994 to August the 26th of 1996,
17    and the second time November of 2007.
18 Q  You've been a captain since November 2007?
19 A  Yes.
20 Q  What are the duties of an EMS captain?
21 A  Well, I'm responsible for shift coverage in
22    the paramedic ranks, providing resource
23    allocations for emergency calls, supervising
24    the 911 center, interactions with hospitals,
25    other public safety forces, police and fire,

Page 72

1     coordinating with any other entity, whether it
2     be Cleveland Public Power, at the direction --
3     directly under the commissioner via either
4     directly or through the deputy commissioner.
5     So I get most of my orders directly from my
6     two superiors.
7  Q  Do you respond to EMS calls yourself as a
8     captain?
9  A  Yes, I do.
10 Q  Do you respond to all the EMS calls that
11    happen when you're working or just particular
12    calls?
13 A  It depends. As many as I can get to.
14 Q  When you respond to a call do you have any
15    particular duties? Do you provide hands-on
16    treatment as a regular matter or do you assist
17    the EMS crew in other ways?
18 A  That depends also. Sometimes I'm there first,
19    and if I'm on scene first I do provide direct
20    patient care. The other situation that I
21    would provide direct patient care is if the
22    patients are more overwhelming than the
23    resources that we have available on scene. So
24    every now and then in addition to the medics,
25    the fire department I would have to provide

Page 73

1     patient care.
2  Q  O you engage in any liaison with the public at
3     a scene in assistance of EMS responders?
4  A  Could you be more specific?
5  Q  Talk to family members while EMS members are
6     providing treatment for a patient?
7  A  Yes. Yes, I do all the time.
8  Q  I'm going to direct your attention to events
9     of 15, February, 2016. Were you working that
10    day?
11 A  Yes, sir.
12 Q  February 15, 2016?
13 A  Yes, 2016. Yes, I was.
14 Q  And in what capacity were you working?
15 A  I was the communications supervisor for EMS.
16 Q  So you were working in dispatch?
17 A  Yes, sir.
18 Q  Was there another captain on duty at that time
19    as well?
20 A  Yes.
21 Q  And who was that?
22 A  Captain Ellen Kazimer.
23 Q  What were her duties for the day?
24 A  She was the field captain making sure the
25    staff was available and had the resources that

19 (Pages 70 to 73)

Page 74

1 they needed. We were the only two on duty I'm
2 pretty sure.
3 Q And just for our understanding solely, as I'm
4 understanding it, and I want you to correct me
5 if I'm wrong, the captain working in dispatch
6 is in dispatch. I don't want to say static,
7 but you're in a particular location?
8 A Yes.
9 Q And the field operations captain might move
10 between dispatch or be in a mobile unit at
11 various places in the city; is that accurate?
12 A Yes. Yes.
13 Q Was there a point at which Captain Kazimer
14 contacted you about an EMS member trying to
15 contact you?
16 A Yes, sir.
17 Q Can you describe that for us?
18 A At the beginning of the shift Captain Kazimer
19 called me and said that Paramedic Mark Barrett
20 wanted to talk to me.
21 Q I'm sorry to interrupt, Captain. When you
22 said the beginning of your shift, when did the
23 shift begin?
24 A Shift start is six in the morning.
25 Q For captains?

Page 75

1 A Yes. But when I say beginning, the beginning
2 portion of the shift.
3 Q I understand.
4 A So morning time.
5 Q Within the first couple hours of the shift?
6 A Yes.
7 Q Please continue.
8 A So she contacted me and stated that Mark
9 Barrett, Paramedic Mark Barrett wanted to talk
10 to me on an untaped line and it was in
11 reference to a personal issue. So I finished
12 up whatever I was doing and she provided me
13 with a phone number and I called Paramedic
14 Mark Barrett.
15 Q And what did you discuss with Mr. Barrett?
16 A He at that time stated that it was a personal
17 matter, it was concerning a Facebook post and
18 he said it was offensive, an offensive post.
19 He stated that it was a post that was seen on
20 Captain Marquardt's page.
21 Q Had you seen the post at the time when first
22 discussed it with Mr. Barrett?
23 A No, I don't have Facebook.
24 Q Did Mr. Barrett make any requests of you with
25 regard to the post?

Page 76

1 A He stated that he was just contacting me as a
2 union rep because he knew that I was the union
3 — what he termed union president. I had
4 corrected him. No, I'm not the union
5 president, I'm the steward.
6 He stated I know you're the union
7 contact for the captains. And he didn't
8 really elaborate about the post other than he
9 was deeply offended by it.
10 Q Did you have any communications with other EMS
11 members on February 15, 2016 about the post?
12 A Close to my lunchtime Captain Kazimer reported
13 to the RED Center and informed me —
14 Q The RED Center is dispatch?
15 A Yes, radio emergency dispatch. It's an
16 acronym.
17 Q R-e-d?
18 A R-e-d, yes.
19 Q Thank you.
20 So Captain Kazimer reported in from the
21 field to radio emergency dispatch and told you
22 what?
23 A By that time she came up there. So she
24 physically entered the building and told me
25 that a paramedic was trying to reach me,

Page 77

1 wanted to be connected with me. She had his
2 phone number, I didn't. I was in the process
3 of taking a refusal from a citizen and
4 finished up the refusal. Not a refusal, a
5 complaint. Finished up the complaint and then
6 we exited the dispatch floor and contacted the
7 employee.
8 Q And who was that employee?
9 A Gregory Hyde.
10 Q And how did you contact the employee?
11 A Ellen's cell phone. Just put it on speaker.
12 We went into the conference room so that it
13 was more private.
14 Q And what did you discuss, you and Captain
15 Kazimer, with Mr. Hyde?
16 A Well, he immediately started talking about a
17 Facebook post and it being something that
18 could possibly affect on-scene activity of the
19 citizens. He stated that it was a racially
20 inappropriate post and that it could be
21 volatile. I think that's the word he used.
22 I'm not sure. But that's what I got out of
23 it.
24 He said that he wanted to remain
25 anonymous, as did Mark Barrett. He also

20 (Pages 74 to 77)

FINCUN-MANCINI -- THE COURT REPORTERS
(216) 696-2272

3f9e1ee5-24a0-4d24-a273-0ab55abd0f17

CITY01250

Page 78

1  stated that, you know, you're the Union guy
2  and I just wanted to, you know, get in touch
3  with you to try to get this taken care of.
4  And he also stated that, you know, it was
5  dangerous.
6  Q  Dangerous in regard to him personally or EMS
7  members?
8  A  Well, what he alluded to was the civil unrest
9  that was present at the time. And he also
10  stated that it could be damaging to the
11  reputation of the City, meaning because
12  everybody in EMS kind of gets credit for the
13  bad news that pops in about the Division, so
14  something hits the media, you know, it's going
15  to be bad for everybody. That's what he
16  expressed.
17  So, you know, at that time I hung up
18  with him -- well, no, take that back. I
19  advised him that if it is what you say it is
20  I'm going to have to report it to my
21  superiors.
22  Q  And that was in your capacity as an EMS
23  captain?
24  A  Yes.
25  Q  A supervisor?

Page 79

1  A  Yes. And he asked that he remain anonymous.
2  I told him that I would try to keep him
3  anonymous. It was very important to me for
4  both members to stay anonymous, both members
5  of my shift to stay anonymous, but, you know,
6  obviously I wasn't able to keep them
7  anonymous.
8  Q  Had you seen the post before you spoke with
9  Mr. Hyde?
10  A  No.
11  Q  I'm going to direct your attention to City
12  Exhibit 1. It should be on the table there in
13  front of you. It says CX-1 in the lower
14  right-hand corner. Do you have it there, sir?
15  A  Yes, I do.
16  Q  All right. If you can just look at that for a
17  moment. I'll ask did you ultimately see the
18  post that Mr. Hyde and Mr. Barrett referred
19  to?
20  A  Yes.
21  Q  And was this the post that you saw?
22  A  I'm pretty sure it was, yes.
23  Q  How did you see it? And by that I mean on a
24  phone, on a laptop, on a computer?
25  A  I saw it on Captain Kazimer's Facebook page.

Page 80

1  Q  And you accessed that on her phone?
2  A  On her phone.
3  Q  On her phone. All right.
4  What was your reaction when you saw the
5  post?
6  A  I just thought it was bad. It was very bad is
7  what I said. And, you know, I need to report
8  this to my superiors.
9  Q  Why did you feel it was important to report it
10  to your superiors?
11  A  Because my job is to report anything that
12  could be high profile, damaging or unsafe.
13  Q  Did you, in your capacity as an EMS captain
14  and with your years of experience, conclude
15  that this post may represent a threat to the
16  safety of the EMS members?
17  A  I didn't conclude it but it was expressed by a
18  paramedic, and to make sure that whatever I
19  felt about it wasn't going to be the important
20  thing, just making sure the safety was going
21  to be maintained, that's why I reported it.
22  Q  To whom did you report it?
23  A  Deputy Commissioner David Miller.
24  Q  Deputy commissioner of EMS?
25  A  Yes.

Page 81

1  Q  I'm going to direct your attention to CX-2.
2  It should be on the table there in front of
3  you. Have you ever seen this?
4  A  I've seen it before.
5  Q  And did you see it on February 15th?
6  A  I'm pretty sure I did not.
7  Q  How did you see it or where did you become
8  aware of it first?
9  A  I'm pretty sure it was in the hearing for
10  Captain Marquardt.
11  Q  In the predisciplinary hearing?
12  A  Predisciplinary hearing.
13  Q  And you hadn't seen it prior to that?
14  A  No, I had not.
15  Q  Thank you, sir. I appreciate it.
16  THE ARBITRATOR: Okay. Cross?
17  CROSS-EXAMINATION
18  By Mr. Passalacqua:
19  Q  Good morning, Mike.
20  A  Good morning, sir.
21  Q  So you stated you don't use Facebook, you
22  don't have Facebook?
23  A  No, I do not.
24  Q  So then you wouldn't have an understanding of
25  friend or nonfriends or anything like that

21 (Pages 78 to 81)

Page 98

1  need to let me superiors know.
2        THE ARBITRATOR: Okay. Fair enough.
3  That's it. Thank you.
4            ELLEN KAZIMER
5  Of lawful age, being first duly sworn, was examined
6  and testified as follows:
7            DIRECT EXAMINATION
8  By Mr. Hoban:
9  Q  Captain Kazimer, thank you very much for
10    coming today.
11        Would you please state your full name
12    for the record and spell your last name
13    please?
14 A  Sure. It's Ellen Kazimer, K-a-z-i-m-e-r.
15 Q  And Captain Kazimer, where are you currently
16    employed?
17 A  City of Cleveland Division of EMS.
18 Q  And how long have you been employed with EMS?
19 A  Since 1995.
20 Q  And are you a paramedic?
21 A  I'm a paramedic but my current role is
22    operational captain.
23 Q  How long have you been an operational captain?
24 A  Since 9-18 -- I'm sorry 10-18 of 2011.
25 Q  So October 18th of 2011?

Page 99

1  A  Uh-huh.
2  Q  What are the duties of an EMS captain?
3  A  Well, what aren't the duties of an EMS
4     captain? We have a wide variety of duties;
5     staffing, supplies, medications, overseeing
6     personnel, handling complaints, whether it be
7     families, communities, hospital staff,
8     handling injuries, MVAs, exposures. Just
9     about anything that would occur in our 12 hour
10    shift we're likely going to touch.
11 Q  And as a captain your shift is from 6 a.m. to
12    6 p.m.?
13 A  Mine is, yes.
14 Q  When you work; is that correct?
15 A  Uh-huh.
16 Q  Do you respond to EMS calls?
17 A  We do have calls that we're required to go to
18    and other ones that we can go to at our
19    discretion.
20 Q  What types of calls are you required to go to?
21 A  Anything that is high level, gunshot wounds,
22    MVAs, suicide attempts, anything that might be
23    in the public, high profile.
24 Q  Do you have any particular duties when you
25    respond to an actual EMS call? Do you do

Page 100

1     hands-on care? Do you do liaison with the
2     public on behalf of the treating crew? Can
3     you describe that for us?
4  A  As little hands-on care because our role is
5     more globally to observe everything that is
6     going on and help to facilitate anything that
7     might need to be, whether that's packed up,
8     telling the family where we're going, what
9     hospital or what condition. Try to get that
10    together. So not so much hands-on but more
11    controlling the situation that's occurring.
12 Q  I'm going to direct your attention -- well,
13    let me ask this question first: Having worked
14    for EMS for almost 23 years can you describe
15    the relationship between EMS and the
16    community?
17 A  Well, you mean our responsibilities, what I
18    feel our responsibility is?
19 Q  What kind of relationship does EMS try to
20    maintain with the community?
21 A  A neutral. You know, we're not there to
22    judge. I mean, I can say that there are times
23    where we have somebody who needs to be treated
24    and oftentimes it's hey, it doesn't matter to
25    us what you did, I just need to know so I can

Page 101

1     treat you appropriately. So kind of just a
2     neutral party so that we can get to the end
3     means, which is treating the person
4     appropriately so not to make any judgments.
5  Q  I'm going to direct your recollection to
6     February 15th of 2016. Were you working that
7     day?
8  A  I was.
9  Q  And in what capacity were you working?
10 A  As a operational captain in the field as
11    Captain 1.
12 Q  Was there another captain scheduled that day
13    as well?
14 A  The other captain was Captain Threat who was
15    at the dispatch center.
16 Q  Did you receive any communication from any EMS
17    member on 15, February, 2016 who wanted to get
18    in touch with Captain Threat?
19 A  That is correct. Paramedic Mark Barrett had
20    contacted me wanting to get ahold of Captain
21    Threat and I said, you know, is this work
22    related, what is this. He said I just need to
23    talk to him about something. And I said I'm
24    not going to give you Mike's number, but if
25    you give me your number I'll pass it on to

Page 102

1  Mike. That's what I did.
2  Q  Did you ever speak to Mr. Barrett on February
3     15th?
4  A  Other than that conversation?
5  Q  Other than that conversation.
6  A  No.
7  Q  Did you pass his number on to Captain Threat?
8  A  I did.
9  Q  Okay. Do you know if Captain Threat spoke
10    with Mr. Barrett?
11 A  To my recollection I don't know if he reached
12    out to him or not.
13 Q  Did you receive or have a communication with
14    any other EMS member on February 15th, this is
15    other than Mr. Barrett, regarding a Facebook
16    post from Mr. Marquardt?
17 A  Yes, then I received later on in the day a
18    text from Paramedic Greg Hyde saying that he
19    needed to speak with or wanted to speak with
20    Captain Threat regarding something that he saw
21    that he wanted to reach out to us,
22    specifically Mike, to talk to him about it.
23 Q  Were you aware or had you seen a Facebook post
24    at that point? Did you know what that was
25    about at that time?

Page 103

1  A  No. You know, our day flows, our day flows.
2     It wasn't anything that seemed to require my
3     immediate attention at the time.
4  Q  Did you speak to Mr. Hyde that day?
5  A  Both Captain Threat and I spoke with him on
6     speaker phone on my cell phone.
7  Q  Now, you don't hold the position of steward or
8     any officer positions with the CWA?
9  A  No.
10 Q  You are a member?
11 A  That's correct.
12 Q  But you have no office with CWA?
13 A  That's correct.
14 Q  How did the communication with you and Captain
15    Threat occur with Mr. Hyde? Was it on a cell
16    phone? Where was it?
17 A  On my cell phone in a conference room with
18    doors closed so as to, whatever the situation
19    is, maintain privacy.
20 Q  And what was the nature of the discussion with
21    Mr. Hyde?
22 A  He wanted to express to us his concern about
23    posts that were made and his concern for
24    Captain Marquardt and for all of us in general
25    due to the nature of the post.

Page 104

1  Q  I'll direct your attention to City Exhibit 1.
2     It's identified there as CX-1. Did you at
3     some point on February 15th view this post?
4  A  I did.
5  Q  And how did you view it?
6  A  Through my cell phone. Is that what you're
7     looking for, how I actually saw it?
8  Q  Yes. Physically.
9  A  On my cell phone.
10 Q  Did you look at it with anybody else or just
11    by yourself?
12 A  No, Captain Threat and I looked at it at that
13    time.
14 Q  What was your reaction to it when you saw it?
15 A  I was a bit shocked and disappointed.
16 Q  Why?
17 A  I just felt that the nature of what was
18    written was upsetting to me.
19 Q  In your discussion with Captain Threat with
20    Mr. Hyde, did Mr. Hyde express his concerns
21    about the post to you? You said he had
22    concerns about Captain Marquardt and then he
23    had other concerns. What were those other
24    concerns?
25 A  Just how it would paint us, us being the

Page 105

1     Division, possibly in not the best light with
2     the community.
3  Q  Did he express any safety concerns?
4  A  Yes.
5  Q  Anything specific or what were the nature of
6     the safety concerns?
7  A  My general recollection is that it just – it
8     could potentially put us in a position where
9     the community may not understand. As we know
10    how things role out in this life and such
11    completely that it could be somebody in –
12    could put them in danger, whether it be, you
13    know, verbally harassed or build upon that.
14 Q  I'll direct your attention to CX-2, which
15    should also be there on the table in front of
16    you. Had you seen this post from
17    Mr. Marquardt as well?
18 A  This one I saw later.
19 Q  And what was your reaction to this when you
20    saw it?
21    THE ARBITRATOR: Could we identify
22    later?
23 Q  Indeed. How long ago was later?
24 A  It was after I left the RED Center.
25 Q  Still during the workday before 6 p.m.?

27 (Pages 102 to 105)

Page 106

1  A   Correct.
2  Q   But after you had actually left dispatch?
3  A   Right.
4  Q   What was your reaction when you saw it?
5  A   It would have been similar to the initial
6      reaction I had.
7  Q   Did you take any action after your
8      communication with Mr. Hyde and having seen
9      the post?
10 A   I did not, no.
11 Q   Do you know if any action was taken?
12 A   Captain Threat contacted Deputy Commissioner
13     David Miller.
14 Q   Did you agree that Commissioner Miller should
15     be contacted?
16 A   Yes, I did agree.
17 Q   And why did you agree?
18 A   It looked like something that was not --
19     something that shouldn't be addressed at our
20     level and needed to be addressed at a higher
21     level than an operational captain.
22 Q   Thank you, Captain. I have nothing further.
23         THE ARBITRATOR: Cross when you're
24     ready, sir.
25         CROSS-EXAMINATION

Page 107

1  By Mr. Passalacqua:
2  Q   Good morning.
3  A   Good morning.
4  Q   All right. So you have Facebook?
5  A   I do.
6  Q   All right. Are you friends with Jamie on
7      Facebook?
8  A   I was at that time.
9  Q   At that time. When you were friends with
10     Jamie was there any indication on his Facebook
11     page where he was employed?
12 A   No, not that I can recall.
13 Q   He didn't reference at any time working for
14     the City or anything like that?
15 A   Not that I can recall.
16 Q   So nothing to tie Jamie to the City other than
17     you knew where he worked?
18 A   My personal knowledge, correct.
19 Q   So there was no public knowledge to that?
20 A   As far as I know, correct.
21 Q   And you said you work with the public in your
22     role as a captain?
23 A   That's correct.
24 Q   One would assume Jamie also does, seeing he
25     had the same position?

Page 108

1  A   Uh-huh.
2  Q   Was there any interaction with the public that
3      you saw that was detrimental, was it negative
4      in any fashion due to this post? Was there
5      any safety concerns due to this post that
6      you're aware of?
7  A   None that I am aware of.
8  Q   After this post are you aware if Jamie still
9      worked in the field?
10 A   I have no recollection what his assignments
11     would have been after that. He was on a
12     different shift.
13 Q   But you saw his name on the roster, you knew
14     he was scheduled and stuff like that?
15 A   Correct.
16 Q   So he was still working after these posts?
17 A   To the best of my recollection.
18 Q   And there was no public negative interaction
19     or anything?
20 A   I did not experience any.
21 Q   All right. Okay. You said that you received
22     phone calls from Mr. Barrett and Mr. Hyde
23     specifically asking to talking to Mr. Threat?
24 A   Uh-huh.
25 Q   Did they state why they wanted to talk to

Page 109

1      Mr. Threat and not to you?
2  A   I did ask, because oftentimes -- sometimes our
3      guys just want to talk to the other guys about
4      stuff and it is something I can handle. But
5      they wanted to speak to him in the capacity of
6      being the union steward and another union
7      member.
8  Q   They weren't talking to Captain Threat as a
9      captain, they were talking to him because it
10     was a union issue?
11 A   Correct.
12 Q   Okay. You stated that Mr. Hyde made a comment
13     concerned about Jamie. Did he elaborate on
14     his concern for Jamie?
15 A   I can only think that he felt it may have been
16     uncharacteristic and so therefore what was
17     going on.
18 Q   So you thought it was unlike Jamie?
19 A   That's what I think that Greg Hyde thought.
20 Q   Okay. Thank you. Are you aware of City of
21     Cleveland employees making posts on social
22     media in the past that may be characterized as
23     negative, inflammatory, discriminatory?
24 A   I'm sure stuff happens.
25 Q   Are you aware of any disciplinary action ever

28 (Pages 106 to 109)

Page 178

1  if you're resting at the moment with the right
2  to rebuttal.
3      MR. HOBAN:    Right.
4      THE ARBITRATOR: Let's take a break.
5  Off the record.
6      (Luncheon recess.)
7          - - -

Page 179

1          AFTERNOON PROCEEDINGS
2      THE ARBITRATOR: Dave, your case.
3      MR. HOBAN:  I will just note two
4  things, housekeeping. Two things for the
5  record: One, because Commissioner Carlton had
6  to leave for a family commitment Assistant
7  Safety Director Ed Eckart is sitting in as the
8  City's representative.
9      Additionally, pursuant to the questions
10 before, the copies of the City Civil Service
11 rules which were entered as Joint Exhibit 7
12 were last updated or last revised in 2006.
13     THE ARBITRATOR: Just a year you have?
14     MR. HOBAN:    That's it.
15     And then the EMS rules and regulations
16 were last revised in 2005.
17     THE ARBITRATOR: And that was H,
18 right?
19     MR. HOBAN:    That was H, yes, sir.
20     THE ARBITRATOR: Okay. That's all I
21 need. That's all I need. All right. Good
22 enough. Now, I think you start.
23     MR. PASSALACQUA: All right. Well, the
24 Union calls their first witness, Jamie
25 Marquardt.

Page 180

1          JAMIE MARQUARDT
2  Of lawful age, being first duly sworn, was examined
3  and testified as follows:
4          DIRECT EXAMINATION
5  By Mr. Passalacqua:
6  Q  Jamie, please state and spell your name for
7     the court reporter.
8  A  Jamie Marquardt. J-a-m-i-e. Marquardt is
9     spelled M-a-r-q-u-a-r-d-t. Sorry, I've got a
10    cold.
11 Q  Jamie, approximately how long have you worked
12    for the City?
13 A  Since September of '95.
14 Q  Since September of '95. And it's always been
15    for the Department of EMS?
16 A  Correct.
17 Q  And originally you were hired as what?
18 A  A paramedic.
19 Q  Paramedic. Okay. Eventually you were
20    promoted; is that correct?
21 A  Yes.
22 Q  Who promoted you into what position?
23 A  Commissioner Eckart. At the time he was
24    Commissioner Eckart. Assistant Safety
25    Director Eckart promoted me to sergeant to

Page 181

1  work in the office in the logistics
2  department. That was probably about 2010
3  approximately.
4  Q  2010 approximately. Okay. And subsequently
5     after that you were eventually promoted a
6     second time?
7  A  Yes.
8  Q  All right. You were promoted to what?
9  A  Operational captain.
10 Q  Do you know approximately when that occurred?
11 A  That was May -- May of 2013.
12 Q  May of 2013. And who promoted you?
13 A  Commissioner Carlton.
14 Q  Commissioner Carlton. Okay. I would like to
15    point to Tab 7 of the Union binder, Page 33. I
16    believe this is a memo to the Civil Service
17    Secretary from Acting Commissioner Carlton
18    asking Jamie and Beatrice Gomez to be
19    considered for a promotion, followed on page
20    34 by a certificate of appointment, and then a
21    conduct evaluation on Page 35, 36 and 37.
22        Jamie, looking at Page 30 of the
23    evaluation, on 35, 36, 37, is this an
24    evaluation for your job as a captain?
25 A  It appears to be, but to be honest with you I

46 (Pages 178 to 181)

Page 198

1 said while you remember the first post at the
2 top of the first page you just don't recall
3 any of the others; is that correct?
4  A  Yes.
5  Q  You're not denying that you made them, you
6    just don't remember making them?
7  A  I mean, some of these are blank. They're in
8    all different order. There is a different
9    font. So that's what I'm going from, my
10   memory.
11 Q  Okay. That's fair. I'm just saying you don't
12   remember. You're not saying you didn't make
13   this, you just don't remember?
14 A  Right, except for the one I do.
15 Q  You do remember the first one, right?
16 A  Yes.
17 Q  I'm going to direct your attention to City
18   Exhibit 1 that should be on the table there in
19   front of you.
20 A  I'm well aware of it.
21 Q  Just so you have it. You've got it there. So
22   looking at City Exhibit 1, that's your name at
23   the top of the page, right?
24 A  Yes.
25 Q  Jamie Marquardt?

Page 199

1  A  Yes.
2  Q  That's a picture of you?
3  A  Yes.
4  Q  City Exhibit 2 should be there on the table in
5    front of you as well. Looks like this.
6    (Indicating.) CX-2 down on the lower
7    right-hand corner.
8  A  I'm having a heck of a time finding these
9    things. There you go.
10 Q  Do you have it?
11 A  Yes.
12 Q  This post also has your name at the top?
13 A  Yes.
14 Q  And that looks like part of a picture of you
15   to the upper left-hand side?
16 A  Yeah, it's the same picture.
17 Q  Okay. Now, in February of 2016 at the time
18   that these two posts were made, City Exhibit 1
19   and City Exhibit 2, you were Facebook friends,
20   as you said, you had approximately 250
21   Facebook friends; is that correct?
22 A  Yes.
23 Q  Many of those friends were EMS employees?
24 A  No.
25 Q  Many were not?

Page 200

1  A  Many were not. Only a handful.
2  Q  Only a handful. But there were some?
3  A  There were some.
4  Q  How about firemen, city firemen?
5  A  Maybe a few.
6  Q  A few as well. How about police?
7  A  A few again.
8  Q  So there were some police, EMS and fire among
9    your Facebook friends?
10 A  Yes.
11 Q  And those friends knew that you were an EMS
12   captain?
13 A  Yeah.
14 Q  Now, you would agree with me that EMS needs
15   the trust of the community to operate
16   effectively?
17 A  I agree.
18 Q  They have to look at EMS as the good guys?
19 A  Yes.
20 Q  And not feel judged or condemned by EMS
21   members?
22 A  Yes, I agree with that.
23 Q  And that's a question of the operational
24   effectiveness of EMS, correct?
25 A  Yes.

Page 201

1  Q  And the safety of EMS members?
2  A  Yes.
3  Q  Tamir Rice had been a patient of Cleveland
4    EMS, correct?
5  A  Of EMS, yeah, not me.
6  Q  Not you personally, but of Cleveland EMS?
7  A  Yes.
8  Q  You texted -- and this was in relation to --
9    we can go from Tab 8, Page 6.
10 A  Are we done with these? (Indicating.)
11 Q  We may very well be back to those. But what
12   I'm also going to -- what I'm also going to go
13   to is City Exhibit 5, which looks like this.
14   (Indicating.) It's actually copies of text
15   messages between you and -- there you have it.
16 A  All right.
17 Q  So as we see in Tab 8, Page 6 there in the
18   binder and on City Exhibit 5, and as you
19   testified, on the afternoon of February 15,
20   2016 you texted Commissioner Carlton and told
21   her about the post, correct?
22 A  Yes.
23 Q  And you told her that a friend grabbed your
24   phone and made the post?
25 A  Correct.

51 (Pages 198 to 201)

FINCUN-MANCINI -- THE COURT REPORTERS
(216) 696-2272

```
 1  State of Ohio,          )
                            ) SS:
 2  County of Cuyahoga.     )

 3

 4              C E R T I F I C A T E

 5      This certifies that the foregoing is a true

 6      and correct transcript of the proceedings had

 7      before the American Arbitration Association,

 8      held at Burke Lakefront Airport, 1501 North

 9      Marginal Road, Cleveland, Ohio 44114-1077], on

10      Thursday, January 18, 2018, commencing at

11      10:00 a.m.

12

13      In the Matter of Arbitration Between:

14      Communication Workers of America, Local 4340
                 and
15      City of Cleveland
        Case No.: 01-16-0004-6966
16

17

18

19              Mary Balas-Dietz

20              COURT REPORTER

21              FINCUN-MANCINI COURT REPORTERS
                1801 E. 9th Street
22              Suite 1720
                Cleveland, Ohio  44114
23              (216) 696-2272
                (216) 696-2275 FAX
24

25
```

FINCUN-MANCINI — THE COURT REPORTERS
(216)696-2272