|  |  |
|---|---|
| *IN THE MATTER OF*<br>*ARBITRATION* | ) |
|  | ) |
|  | ) |
| *BETWEEN* | ) |
|  | ) *GRIEVANCE: Termination* |
|  | ) *Jamie Marquardt* |
| *CITY OF CLEVELAND* | ) |
|  | ) *AAA CASE # 01-16-0004-6966* |
| *AND* | ) |
|  | ) *BEFORE: ROBERT G. STEIN, NAA* |
|  | ) *ARBITRATOR* |
| *COMMUICATION WORKERS OF* | ) |
| *AMERICA, LOCAL 4340, AFL-CIO* | ) |
|  | ) |

**FOR THE EMPLOYER:**     **Patrick J. Hoban (0079794)**
950 Main Avenue, 4th Floor
Cleveland, Ohio 44113
pjh@zrlaw.com

**FOR THE UNION:**     **David Passalacqua**
**Executive Vice-President**
**CWA Local 4340**
1400 E. Schaaf Road
Brooklyn Heights, Ohio 44131
Dave4340@americtech.net (e)

**EXHIBIT**
**12**

**EXHIBIT**
ZS

## INTRODUCTION

This matter came on for hearing before the arbitrator pursuant to the terms of the collective bargaining agreement ("Agreement") (Joint Ex. 1) between The City of Cleveland ("City" or "Employer") and the City, County, and the Communications Workers of America, Local 4340, AFL-CIO, EMT Supervisors (Captains) ("Union"). That Agreement was effective from April 1, 2013 through March 31, 2016 and included the conduct which is the subject of this grievance.

Robert G. Stein was mutually selected by the parties to impartially arbitrate this matter, pursuant to the terms of Article XXV, Section 3 under the auspices of the American Arbitration Association as case number 01-16-0004-6966. A hearing on this matter was conducted on January 18, 2018 in a conference room at Burke Lakefront Airport, located at 1501 Marginal Road, Cleveland, Ohio. The parties mutually agreed to that hearing date and that location, and they were each provided with a full opportunity to present both oral testimony and documentary evidence supporting their respective positions. The hearing, which was fully recorded via a written transcript, was subsequently declared closed upon the parties' individual submissions of post-hearing briefs.

No issues of either procedural or jurisdictional arbitrability have been raised, and the parties have stipulated to the statement of the issue to be resolved. (Tr. 7) The parties have also agreed to the submission of eleven (11) joint exhibits.

2

CITY01343

**ISSUE**

Did the City of Cleveland have just cause to terminate the employment of Jamie Marquardt? If not, what is to be the remedy?

(Joint Ex. K)

**RELEVANT AGREEMENT PROVISIONS**

ARTICLE III—MANAGEMENT RIGHTS
ARTICLE XXV—GRIEVANCE PROCEDURE

**BACKGROUND**

Before the details of the instant grievance are presented, it is imperative that some background information be included to establish the events and circumstances which previously had occurred that eventually led the discipline challenged herein arose.

On November 22, 2014, an individual sitting under an open pavilion or gazebo at the Cudell Recreation Center outdoor park area in a generally "impoverished and blighted" area on Cleveland's near West Side made a 9-1-1 call. The unidentified caller reported that he had observed another individual pointing a pistol at random people at the park location shortly before 3:30 p.m. Two (2) police officers were dispatched to the scene and repeatedly yelled to the young black male to "show me your hands" through an open patrol car window. At least one of the officers saw a black gun lying on the table in front of the young man, and then saw the twelve-year-old boy pick it up and put it in his waistband. At least one of the officers told the boy to raise up his hands. Instead of complying with the officer's directive, the boy, Tamir Rice ("Rice"), reached into his waistband to pull out the

3

CITY01344

gun. In response, the one officer jumped out of the cruiser and immediately shot his own gun at Rice, hitting the latter twice in his torso from a distance of less than ten (10) feet. The officers subsequently discovered that Rice's gun was an Airsoft gun, which had had its orange safety tip, removed. That type of weapon is an actual size replica of a real gun, but was designed to shoot non-lethal plastic pellets. Rice's mother said that the toy gun had been given to her son to play with by a friend of her son just a few minutes before the police arrived.

Shortly after Rice's being shot, EMS (Emergency Medical Service) paramedics arrived and took him to a nearby hospital where Rice died the next day. The incident received local, national and international coverage. In the wake of the shooting and the ultimate lack of any indictment against the officer who had shot Rice, protests and public outcry broke out in Cleveland, similar to that which had happened earlier in Ferguson, Missouri and also in the other locations where other black males were shot by white police officers and ultimately sparked the nationwide "Black Lives Matter" movement.

Although he was not involved in the Rice shooting incident, Jamie Marquardt ("Marquardt" or "Grievant") was originally hired to work for the City's EMS as a paramedic in September 1995. (Tr. 180) In approximately 2010, he was promoted to sergeant in the EMS logistics department, and then was subsequently promoted again in May 2013 to EMS operational captain. (Tr. 180-1814)

On February 15, 2016, approximately 250 of Marquardt's Facebook friends, including some of his EMS work colleagues, discovered the following post on Grievant's Facebook® page with his name and photograph and with time stamps between 3:30 a.m. and 4:59 a.m.

4

Let me be the first on record to have the balls to say Tamir Rice should have been shot and I am glad he is dead. I wish I was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around acting bad. I am upset I did not get the chance to kill the little criminal f—ker. (letters eliminated here were included in original Facebook message)

(City Ex. 1)

EMS employees Mark Barrett ("Barrett") and Greg Hyde ("Hyde") each received the above Facebook® message and independently decided to report the post immediately to their EMS supervisors, Captains Michael Threat ("Threat") and Ellen Kazimer ("Kazimer"). Threat and Kazimer received the reports from Barrett and Hyde, immediately noted the Grievant's post as inappropriate and immediately submitted it to Deputy Commissioner David Miller, who immediately communicated the Grievant's Facebook® post to Commissioner Nicole Carlton ("Carlton"). Also on February 15, Grievant sent a text message to Carlton claiming that a friend of his named Donnie had actually created and sent the disputed Facebook® message while he was an overnight guest at Grievant's home on Sunday, February 14, 2016. "During his February 18 interview with the Office of Integrity, Control, Compliance and Employee Accountability ("OICCEA"), Grievant said his friend was a member of Alcoholics Anonymous ("AA") and, for that reason, Grievant could provide only a first name . . . but not a last name, denying investigators the ability to contact the 'friend.'" (Employer brief p. 2)

As a neutral investigative office with the City's Department of Public Safety, OICCEA completed its investigation of the matter and issued its report on February 24, 2016. (Tr. 131; Joint Ex. C) After reviewing that report, the evidence, and an audio interview (Joint Ex. D), Commissioner Carlton notified Grievant and the Union in a February 24th letter regarding the charge specifications, the rules purportedly violated, and a March 4 pre-

5

disciplinary hearing. (Tr. 132-133; Joint Ex. E) At the pre-disciplinary hearing, Grievant further claimed that Donnie made the challenged Facebook® post but Marquardt refused again to give a last name for him.

In a March 16, 2016 letter, Carlton notified Marquardt and the Union of her decision to terminate Grievant's employment "based on Grievant's implausible explanation, the inflammatory and disruptive content of the posts, and EMS rules violated." (Joint Ex. F; Tr. 153)

On May 12, 2016, the Union filed a Step 3 grievance on Marquardt's behalf (Joint Ex. G), which was heard on May 1 and May 27, 2016. Because the grievance was denied at that level on June 23, 2016, the matter was advanced to arbitration by the Union. (*Id.*) Thus, the matter has been submitted to this arbitrator for final and binding resolution.

## SUMMARY OF THE EMPLOYER'S POSITION

The City's underlying contention is that it had a "just cause" basis to terminate Marquardt's employment based on the content of the postings made on his personal Facebook® page. In addition to the February 15 posting cited above, Marquardt also responded to a Facebook response to the original message sent by his cousin Kevin with the following message:

> Stop Kevin. How would you feel if you were walking in the park and some ghetto rat pointed a gun in your face? Would you look to him as a hero? Cleveland looks to this felony hood rat as a hero.

(City Ex. 2)

6

CITY01347

The Employer insists that Grievant's Facebook® posts violated clear EMS policies known by Grievant and which he was responsible for enforcing to preserve a positive relationship with the community served by the EMS. EMS rules specifically prohibit:

- "... conduct that is unbecoming [to] an employee;"

- Conduct that is "prejudicial to the reputation or good name of the Division or EMS either or off duty;"

- "The use of profane, disrespectful, or uncivil language or behavior to ... [a] civilian;"

- Social media posts that are "knowingly ... harmful, inappropriate ... about ... any patient or patients' family members at any time on or off duty."

(Joint Ex. H) The Employer further asserts that on-duty and off-duty posts made on Facebook® or other social media posts have been found by arbitrators as a justifiable basis for an employee's termination because the Employer has "an interest in maintaining efficiency and control over its operations and it was not obligated to wait until the Grievant's activities caused actual harm or disruption to those operations before taking action." *City of Ada*, 134 LA 702, 708-709 (Lumley 2014), citing to *Connick v. Meyers*, 461 U.S. 138, 150-152, 103 S.Ct. 1684, 71 L.Ed 2d 708 (1983).

The City also asserts that Grievant denied the City any opportunity to contact "Donnie" and, by doing so, Marquardt denied the Employer the ability or means to verify that alibi of Donnie's alleged responsibility for the Facebook® postings regarding Tamir Rice. (Tr. 205)

In response to the Union's claim that Grievant was a victim of disparate treatment imposed by the City compared with that imposed in previous and separate incidents against police sergeant Johnny Hamm ("Hamm"), police sergeant Frank Woyma "Woyma") and fire lieutenant Guy Estergall ("Estergall (Union Ex. 10), the Employer emphasizes that

7

EMS is independent among the City's other safety forces and its employees are subject to

the EMS's rules and Commissioner Carlton's comprehensive authority, rather than the rules

and regulations effective for the City's law enforcement officers and fire fighters.  The

Employer argues:

> The Union failed to meet its burden.  The Union presented no witness with first-hand knowledge of Woyma, Estergall, or Hamm's conduct of the City's investigation.  None of them were EMS employees subject to EMS rules or charged with maintaining EMS's critical relationship with the community.  Witnesses, including Grievant, agreed that Woyma, Estergall, and Hamm did not state that they wished they had killed a child. (Tr. 30, 67, 91, 195)  To the contrary, Hyde testified that Estergill's posts specifically expressed concern over a child's well-being.  (Tr. 68)
>
> The Union presented no evidence that Woyma, Estergall, or Hamm's posts disparaged a named City resident.  Nor did the Union present evidence that their subordinates reported, took offense to, or expressed safety concerns based on their posts.  In short, the Union presented no evidence of similarly situated employees receiving different discipline [for] conduct even remotely similar to Grievant's.
>
> The basis for Commissioner Carlton's decision to terminate was the content of Grievant's posts expressing disappointment that he did not have the opportunity to kill Tamir Rice.  The purported social media posts by other City employees the Union produced may be unpleasant or upsetting, but they are not statements by an EMS Captain wishing he had shot to death a 12-year-old boy who was an EMS patient.

(Employer brief p. 27)  The City cites to the prior arbitration of *City of Piqua*, 137 LA 1888,

1894 (Goldberg 2017) for its holding that "a supervisor is held to higher standards than if

he were a non-supervisor."  Because of his role as a recognized EMS leader, more weight is

given to what he says and what he does as he is viewed by his subordinates because he has

significant responsibility for carrying out the recognized mission of the EMS organization.

While noting that EMS has a progressive disciplinary policy, the City emphasizes

that that policy permits termination for a single offense. (Tr. 151)  The Employer insists

that Carlton acted reasonably in determining that Marquardt's egregious conduct, in stating

that he was disappointed that he did not kill Tamir Rice, merited his termination.

8

CITY01349

Therefore, the City requests that the Union's grievance be denied in its entirety. As a long-term City employee, the Grievant was well-aware that the Tamir Rice shooting was a highly charged social issue both locally and nation-wide, and the fact that the subject messages were sent when he was off-duty is inconsequential.

## SUMMARY OF THE UNION'S POSITION

In its post-hearing brief, the Union's initial argument states:

Since [there] was no formal complaint filed against Marquardt either internally or from the community and the post was limited to approximately 250 "friends," and [there] was no evidence that the posts affected EMS service, the only [plausible] explanation for the disparate treatment applied to Marquardt was the intense media pressure that finally resulted in his discharge.

(Union brief p. 4)

The Union asserts that the three (3) City employees who had also placed inappropriate Facebook® posts online had received either no discipline at all, or a mere hand slap." (Union Ex. 10)

- Hamm made inappropriate remarks after a police chase that resulted in two deaths;
- Woyma made racist and anti-Muslim remarks; and
- Estergall engaged in online "gay bashing."

The Union also emphasizes that those three (3) individuals were employees of the City's police and fire departments and received "no discipline at all, or a mere hand-slap." (Union brief p. 5; Union Ex. 10) The Union avers that the Facebook® posts made by the three (3) other City employees identified their authors as Cleveland City employees and the specific department in which they worked, while Grievant's postings leading to his discipline did not include any identifying information as to his status as an EMS staff member and officer.

9

(Tr. 147)  The Union claims that "[t]he City offered no real evidence that there was ever any negative impact from the posts, only rough opinions from the Commissioner.  On cross-examination she admitted she didn't know of any disruption of service or any other negative impacts." (Union brief p. 12)  The Union concludes:

> Carlton's rationale for terminating Marquardt is just not reasonable, believable nor credible.  Her testimony applied to the facts leads to one conclusion.  That is, that she was under intense pressure from the media and most likely otherwise to resolve and end the Marquardt issue quickly.  And so she did, she fired Marquardt, not for a violation of EMS's social networking policy, or disruption of service or morale, nor any other rule, regulation or reason she claims.  There was not even an actual complaint.  She ignored the disciplinary policy that the City had established with the City's Police and Fire Departments regarding inappropriate social media use.  The only thing that mattered is that Jamie Marquardt had to be fired as a sacrifice to quiet the media . . .

(Union brief p. 13)

Based on the above claims, the Union requests that its grievance be sustained, that Marquardt be reinstated to his former position as a captain for Cleveland's EMS, and that he be made whole in every way.

**DISCUSSION**

In an employee disciplinary matter, an arbitrator must determine whether an employer has proved with substantial evidence that a disciplined employee has committed an act warranting discipline and that the penalty imposed is appropriate under the circumstances. *Hy-Vee Food Stores, Inc. and Local 747, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of Am.*, 102 LA 555 (Bergist 1994).  In making this determination, the arbitrator may consider, among other circumstances, the nature of the Grievant's offense(s) and the Grievant's previous work record.  *Presource Distrib. Servs., Inc. and Teamsters Local 284*, FMCS No. 96-10624 (1997).

10

Commonly-accepted "just cause" principles routinely used by arbitrators in disciplinary matters "are intended to ensure a higher level of fairness and due process for employees accused of wrongdoing. They are also intended to increase the probability of workplace justice." *Paper, Allied Indus., Chem., and Energy Workers Int'l Union, AFL-CIO, Oren Parker Local 8-171, Vancouver, Wash. and Petra Pac, Inc.,* 05-1 Lab. Arb. Awards (CCH) P 3078 (Nelson 2004).

> "Just cause" imposes on management the burden of establishing: (a) that the standard of conduct being imposed is reasonable and is a generally-accepted employment standard which has been properly communicated to the employee; (b) that the evidence proves that the employee engaged in the misconduct which did constitute a violation of that standard; and (c) that the discipline assessed is appropriate for the offense after considering any mitigating or extenuating circumstances.

*Phillips Chem. Co. and Pace, Local No. 4-227, AFL-CIO,* 00-2 Lab. Arb. Awards (CCH) P 3553 (Taylor 2000).

The precise issue for resolution here is whether the Employer has proven that the Grievant's termination was based on "just cause." ,Article III, Section (E) identifies the Employer's right to "[s]uspend, discipline, demote or discharge for just cause . . ."

> "Just cause" is a contractual principle that regulates an employer's disciplinary authority. It is an amorphous standard, ordinarily open to arbitral interpretation on a case-by-case basis. Before an arbitrator will uphold a penalty, he ordinarily looks to the circumstances of the misconduct, any mitigating factors, and whether the aggrieved employee received his/her contractual and legal due process protections.

*State of Iowa, Iowa State Penitentiary and Am. Fed'n of State, County, and Mun. Employees, AFSCME State Council 61,* Lab. Arb. Awards (CCH) P 3923 (Dworkin 2001). The purpose of "just cause" is to protect employees from unexpected, unforeseen, or unwarranted disciplinary actions, while at the same time protecting management's rights to adopt and to

11

enforce generally-accepted employment standards. *Phillips Chem. Co. and Pace, Local No. 4-227, AFL-CIO*, 00-2 Lab. Arb. Awards (CCH) P 3553 (Taylor 2000).

Because not all of the conflicting testimony offered in this matter can be accurate, the arbitrator must carefully analyze all of the statements given at hearing in an attempt to resolve the recognized conflicts. The arbitrator must undertake a full and fair consideration of all of the evidence presented and determine the weight to which he honestly believes the individual evidence is entitled. It is the role of an arbitrator to observe the witnesses and to determine who among them is telling the truth. *Givaudin Corp*, 80 LA 835, 839 (Deckerman 1983). In addition to determining the credibility of witnesses, the arbitrator must also determine the weight to be afforded to their testimony, as well as all of the other evidence submitted by the parties. *Minn. Teamsters Pub. and Law Enforcement Employees Union, Local No. 320 and City of Champlin, State of Minn.*, 00-2 Lab. Arb. Awards (CCH) P 3499 (Berquist 1999). To do so, an arbitrator must consider whether conflicting statements do ring true, weigh each witness's demeanor while he testifies, and use certain guidelines to determine credibility—the self-interest or bias of a witness, the presence or absence of corroboration, and the inherent probability of the specific testimony offered. *CLEO, Inc. (Memphis, Tenn.) and Paper, Allied Indus., Chem. and Energy Workers Int'l Union, Local 5-1766*, 177 LA 1479 (Curry 2002).

> An accused employee is presumed to have an incentive for not telling the truth, and when his testimony is contradicted by one who has nothing to gain or lose, the latter is to be believed.

*United Parcel Serv., Inc. and Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., Local 89*, 66-2 ARB 8703 (Dolson 1966). One arbitrator noted: "In determining credibility, the arbitrator may consider not only the demeanor of the witnesses, but the

12

CITY01353

motivation of those witnesses, as well." *Teamsters Local 688 and Meridian Med. Techs.*, 01-1 Lab. Arb. Awards (CCH) P 3815 (King, Jr. 2001). Arbitrator King also noted: "A grievant's continued job tenure is sufficient motivation, in and of itself, to lie." *Teamsters Local 688*. "In resolving divergent claims, arbitrators are allowed to credit the testimony of disinterested witnesses over that of a grievant, absent a showing that witnesses called on behalf of the employer have a motive to lie." *Teamsters Local 688*. "Many arbitrators have also recognized that supervisors and disinterested witnesses have a higher goal than attempting to sustain the disciplining of an employee. Thus, in resolving credibility, the arbitrator may consider not only the demeanor of the witnesses but the motivation of those witnesses as well." *Teamsters Local 688*.

> An employee has an incentive for denying a charge against him, for he stands immediately to win (or lose) the most in the outcome of the case ... [I]f there is no ill will toward the accused on the part of the accuser, and if there is no evidence upon which to base a conclusion that the accuser is mistaken, the conclusion that the charge is true should not be deemed improper.

*Cargill, Inc. and Bakery, Confectionery, Tobacco Workers and Grain Millers Int'l, AFL-CIO, CLC, Local 49*, 00-2 Lab. Arb. Awards (CCH) P 3645 (Wyman 2000). In this matter, the arbitrator found the individual and collective testimony of the other hearing witnesses to be more credible than that of Grievant in his attempt to diminish any personal responsibility for his unacceptable conduct, which included his failure to accept any personal responsibility for the loathsome and racist remarks on Facebook® about what can only be characterized as the tragic death of a twelve year old boy.

After a thorough review of all of the evidence submitted in this matter, the testimony of the various witnesses at the hearing, and the summary arguments made in the

13

parties' post-hearing briefs, the arbitrator finds that the Employer was justified in imposing the challenged termination discipline against Marquardt. It must be noted that if the remarks on Facebook® were not made by the Grievant, but were made by who the Grievant refers to as Donnie and without his permission, the actions of the Employer and if needed the conclusions reached by the arbitrator would have rested upon a very different set of facts to consider. However, the Grievant's testimony about Donnie remain implausible in light of the evidence and what is at stake. Marquardt refused to provide Donnie's last name, so he could have been questioned about his role in this matter. And, while I respect the AA code of not revealing names of those who participate in the program the AA code provides specific exceptions relevant to this matter:

The AA document, "Safety and A.A.: Our Common Welfare" (Employer Ex. 9), under Section "Group Safety and Unity " states the following:

. . . *"Anonymity is not a cloak protecting criminal or inappropriate behavior. . .*

*"Victims of inappropriate behavior, harassment or predators can let the group know about such situations, often through a sponsor or trusted friend. This way the group is informed, and members can help address the situation and curtail further problems."*

Notably, the City gave notice to Grievant regarding the specific sections of the EMS Rules and Regulations (Joint Ex. H), the EMS Social Networking Policy (Joint Ex. I) and applicable civil service rules (Joint Ex. J) Those controlling rules of employee conduct include the following:

- **101.01—City of Cleveland Mission Statement**

  1. We are committed to improving the quality of life in the City of Cleveland by strengthening our neighborhoods, delivering superior services, embracing the diversity of our citizens, and making Cleveland a desirable, safe city in which to live, work, raise a family, shop, study, play, and grow old.

14

- **101.02—Cleveland EMS Pledge to our Community**

  1.  We are committed to improving the quality of life in the City of Cleveland by maintaining the highest ethical and professional standards of prehospital care, treating our patients with dignity and respect, and caring for each patient as if they were a member of our family.

- **102.01—Statement of Policy**

  2.  The rules and regulations shall set the policy to be followed by all employees and any deviation from or violation of these rules and regulations shall be deemed as a basis for disciplinary action.

  . . .

  4.  The purpose of this manual is to establish the policies of the Division of Emergency Medical Services, and to provide the guidelines, support, and protection upon which to base their decisions and actions.  It is the responsibility of each employee to be knowledgeable of the contents of this manual and for all supervisory personnel to administer these rules and regulations fairly and impartially.

- **102.02—Familiarity**

  1.  It is the duty of every employee of the Division of Emergency Medical Services to read and understand all of the rules and regulations.  Any questions about the meaning, content, or application of any rule should be immediately noted to an individual's immediate supervisor without delay.

- **104.02—Obedience to Orders**

  1.  All employees of the Division of EMS must obey all:

      1)  Federal, State and Local Ordinances
      2)  Rules, Regulation, and General Orders as issued by the Commissioner or EMS
      3)  Standard Operating Procedures and Medical Protocols as issued by the Commissioner and Medical Director of EMS
      4)  Lawful orders issued by any officer of the Division of a higher rank, either written or oral

  2.  Failure to obey a lawful order issued by any officer of the Division of a higher rank, either written or oral, shall be grounds for immediate suspension from duty.  Employees are responsible for all duties assigned to them by a superior officer.

15

3. These directives are not to be construed as the only guidelines for acceptable behavior. All conduct that is unbecoming to an employee shall be grounds for disciplinary action.

4. Employees shall not escape responsibility for a violation of any of the type of directive by pleading ignorance of the rule or a belief that the rule in question did not apply to them.

- **202.01—Code of Conduct**

1. All employees shall conduct themselves at all times in a manner not prejudicial to the reputation or good name of the Division of EMS, either on or off duty.

2. Employees will render proper respect to all individuals of higher rank. The use of profane, disrespectful, or uncivil language or behavior to another employee, superior officer, or civilian is prohibited.

(Joint Ex. H)

- **Division of Emergency Medical Service General Orders 1.20—Social Networking Policy 1.20**

C. Division of Emergency Medical Service employees shall not post knowingly false, harmful, inappropriate, confidential, or proprietary information/media about the City of Cleveland, the Department of Public Safety, the Division of Emergency Medical Service employees, and any patient or patients' family members at any time on or off duty.

(Joint Ex. I)

- **City of Cleveland—Rules of the Civil Service Commission**

Rule 9.10 Tenure

... [A]ny officer or employee in the classified service may be discharged, suspended, or reduced in rank for any one or more of the following causes:

9.10-5. Conduct unbecoming an employee in the public service

9.10.18 For other failure of good behavior which is detrimental to the service, or any other act of misfeasance, malfeasance, or nonfeasance in office.

(Joint Ex. J)

16

Marquardt's other Facebook® entries reflect that he has an existing propensity for making disparaging comments, such as against NFL player Cam Newton. (Employer Ex. 3) As a long-term City employee, he was well-aware that the Tamir Rice shooting was a highly charged social issue both locally and nationally, and the fact that the subject messages were sent when he was off-duty is irrelevant given the fact that his coworkers and friends on Facebook® are aware of his position with EMS. As a recognized EMS leader, his judgments and actions define the quality and character of the services rendered by that organization as he is one of the EMS leaders responsible for carrying out the organization's mission. EMS's inherent mission is to neutrally lend assistance to individuals in need without prejudice or bias. EMS's neutrality is essential to providing the life-saving services it provide to all Cleveland citizens . . . The goodwill of the public and the firm belief that EMS is on their side is not only essential to EMS's effective operations but also to EMS members' safety. (Tr. 8-9)

Despite the Grievant's claim that the "challenged" Facebook® message would potentially be received and viewed only by his 250 established "friends," "any notion of privacy in today's social media [is] illusory." *Vista Nuevas Head Start and Mich. ASFCME Council 25 & Local #1640*, 12-2 Lab. Arb. Awards (CCH) P 5707 (Daniel 2011). "In an age of digital recording and social media, it is unreasonable for any officer to assume that he can 'get away' with something." *Law Enforcement Labor Servs. Local 123, Officers and Detectives and the City of Richfield*, 17-1 Lab. Arb. Awards (CCH) P 6828 (Neigh 2016). Even seven (7) years ago, Arbitrator William Daniel recognized the following:

> In this day and age, no one who is familiar with and uses the internet for the purpose of communication, such as by means of Facebook®, can possibly be ignorant of the accessibility by others to information that is posted. Merely

CITY01358

> intending to exclude all others is not a defense against such publication generally,
> and so users must make use of such communication methods with due caution.

*{Vistas Nuevas Head Start}* Indeed, Marquardt's defense that the subject postings leading

to his discipline were limited to being received and reviewed by only 250 of his selected

friends or recipients is illusory, because each recipient had the potential to send or advance

that same message to his/her own friends or chosen recipients, including media in the

Cleveland area.  Grievant's participation on Facebook®, and his entries demonstrated a

combined unacceptable attitude and objectionable disregard for the standards of conduct

which the Employer had a right to expect.  "When citizens enter into an employment

relationship with the government, they voluntarily acknowledge and accept that in its role

as an employer, the government is endowed with all rights normally reserved to

employers, including the right to maintain discipline and promote morale, harmony and

efficiency in the work place." *City of Wooster, Ohio*, 111 LA 1167, 1172 {Richard}.  The

Grievant's off-duty racist posts reflected adversely upon the EMS Division and created

some friction within the ranks and also the chain of command.  Additionally, Marquardt

violated the EMS rules and regulations and social media policy as to personal conduct and

communications that may have diminished the esteem of the EMS Division or its personnel

in the eyes of the public, including through local newspaper and television coverage.

Marquardt was deserving of severe discipline based on the creation of a "nexus" or

"connection" between what he did as an employee and the Employer's intended operations.

The subject electronic posting was clearly an exercise of extremely poor judgment.

Finally, the Union's claim of disparate treatment needs to be addressed and resolved

regarding the three other City employees as identified above on page 8 of this decision.

The Union's claim of disparity states:

18

Two Cleveland police officers and one firefighter (supervisors as well, two Sergeants and a Fire Lt., just like Marquardt, posted outrageous statements on their Facebook® accounts. Some of these accounts even identified their authors as Cleveland City employees and what department they worked for. Marquardt's post did not have any identifying information at all. Two [of the three other City employees] were not disciplined at all and one was given a ten-day suspension, later reduced to three. Marquardt was fired.

(Union brief p. 6)

"The burden to prove disparate treatment lies with the Union, and it is a 'difficult burden of proof.'" *Stone Container Corp.,* 106 Lab. Arb. Awards (CCH) P 475 (Gentile 1996). "A claim of disparate treatment requires a showing that another employee who was similarly situated to the Grievant was treated different for the same or a similar offense." *Logan-Hocking School Dist.,* 122 Lab. Arb. Awards (CCH) P 550 (Sellman 2006). "In order to prove disparate treatment, a union must confirm the existence of both parts of the equation. It is not enough that an employee was treated differently than others; it must also be established that the circumstances surrounding his/her offense were substantially like those of individuals who received more moderate penalties." *Genie Co.,* Lab. Arb. Awards (CCH) P 542 (Dworkins 1991). None of these examples submitted by the Union involves a supervisor stating that a patient (specifically identified by name) of the EMS should have been shot and that he was glad that patient was dead. Furthermore, he stated he was upset about not having the opportunity to kill the patient himself, a patient that his own subordinates at EMS responded to after he was shot and then treated in an attempt to save his life while transporting him to the hospital.

Although the posts of Hamm, Woyma and Estergall (Union Exs. 10) were subject to respective review for their "inappropriate content," that review was done under the auspices of different supervisors and administrators in the City's police and fire

19

department, rather than EMS personnel. Additionally, the conduct of the three individuals, in those other City departments was subject to review under the respective rules and regulations and disciplinary standards established in separate and different collective bargaining agreements. The Union here has failed to establish that the Grievant was the victim of disparate treatment when the standards utilized were not identical.

20

**AWARD**

For the reasons set forth above and incorporated herein, the Union's grievance is denied.

Pursuant to Article XXV, Section 3, the Union, as the losing party in this matter, is responsible for all of the arbitrator's fees and expenses.

Respectfully submitted to the parties this 23rd day of April 2018

Robert G. Stein, Arbitrator

21

CITY01362