# In The Matter Of:
*Jamie Marquardt v.*
*Nicole Carlton, et al.*

---

*Jamie Marquardt*
*December 12, 2018*

---

*Fincun-Mancini, Inc.*
*1801 E. Ninth Street*
*Suite 1720*
*Cleveland, Ohio 44114*
*(216) 696-2272*

**Min-U-Script® with Word Index**

**EXHIBIT 2**

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3                        - - -
 4   Jamie Marquardt,          )
                               )
 5           Plaintiff,        )
                               )
 6      vs.                    )Case No. 1:18-CV-00333-SO
                               ) Solomon Oliver, Jr., J.
 7   Nicole Carlton, et al.,   )
                               )
 8           Defendants.       )
 9                        - - -
10
11        Deposition of Jamie Marquardt, the plaintiff
12   herein, called on behalf of the defendants for oral
13   examination, pursuant to the Federal Rules of Civil
14   Procedure, taken before Karen A. Toth, Notary Public
15   in and for the State of Ohio, pursuant to notice, at
16   the offices of Zashin & Rich, Ernst & Young Tower,
17   950 Main Avenue, 4th Floor, Cleveland, Ohio 44113 on
18   Wednesday, December 12, 2018, commencing at
19   9:58 a.m.
20                        - - -
```

## Page 2

```
 1  APPEARANCES:
 2  On behalf of the Plaintiff:
 3      William C. Livingston, Esq.
        Berkman, Gordon, Murray & DeVan
 4      55 Public Square, Suite 2200
        Cleveland, Ohio 44113
 5
 6  On behalf of the Defendants:
 7      David R. Vance, Esq.
        Patrick J. Hoban, Esq.
 8      Zashin & Rich
        Ernst & Young Tower
 9      950 Main Street, 4th Floor
        Cleveland, Ohio 44113
10
11  Also present:
12      Nicole Coleman
        Jzinae Jackson (After lunch)
13
14                        - - -
```

## Page 3

```
                       INDEX
WITNESS:                                    CROSS
Jamie Marquardt
    by Mr. Vance                              6

                        - - -

                    E X H I B I T S
Defendants':                                Marked
    1                                         23
    2                                         24
    3                                         27
    4                                         29
    5                                         52
    6                                         55
    7                                         83
    8                                        127
    9 and 10                                 133
   11                                        135
   12                                        137
   13                                        138
   14                                        140
   15                                        141
   16                                        143
   17                                        146
   18                                        154
```

## Page 4

```
               E X H I B I T S (Cont.)
Defendants':                                Marked
   19                                        157
   20                                        160
   21                                        162
   22                                        169
   23                                        176
   24                                        181
   25                                        184
   26                                        186
   27                                        199
   28                                        200
   29                                        202
   30                                        203
   31                                        226
   32                                        232
   33                                        234
   34                                        236
   35                                        238
   36                                        259
   37                                        260
   38                                        263
   39                                        266
   40                                        268
   41                                        269
```

Page 33

1   was for angioedema.
2 Q And what is that, sir?
3 A It's a reaction to a blood pressure medicine.
4   Throat, face, tongue swell.
5 Q Kind of like anaphylaxis?
6 A Much worse.
7 Q And when was that; do you recall?
8 A I believe I provided that to you. I don't
9   remember the exact date. There were a
10  number -- unfortunately it happened a number
11  of times.
12 Q What is your current address?
13 A 10034 Pleasant Lake Boulevard, Apartment J18,
14  Parma.
15 Q How long have you been in that apartment?
16 A At least three years.
17 Q Do you live with anyone?
18 A No.
19 Q And you're divorced; is that correct?
20 A Correct.
21 Q And when were you divorced?
22 A 2015. 2015.
23 Q Is that when it was finalized?
24 A I believe so, yeah, somewhere in that area.
25 Q And what is your ex-wife's name?

Page 34

1 A Debra.
2 Q Does she is still go by Marquardt?
3 A Yes.
4 Q Have you discussed with your ex-wife this case
5   at all?
6 A Only when she -- yes, I did.
7 Q What have you discussed?
8 A I think I -- when it originally happened I
9   told her what happened.
10 Q What do you mean by what happened?
11     MR. LIVINGSTON: Can we clarify the
12  time frame, whether you were married or
13  divorced?
14     MR. VANCE: I'll worry about the
15  record and whether or not it's clear, okay?
16     MR. LIVINGSTON: That could be a
17  privilege. That's why I'm stating that.
18     MR. VANCE: I asked him when he
19  spoke with his ex-wife about it.
20     MR. LIVINGSTON: I know and I'm saying
21  ex-wife at the time? This is a privilege that
22  I have to protect. I just want to clarify and
23  make sure he wasn't married at the time.
24 Q Were you married at the time of your
25  separation, sir?

Page 35

1 A Separation from the City?
2 Q From the City.
3 A No.
4 Q And how long before your separation from the
5   City were you divorced; do you recall?
6 A Maybe less than a year.
7 Q Okay. So you just stated that you spoke with
8   your ex-wife about what happened. What is
9   what happened?
10 A With the Facebook posts.
11 Q And what did you two discuss?
12 A I just told her I didn't do it.
13 Q Is that a verbal communication?
14 A Yes.
15 Q Any other conversations you've had with your
16  ex-wife about this case?
17 A Yes.
18 Q Okay. What is that?
19 A My kids. My two daughters.
20 Q For the record, I don't want to know what your
21  daughters' names are. I'm going to ask you
22  how old they are here, but other than that
23  we'll try to keep their names out of the
24  record, okay?
25 A Sure.

Page 36

1 Q Sorry. I didn't mean to cut you off. I
2   wanted to make that clear.
3 A That's okay. My two daughters are being
4   harassed at school regarding that because it
5   was in the news.
6 Q So the two of you spoke about that?
7 A Yes.
8 Q Anything else?
9 A Not that I can recall, no.
10 Q Are you currently dating?
11 A No.
12 Q And how old are your daughters?
13 A My daughters are 14 and 16.
14 Q Have you discussed the case with them at all?
15 A Yes.
16 Q Okay. What have you told to them?
17 A That, you know, you're going to see some stuff
18  on the news.
19 Q Anything else?
20 A No.
21 Q Where did you go to high school?
22 A Midview.
23 Q And you graduated of Midview?
24 A Yes.
25 Q Do you have any post high school education?

Page 49

1  just understood you don't do that.
2 Q Did somebody tell you that you were prohibited
3  from doing those things?
4 A No. It's just an understanding that every --
5  I mean, you know, you don't post stuff like
6  that.
7 Q How did you come to have that understanding?
8 A Well, my ex works for Cleveland Clinic. They
9  have a very strict social media policy. So,
10  you know, I kind of knew the ins and outs of
11  what you can and can't post, plus just
12  watching the news.
13 Q Did anyone ever from the City direct you as to
14  what you could or could not post on your
15  Facebook?
16 A There is a social media policy within the
17  City.
18 Q And had you received that social media policy?
19 A I never received it.
20 Q You were a captain at the time of your
21  separation from the City?
22 A Correct.
23 Q As part of your duties as captain were you
24  responsible for ensuring that your
25  subordinates abided by general orders of EMS?

Page 50

1 A Yes.
2 Q And you had access to those general orders?
3 A I have access to what I was given.
4 Q Did you know where you could find general
5  orders when you were a captain?
6 A They were starting to be put online.
7 Q And how do you mean online?
8 A Through your city account they would be in
9  folders.
10 Q Any other way in which you believe that there
11  are -- how you came to have this understanding
12  of what was and was not allowed to be posted
13  on Facebook?
14 A No.
15 Q Can you describe for me what happened relative
16  to Tamir Rice?
17 A I don't understand the question.
18 Q So obviously there was a shooting that
19  involved Tamir Rice, correct?
20 A Yes.
21 Q Do you recall when that was?
22 A No.
23 Q So let's go back, if we could, go back to
24  Exhibit 4.
25 A Okay.

Page 51

1 Q In the first paragraph there, second line, it
2  talks about the shooting of a 12 year old boy
3  who police said was killed by an officer when
4  the boy reached toward his waistband for a
5  realistic pellet gun in November 2014.
6 A Yes.
7 Q Is that fairly accurate or is that an accurate
8  description of the Tamir Rice incident?
9 A The date appears correct.
10 Q You believe it was in November of 2014?
11 A If they put it, yes. I have no reason not to.
12 Q And is it your understanding that the claim
13  was that Tamir reached into his waistband for
14  a gun?
15 A Am I aware of the claim?
16 Q Your understanding of the incident?
17 A Yes.
18 Q And is it your understanding that that gun
19  turned out to be fake?
20 A Yes.
21 Q And was there an orange safety tip that was
22  removed from that gun; is that your
23  understanding?
24 A I have no idea. I had heard that.
25 Q That was something that you had heard?

Page 52

1 A Yes.
2 Q And is it your understanding that Tamir was
3  indeed a 12 year old boy?
4 A That's my understanding, yes.
5 Q And that he was shot by the police?
6 A Yes, that's my understanding.
7 Q And that he died the following day; is that
8  right?
9 A I don't recall when he died. I know he died.
10 Q Would you consider that incident to have been
11  a tragedy?
12    MR. LIVINGSTON: Objection.
13 A A tragedy?
14 Q Yes.
15 A Yes.
16 Q Let's go to Exhibit 5.
17    (Defendant's Exhibit 5
18    marked for identification.)
19 Q What is Exhibit 5, sir?
20 A This is the post that ultimately I received my
21  termination for.
22 Q There is a couple posts here; is there not?
23  Two separate posts?
24 A Yes, this looks like it's the start of the one
25  on Page 2.

Page 53

1 Q So there is a post at the top of Page 1 and
2   then there is a second post that begins on
3   Page 1 but it's not the whole thing, and then
4   the whole thing is on Page 2; is that right?
5 A Yes. It's a -- this is a post and it looks
6   like this one is a reply. (Indicating.)
7 Q A reply to a comment to the original post?
8 A It must be, yeah.
9 Q Okay. So if you could for me please read into
10  the record what the first post is.
11 A What it is?
12 Q Yeah, please read it for me.
13 A "Let me be the first on record to have the
14  balls to say Tamir Rice should have been shot
15  and I am glad he is dead. I wish I was in the
16  park that day as he terrorized innocent
17  patrons by pointing a gun at them walking
18  around acting bad. I am upset I did not get
19  the chance to kill the little criminal
20  fucker."
21 Q And then if you could read the reply.
22      MR. LIVINGSTON: I'll object. The
23  document speaks for itself, but you can go
24  ahead.
25 A "Stop Kevin. How would you feel if you" --

Page 54

1   it's cut off -- "Walking in the park and some
2   ghetto rat pointed a gun in your face? Would
3   you" -- cut off again -- 'to him as a hero?
4   Cleveland sees this felony hood rat as a
5   hero."
6 Q On the second page there it says two hours
7   ago. Do you see that on the bottom?
8 A Yes.
9 Q And then there is -- what exact time do you
10  believe that these posts were made on your
11  Facebook -- these posts showed up on your
12  Facebook page, correct?
13 A Yes.
14 Q And when exactly do you believe these posts
15  were on your Facebook page?
16 A Sometime in the morning.
17 Q The morning of what date, do you recall?
18 A It would have been the 14th. I believe the
19  14th. Like I said, I don't know the dates.
20 Q Okay.
21 A I would have to look at something. I think
22  it's the 14th.
23 Q So let's try and get this date squared away so
24  we're all on the same page here. You had a
25  interview with James Votypka of the OIC,

Page 55

1   correct?
2 A Yes.
3 Q And that interview was the same week as the
4   post, correct?
5 A I believe so, yes.
6 Q Okay. And you were to be truthful during the
7   interview; is that right?
8 A Yes.
9 Q And were you truthful during that interview?
10 A Yes.
11     MR. VANCE: Okay. Bill, I don't
12  have this to give to you today but this is the
13  recording of that interview. You have it
14  already. It was produced at -- I can't tell
15  you the exact number. But after this depo is
16  over I'll email it to you. And, Karen, I'll
17  email it to as well so you can include it in
18  the exhibits.
19     MR. LIVINGSTON: So are you marking
20  this as 6?
21     MR. VANCE: I will mark this as
22  6.
23     (Defendants' Exhibit 6
24  marked for identification.)
25     MR. VANCE: And so we're all on

Page 56

1   the same page, this is Bates stamped City
2   0560.
3       If anybody has any trouble listening
4   or hearing, it should be loud enough but just
5   say so. I'm just going to play a little bit
6   of it from the beginning.
7       (Tape playing.)
8       (Tape stopped.)
9 Q Let me pause this for a second. So Sunday
10  night is when you believe that this started;
11  is that correct?
12     MR. LIVINGSTON: Objection. I believe
13  he said probably Sunday.
14     MR. VANCE: Then he said it was
15  Sunday night.
16 A Whatever the tape says.
17 Q Let's go back and listen to it again. We can
18  do that.
19     (Tape playing.)
20     (Tape stopped.)
21 Q Okay. So is it your recollection that on
22  Sunday night somebody had come over to your
23  house?
24 A Yes.
25 Q Okay. And who was that gentleman that came

Page 65

1 A On Page 1 I would agree that he was walking
2   around acting bad.
3 Q Okay. Anything else you don't disagree with
4   or you don't agree with? Excuse me. Excuse
5   me. Let me scratch that. Anything else that
6   you disagree with as to these posts?
7 A Disagree with?
8 Q Yes.
9 A Or agree with?
10 Q Agree with. Excuse me. Anything else you
11   agree with as to these posts?
12 A I believe he -- where it says terrorized
13   innocent patrons, I believe he did that. Or
14   the tape, the videotape that was on the news
15   appeared to show that.
16 Q Anything else?
17 A No, not on Page 1.
18 Q How about Page 2?
19 A I mean, if I take out the some ghetto rat I
20   would -- see, I didn't -- I don't know what
21   the person was replying to. But the fact
22   that, you know, it's not cool to have a gun
23   pointed at your head. That's what.
24 Q Do these posts in any way speak out against
25   the City of Cleveland?

Page 66

1 A The City?
2 Q Yes, sir.
3 A No. Well, I mean it says Cleveland but I
4   don't know what they mean by that.
5 Q But as you read them you don't feel that they
6   speak out against the City in any way, do
7   they?
8 A I don't know the intention of the writer.
9   They don't appear to be.
10 Q If anything they seem to attack Tamir Rice; is
11   that correct?
12 A Yes, that's what it appears to be.
13 Q Do these posts in any way relate to a public
14   concern, that you're aware of?
15    MR. LIVINGSTON: Objection. He's not
16   a lawyer. You can answer.
17 A I'm not sure. Is there a way you can reword
18   that?
19 Q Sure. These posts, as you read them, do they
20   relate in any way to a social concern?
21 A This whole case was a social concern.
22 Q How so do you believe that those posts relate
23   to a social concern of the City or of the
24   community?
25 A I mean, the fact that you have, you know, a

Page 67

1   child shot. You have, you know, the police
2   having to shoot him. You have public outrage.
3   You have public support. You have -- I mean,
4   it was just a whole -- it's a national story.
5   Endless.
6 Q What part of the sentence "I am upset I did
7   not get the chance to kill the little criminal
8   fucker" relates to a social concern, if any?
9 A I don't know if it's a social concern. It's
10   someone's opinion.
11 Q And same question relative to any political
12   concern; do these posts relate in any way to a
13   political concern?
14 A I believe the case is a political concern,
15   yes.
16 Q What aspect of "I'm upset I did not get a
17   chance to kill the little criminal fucker"
18   relates to a political concern, if any?
19 A I don't think it has anything to do with it.
20 Q And why do you believe that the posts here
21   relate in any way to a community concern?
22 A I read it as one person's opinion.
23 Q Okay.
24 A That's the way I'm reading it.
25 Q Were these posts upsetting to you?

Page 68

1 A I was upset about them, yes.
2 Q How come?
3 A Because, number one, it was on my Facebook
4   post and it made it look like it was my
5   opinion.
6 Q And if you had this opinion why would that be
7   bad?
8 A Because the person wants to shoot -- it
9   appears they want to shoot a kid.
10 Q And you would consider that to be egregious,
11   the death of a child and the idea that --
12 A I would consider that --
13 Q -- somebody wants to kill a child is --
14 A If that was the person's true intention, yes.
15 Q Yes, that's pretty heinous?
16 A It's -- I don't know how to answer that
17   question because, you know, I've read this
18   post a thousand times and to me it -- I took
19   this as it appears that if this person was in
20   the park that day when the crime was
21   occurring, it's almost like a support for the
22   police officer is the way I read this. Now,
23   if somebody else reads it they can get a
24   different opinion of it. Obviously it's black
25   and white. It says what it says. But I think

Page 69

1   it's up to the reader to determine. And the
2   only person that truly knows is the person
3   that posted it and I'm not him so I don't
4   know.
5 Q How exactly do you read the police into either
6   of those posts, Mr. Marquardt?
7 A Because it appears -- I don't know about read
8   the police into it. It appears that there was
9   a crime being committed and that, you know,
10  obviously the police shot him and this
11  person's saying he would shoot him.
12 Q And that he was angry that he didn't get the
13  chance to do that?
14 A Well that one, yeah. I don't see the police
15  in that part.
16 Q I'm still confused on where exactly do you
17  read the police into these posts?
18 A I don't read the police into it, but at this
19  particular time, if I recall correctly,
20  everybody was attacking the police and it
21  seemed like everybody was polarized in one
22  direction or the other. They were either
23  supporting the police and had this type of
24  opinion or they were supporting, you know,
25  Tamir Rice and his -- you know, his actions.

Page 70

1 Q Where did you fall in that spectrum?
2 A I saw both sides of it.
3 Q Were you glad this 12 year old boy Tamir Rice
4   was dead?
5 A No.
6 Q Did you in any way see that as a good thing?
7 A No.
8 Q So is it fair to call these posts egregious?
9 A Yes. I -- yes. I mean, that part of it, yes.
10 Q Do you agree that these posts have a potential
11  to affect EMS operations?
12 A No.
13 Q Why not?
14 A Because they didn't. It's my opinion it
15  didn't affect it at all.
16 Q Why do you believe that to be the case?
17 A Because I got blamed for this and I continued
18  to work after this post was made for a month
19  and there were absolutely no ill effects about
20  it. I was worried about that.
21 Q And you can speak to the totality of EMS?
22 A I would have heard about it, yes.
23 Q Why would you have heard about it?
24 A Because I'm a captain of operations. I
25  oversee everybody there.

Page 71

1 Q You oversee all EMS employees?
2 A On my shift and when I work overtime hours,
3   yes.
4 Q Do you believe that these posts harmed your
5   friendships?
6 A No.
7 Q Why not?
8 A Because I would have known. Somebody would
9   have said I don't want to be friends with you
10  anymore.
11 Q Do you feel these posts at all negatively
12  impacted your working relationships?
13 A No.
14 Q Had you been the one, at least according to
15  you that -- and I understand that you say you
16  didn't make these posts, but had you made
17  these posts would they have impacted your
18  working relationships?
19 A You're asking me to predict something. I
20  don't know.
21 Q Were you worried about the adverse effects of
22  the posts?
23 A Absolutely.
24 Q Why?
25 A Because it was on the news. I was more

Page 72

1   worried about my kids.
2 Q Anything else you were worried about?
3 A I was worried that people were going to think
4   that this was who I was.
5 Q Any concern that you as a captain of EMS, that
6   they'd also consider this is who EMS was?
7 A No.
8 Q Why not?
9 A Because people that know me know I wouldn't --
10  this is not me, so I wasn't concerned about
11  that.
12 Q You don't know everybody in the City, correct?
13 A I thought you were talking about EMS.
14 Q No, just that there would be a concern that
15  this would be attributed to you and in turn
16  attributed to EMS.
17 A No, I don't believe so.
18 Q No concern about that whatsoever?
19 A No.
20 Q Why not?
21 A Because everybody had an opinion at the time,
22  like I said. There were opinions all over the
23  place.
24 Q If these posts had been attributed to you as a
25  captain in EMS could that cause the public to

Page 73

1   become angry with EMS?
2 A I don't -- again, you're asking me to predict
3   something. I don't know. I can't speak for
4   the public.
5 Q Let's say if the public was angry with EMS,
6   would that be a problem for EMS? Could that
7   create a problem?
8 A It could create a problem, yes.
9 Q What do you think the public's reaction would
10  be if it felt that an EMS captain wanted to
11  kill a child?
12      MR. LIVINGSTON: Objection.
13 A I don't know.
14 Q Now, we spoke a little bit about your
15  interview with Mr. Votypka. Were you 100
16  percent truthful as part of that interview?
17 A As I recall, yes.
18 Q Do you recall stating during that interview
19  that I never used the F word?
20 A I never said that. I said I never used the F
21  word on Facebook.
22 Q Let's go back to Exhibit 6, if we could.
23     Just so the record is clear, Exhibit 6
24  is a recording of your interview with
25  Mr. Votypka, correct?

Page 74

1 A Yes.
2 Q All right. Let me play it here. If you can
3   listen.
4       (Tape playing.)
5       (Tape stopped.)
6 A I was referring to Facebook when I said I
7   don't use the word fuck or balls. It was
8   Facebook.
9 Q So through Facebook and as part of Facebook
10  you never use fuck --
11 A Not in my posts, no.
12 Q Any other part of Facebook that you use that
13  word?
14 A Maybe during personal conversations, not --
15 Q It talked about also Tamir Rice. Have you
16  ever through Facebook posted anything about
17  Tamir Rice?
18 A Not in my posts, no.
19 Q Not in your posts. Anywhere on Facebook at
20  all?
21 A That's possible. I have conversations all the
22  time with persons.
23 Q Seemed pretty clear to me that this was not
24  necessarily limited to Facebook. I mean, you
25  start off with I never say fuck. I never have

Page 75

1   talked about Tamir Rice.
2 A I would never say that. That's not true.
3   First of all, everybody in the City discussed
4   Tamir Rice, and I would never say that I never
5   used the F word. I was referring to Facebook.
6   My Facebook posts. That's what we were
7   talking about.
8 Q So that testimony relative to your OIC
9   interview with Mr. Votypka, that was strictly
10  limited to Facebook?
11 A Actually, my Facebook word posts, yes.
12 Q How about the N word, have you ever use the N
13  word?
14      MR. LIVINGSTON: Objection. You can
15  answer.
16 A Throughout my whole life?
17 Q Throughout the last five years let's say.
18 A I don't recall. It's possible. I'm not going
19  to deny it.
20 Q Did you use the N word in a derogatory fashion
21  in the last five years?
22      MR. LIVINGSTON: Same objection.
23 A Same answer. Possible.
24 Q You understand that the N word is a highly
25  inflammatory word?

Page 76

1 A Yes.
2 Q It's a racist word?
3 A It is highly inflammatory.
4 Q You don't consider it a racist word?
5 A Not always.
6 Q You as a white man, if you were to use that
7   word would you consider it to be racist?
8       MR. LIVINGSTON: Objection. You can
9   answer.
10 A It depends how it's used.
11 Q If you're using it to refer to a black
12  individual, would that be racist?
13 A Not necessarily.
14 Q No? Why not?
15 A Cuz I could -- I use it once in a while. I'm
16  sure I used it with my friends.
17 Q In what context would this word be appropriate
18  with your friends?
19 A Just joking around.
20 Q How so?
21 A Simple as that, just joking around.
22      MR. LIVINGSTON: I'm going to object
23  to this whole line of questioning.
24 Q How do you joke around using that word?
25 A You joke around with your friends. It has no

Page 89

1 A This was printed before I deleted anything.
2 Q Had to have been, otherwise we wouldn't have
3   it.
4 A No, but I mean the reply. There is something
5   missing is what I'm saying. Because Kevin's
6   replying to something.
7 Q Well, you're replying to Kevin.
8 A Right, but first of all, it's not me, but --
9 Q Your account is replying to Kevin?
10 A Right. But whatever Kevin had written is not
11   in here.
12 Q Right. And that would most likely be -- if
13   you go to the first page there is one comment
14   to the original post?
15 A Yes.
16 Q Do you recall whether or not you ever read
17   that comment?
18 A I don't recall.
19 Q So you don't know if that comment was made by
20   Kevin or not?
21 A I just -- I can't figure this out because it
22   says one comment but then it's got this
23   comment under there. So that -- there would
24   have to be two comments.
25 Q Not necessarily if you reply to a comment.

Page 90

1 A There is a comment. This one and Kevin's.
2 Q But you don't have -- all this had been
3   deleted. You deleted all this from your
4   Facebook account, correct?
5 A When I saw it, yes.
6 Q But that Kevin you believe to be Kevin Poplar?
7 A I believe so, yes.
8 Q And that's your cousin?
9 A Yes.
10 Q And you don't have any recollection of any
11   comments that were made to your original post,
12   what that one comment may have been?
13 A No.
14 Q Do you recall when you went to bed on February
15   15th, when in that morning?
16 A Yeah, I said it was probably four or five.
17 Q Four or five in the morning, a.m.?
18 A Yeah.
19 Q And do you recall when it was that you woke
20   up?
21 A I think it was somewhere around noon. I know
22   it was after noon.
23 Q And how exactly was it that you found out
24   about the Facebook posts?
25 A There were a number of messages on my phone

Page 91

1   and then there were a number of messages on
2   Facebook.
3 Q Messages on your phone, I'm assuming those are
4   text messages you're referring to?
5 A Text messages, voice messages.
6 Q Let's start with voice messages. Do you
7   recall who left a voice mail for you?
8 A I believe my sister.
9 Q Which sister?
10 A Her name is Shelley.
11 Q What's her last name?
12 A Nowak.
13 Q And any other voice mail messages that you're
14   aware of?
15 A Not that I can recall. As I said, I don't
16   remember.
17 Q And I'm assuming you don't have that voice
18   mail message any longer?
19 A No.
20 Q Who all do you recall receiving texts from?
21 A I can't differentiate between texts and
22   Facebook messages.
23 Q Okay.
24 A So I don't know which one they did. You know,
25   I can't remember that far back.

Page 92

1 Q Who do you recall either sending you a
2   Facebook message or a text message about the
3   posts?
4 A The ones I remember were John Wearstler. I'm
5   trying to think who else did. I think John
6   McNamara but I'm not sure.
7 Q Who is John McNamara?
8 A Somebody I used to work with.
9 Q In EMS?
10 A Yes. I don't recall who else called me.
11 Q You don't have any of these messages anymore
12   I'm assuming?
13 A No.
14 Q You deleted them?
15 A Yeah. I have to because voice mail only holds
16   so much and the messages on Facebook only goes
17   so long I think.
18 Q How certain are you that Donnie made these
19   posts on Exhibit 5?
20 A How do you want me to --
21 Q If you had to assign a percentage to it, if
22   you're on a scale of zero to 100 percent,
23   what's your comfort level that Donnie was the
24   one that did this?
25 A I'd say 90.

Page 109

1  A  Probably have.
2  Q  Did Donnie make any other posts or did
3     anybody -- were any other posts made the early
4     morning of February 15th other than what's in
5     Exhibit 5?
6  A  If they were I didn't see them.
7  Q  Are you aware of whether or not he sent any
8     Facebook messages on February 15th on your
9     behalf?
10 A  He might have. I'm not sure.
11 Q  Unaware of any?
12 A  I'm not aware of any, yes.
13 Q  Do you believe that Donnie did anything else
14    with your phone?
15 A  I don't know. I can't -- I don't have any
16    evidence if he did.
17 Q  Were any other text messages, Facebook
18    messages, anything else sent on February 15th
19    that you did not send?
20 A  I don't remember.
21 Q  Don't recall whether or not there were any
22    text messages sent that weren't from you?
23 A  There was something else that happened. I
24    can't remember what it was now. But I don't
25    recall specifically what it was.

Page 110

1  Q  Do you believe that the Facebook posts on
2     Exhibit 5 were the reason the City discharged
3     you?
4  A  Yes.
5  Q  Any other reason?
6  A  No.
7  Q  Who do you think made the decision to
8     discharge you?
9  A  I don't know who did.
10 Q  Any idea? Any inkling whatsoever?
11 A  Well, just three.
12 Q  Okay. Who are the three you think?
13 A  Nicole Carlton, Ed Eckart or the Mayor.
14 Q  Any reason to believe or any evidence to
15    suggest that the Mayor was involved in the
16    decision to discharge you?
17 A  Do I have any evidence? No.
18 Q  Why do you believe that the Mayor may have
19    been involved?
20 A  Because it was a media story. I'm sure he was
21    aware of it.
22 Q  But no evidence to suggest that he was
23    involved in the decision?
24 A  I don't have any physical evidence, no.
25 Q  Anybody tell you that?

Page 111

1  A  No.
2  Q  How about Ed Eckart? He's the assistant
3     safety director for the City?
4  A  Correct.
5  Q  That was his position at the time of your
6     separation?
7  A  Yes.
8  Q  And he used to be the commissioner of EMS,
9     correct?
10 A  Correct.
11 Q  And why is it that you believe that Ed Eckart
12    may have been involved in your discharge?
13 A  Well, he was interviewed the day after the
14    post was made.
15 Q  Interviewed by whom?
16 A  Ed Gallek.
17 Q  Did he say anything?
18 A  He pretty much came on there and accused me of
19    it before the hearing was held.
20 Q  Anything that you received that suggested that
21    Ed made the decision to discharge you?
22 A  No.
23 Q  Anybody say that it was Assistant Safety
24    Director Eckart's decision?
25 A  No.

Page 112

1  Q  How about Commissioner Carlton, why do you
2     believe it was her decision to discharge you?
3  A  Because she said it during the arbitration.
4  Q  Do you think it was an easy decision for
5     Commissioner Carlton to make?
6     MR. LIVINGSTON: Objection.
7  A  I don't know.
8  Q  Do you have any idea who replaced you after
9     your separation?
10 A  Nobody directly replaced me. I think they
11    hired -- I heard they hired people or promoted
12    a couple people.
13 Q  So after your separation someone else was
14    promoted to captain of operations?
15 A  That's what I understand.
16 Q  Your position remained there, it was just now
17    somebody else was in it?
18 A  Correct. As far as I know.
19 Q  So what exactly did you do in response to the
20    posts once you saw them?
21 A  I erased them right away and then I posted a
22    global apology. Status update apology.
23 Q  Why was it that you apologized?
24 A  Because I apologized if anybody thought it was
25    me.

Page 113

1 Q Did you apologize due to the inflammatory
2 nature of the posts?
3 A Yes.
4 Q How long did you think the posts were up for
5 total?
6 A I don't -- I'm not sure.
7 Q Less than -- probably at least less than 12
8 hours if you went to bed at five?
9 A Definitely, yeah.
10 Q Definitely less than 12. And did you contact
11 Commissioner Carlton that day about the posts?
12 A Yes.
13 Q And you contacted her the same day that you
14 learned of the posts, correct?
15 A I believe so.
16 Q Did you ever file for bankruptcy before?
17     MR. LIVINGSTON: Objection.
18 A No.
19 Q Other than your divorce have you ever been a
20 party to another legal action? Not criminal,
21 civil.
22 A Not that I'm aware.
23 Q Have you ever asserted any other claims
24 against an employer?
25     MR. LIVINGSTON: Objection.

Page 114

1 A What do you mean by claims?
2 Q Have you ever sued another employer?
3 A No.
4 Q Not including the grievance related to your
5 separation from the City did you ever file any
6 other grievance while you worked for the City?
7 A Yes, but I can't remember what for.
8 Q Do you have any idea how many you think you
9 filed?
10 A Not many.
11 Q Less than two, less than -- I mean less than
12 three?
13 A I can't remember because I was doing
14 grievances too as a union member. So as a --
15 as an employee I don't believe I filed a
16 grievance, but if I did it was only one or
17 two.
18 Q But you did obviously grieve your separation?
19 A Yes. Yes.
20 Q Have you ever testified in court before?
21 A Yes.
22 Q When was that?
23 A It was in the '90s. Probably late '90s.
24 Q Do you recall what the case was?
25 A Yeah, councilman accused of beating his wife.

Page 115

1 Q Do you remember who the councilman was?
2 A Cintron.
3 Q Can you spell that?
4 A C-i-n-t-r-o-n I believe.
5 Q And did you respond to the call?
6 A Yes.
7 Q Any other instance in which you testified in
8 court?
9 A Not that I can recall.
10 Q Have you ever been convicted of any crimes?
11 A Traffic included?
12 Q Yes.
13 A Yes.
14 Q When was that? If we can, let's work
15 backward. When was the most recent?
16 A Oh, boy. 2002, maybe.
17 Q Okay. What was that?
18 A A DUI.
19 Q And were you actually then convicted or did
20 you plead to a DUI?
21 A Yes.
22 Q And the City was aware of that?
23 A Yes.
24 Q You kept your job?
25 A No. Can I correct you?

Page 116

1 Q Absolutely.
2 A It was 1997.
3 Q Maybe '96?
4 A Possible.
5 Q So that was shortly after you had been hired,
6 right?
7 A Right.
8 Q So when you were hired -- where you hired -- I
9 have it at September 5, 1995; is that right?
10 A Yes.
11 Q And what position were you hired into?
12 A Paramedic.
13 Q EMT? Same thing or different?
14 A Different.
15 Q Different. Okay.
16     All right. Anything else that you can
17 think of as to crimes that you may have been
18 convicted for?
19 A No.
20 Q Did you receive any discipline from the City
21 for that?
22 A Yes.
23 Q For the DUI I'm asking?
24 A Yes.
25 Q Do you remember what that was?

Page 121

1  you had a smooth operation. It's the main
2  point of the -- the dispatch center oversees
3  how the whole service is running.
4 Q So that's one. And then what is the other?
5 A Field operations.
6 Q And what did that entail?
7 A It entailed getting the staffing together for
8  the field, allocating overtime, dealing with
9  supply issues the units have, and then also
10 going out and going on calls and monitoring
11 field employees for compliance.
12 Q So you were responsible for potentially caring
13 for individuals that are injured as part of
14 crime?
15 A Yes.
16 Q And you're aware that EMS responded to the
17 Tamir Rice shooting; is that correct?
18 A Yes.
19 Q And EMS was responsible for caring for Tamir?
20 A I don't know what exactly happened on the
21 call, but I assume, yes. I don't know if he
22 called -- meaning I don't know if he was
23 pronounced or they transported him or not. I
24 don't remember.
25 Q He didn't actually pass away until the

Page 122

1  following day or sometime after the shooting.
2  Do you recall that at all?
3 A I don't remember.
4 Q So assuming he was still alive at the time
5  they arrived on scene, EMS would have cared
6  for Tamir?
7 A I would imagine, yes. Hopefully.
8 Q And EMS transported Tamir?
9 A I don't know. That's what I'm say, I don't
10 know if they did or not.
11 Q No reason to disagree with that or any reason
12 to dispute that EMS transported Tamir Rice?
13 A If that's what you say I have to believe you.
14 I don't have any evidence to the contrary.
15 Q Any reason to dispute that your EMS colleagues
16 worked to save Tamir Rice's life?
17 A If they transported him they would have, yes.
18 Q Any idea whether or not any of your colleagues
19 suffered trauma as a result of the Tamir Rice
20 incident, including those that treated him?
21 A I'm not aware.
22 Q Is EMS also responsible for treating those
23 that may be injured during times of civil
24 unrest?
25 A Yes. We're responsible at all times.

Page 123

1 Q So I mean, in a nutshell EMS is responsible
2  for caring for all individuals within the City
3  regardless of race, how they were injured,
4  anything?
5 A Absolutely, yes.
6 Q As a captain were you responsible for
7  enforcing the City's rules?
8 A Yes.
9 Q Were you responsible for recommending
10 discipline?
11 A No.
12 Q No. Were you responsible for reporting
13 misconduct?
14 A Yes.
15 Q What would you have done if you saw the posts
16 in Exhibit 5?
17    MR. LIVINGSTON: Objection.
18 Q And if they were made by a subordinate of
19 yours, if they were on the page of a
20 subordinate of yours, what would you have done
21 in that instance?
22    MR. LIVINGSTON: Objection.
23 A A subordinate of mine?
24 Q Yes.
25 A Nothing.

Page 124

1 Q Nothing. You would just have left them?
2 A No. It happens all the time.
3 Q Have you ever seen a post before where
4  somebody is disappointed that he didn't get a
5  chance to kill a child?
6 A I haven't seen one, no.
7 Q So is it your contention then that it was
8  improper for Captain Threat to report it?
9 A I never said that.
10 Q Well, if you wouldn't have reported it -- if
11 you saw it as captain, you wouldn't have
12 reported these posts in Exhibit 5; is that was
13 your testimony is?
14 A Yes.
15 Q So was it then improper for Captain Threat to
16 report it?
17 A No. That's his --
18 Q Why wouldn't you have reported it?
19    MR. LIVINGSTON: Objection. Asked and
20 answered.
21 A Because nowhere does it say anything about EMS
22 on there.
23 Q Just ignore it?
24 A Yeah.
25 Q And as a captain you're responsible for

Page 169

1  Q  And then you would get off, and then would you
2     then go to sleep at that point?
3  A  Yes, most times.
4  Q  And get up when?
5  A  It depends if I had to work or not.
6  Q  Do you know if you were scheduled to work on
7     February 14th, the day Donnie came over? Did
8     you work that prior day?
9  A  No, I believe I was on vacation.
10 Q  And then were you also on vacation that
11    Monday, the 15th?
12 A  I know I was on vacation the date of the
13    initial hearing with Votypka.
14 Q  Were you on vacation that whole week?
15 A  Part of it, yeah. I don't remember how many
16    days. It was a short -- it wasn't like a two
17    week vacation. It was short.
18 Q  So now on February 15th, the day you found out
19    about the text messages, you texted
20    Commissioner Carlton; is that right?
21 A  Yes, I did.
22       (Defendants' Exhibit 22
23        marked for identification.)
24 Q  Handing you what I've marked as Exhibit 22.
25    When you get a chance, can you please identify

Page 170

1     what Exhibit 22 is for me, sir?
2  A  It appears to be a partial post between me and
3     Commissioner Carlton.
4  Q  These were text messages that you provided?
5  A  Yes, some of them are cut off. Okay. Yeah.
6     Yes.
7  Q  Okay. And then anything that is cut off, is
8     the full text on the next page?
9  A  That's what I was looking at. Okay.
10 Q  So they are complete?
11 A  Okay.
12 Q  The best you recall; is that right?
13 A  Yes.
14 Q  The time for the first text here, the time
15    that you sent that, is that below the text or
16    is the time above the text; if you know?
17 A  I don't know.
18 Q  What kind of phone did you have at the time;
19    do you remember?
20 A  H -- what is this. It's three letters. I
21    can't remember. It's H something something.
22    HTC. That's what it was.
23 Q  That was the phone you had?
24 A  Yes, at the time.
25 Q  So the first text here, let's just go through

Page 171

1     that. If you read it into the record so we
2     have it. And that is a text from you to
3     Nicole, correct?
4  A  You want me to read it?
5  Q  Yeah, just the first one.
6  A  "Before the word gets to you I have to tell
7     you. A jerk of a friend grabbed my phone last
8     night as I ran an errand and trying to be
9     funny made some awful Facebook posts. My
10    friends called me today to let me know and I
11    was horrified when I read them. These are not
12    my beliefs and I certainly did not write them.
13    I posted an apology, but I feel the damage may
14    already have been done. Again, I just wanted
15    you to know I did not post what was written."
16       So the jerk of a friend, who are you
17    referring to there?
18 A  Donnie.
19 Q  And what errand did you run?
20 A  That's the laundry.
21 Q  That's when you were getting laundry?
22 A  Yeah, doing the laundry.
23 Q  So is that when he posted these, when you were
24    doing laundry?
25 A  That's when I originally thought he did.

Page 172

1  Q  And when did you -- and now you believe that
2     he posted them when?
3  A  When I first read them I deleted them so I had
4     no idea what time they were posted so I
5     believe he did it when I was doing laundry.
6     Then when I got copies of the actual posts, a
7     hard copy, then I realized that they were done
8     later in the day.
9  Q  Who did you get a hard copy of the posts from?
10 A  I asked a couple people. I don't remember who
11    said. I asked Wearstler and -- I think
12    Wearstler may have sent it to me. John
13    Wearstler.
14 Q  How did he send those to you; do you recall?
15 A  No, I don't.
16 Q  Do you still have those complete posts?
17 A  No.
18 Q  What did you do with them?
19 A  Probably deleted them.
20 Q  Do you recall when you deleted them?
21 A  No.
22 Q  Before or after your separation?
23 A  It would have been before.
24 Q  Why did you delete them?
25 A  Cuz space reasons. I delete all my stuff.

Page 177

1 Q  Do you recall beginning with after "Is your
2    friend able to send a letter; that would go a
3    long way," do you recall the text message
4    after that? So the text messages that you
5    provided, they end there.
6 A  Yes.
7 Q  And then Commissioner Carlton has a record of
8    another text message from you where you say,
9    "I will take care of him in my own way. No,
10   he will not do that under any circumstances.
11   Like I said, I'll deal with him." Do you
12   recall texting Commissioner Carlton that?
13 A  No, I don't recall but I don't deny it either.
14 Q  What about the next one, "He is afraid it will
15   end up on the news and he will be labeled as a
16   racist. Although the post was not criminal in
17   any way, it was very insensitive and I do not
18   want anyone attempting to kill him over this."
19   Do you recall sending that text message to
20   Commissioner Carlton?
21 A  No, I don't. I don't deny it either.
22 Q  Same thing with the next text message. At
23   some point you texted Commissioner Carlton
24   what the post was; did you not?
25 A  Yes.

Page 178

1 Q  And you did that that day?
2 A  I believe so, yes.
3 Q  And that post is -- or at least that text
4    appears to be the substance of the post?
5 A  I don't remember if she asked for it or if I
6    just sent it to her.
7 Q  Okay. But you recall texting her?
8 A  I believe I did, yes.
9 Q  How about "That was the post..... I feel so
10   bad right now;" do you recall texting her
11   that?
12 A  No, but I may have.
13 Q  Don't deny sending her that text?
14 A  Right, I'm not denying it.
15 Q  And then the next one, "Do you now understand
16   why I am so upset?"; do you recall texting her
17   that?
18 A  I kind of remember that, yes.
19 Q  And then on March 19th presumably 2016 did you
20   text Commissioner Carlton about a story that
21   aired on Channel 19 about her? Take your
22   time. It's the second to last text.
23 A  Yes, I believe I texted her that, yes.
24 Q  Is that how you felt at the time?
25 A  Yes.

Page 179

1 Q  It says "My girls respect you," that your
2    girls respected Commissioner Carlton; is that
3    accurate?
4 A  Yes, they went to the same school with her
5    daughter.
6 Q  And did you respect Commissioner Carlton?
7 A  Yes.
8 Q  Did you have a good relationship with
9    Commissioner Carlton?
10 A  Yes.
11 Q  And was that true as of through your
12   separation, or as of your separation?
13 A  Before the separation.
14 Q  Okay. So up until the point you were
15   separated you had what you would classify as a
16   good relationship with Commissioner Carlton?
17 A  Yes.
18 Q  Do you have any reason to believe that
19   Commissioner Carlton hated you for any reason?
20 A  No.
21 Q  Any reason to believe that Commissioner
22   Carlton would act maliciously towards you?
23 A  I don't have any evidence of that.
24 Q  Any reason to think that Commissioner Carlton
25   acted with ill will toward you?

Page 180

1 A  I believe it was an overreaction is what I
2    believe.
3 Q  But not necessarily out of ill will toward you
4    as a person?
5 A  I don't think it was a personal attack.
6 Q  And then Thursday, March 17, that was I
7    believe the day after you received notice of
8    your separation. Thursday, March 17, 2016.
9    Do you recall sending that text message to
10   Commissioner Carlton?
11 A  Yes, I do.
12 Q  Flipping back to the first page, the second
13   text from the bottom, it says "He's afraid it
14   will end up on the news and he will be labled
15   as a racist." Labeled spelled a little wrong
16   but I'm assuming that's what was meant. He,
17   is that referring to Donnie?
18 A  It appears so, yes.
19 Q  And did Donnie express this to you at any
20   point in time?
21 A  I don't recall it but if I wrote it he must
22   have.
23 Q  When we talked earlier you didn't testify that
24   he had said anything along these lines; do you
25   recall that?

Page 193

1  way to your employment or your separating from
2  the City?
3  A   That she's been charged with a crime?
4  Q   Yes, that's what the question is.
5  A   I have no idea.
6  Q   Are you aware of whether or not Ms. Carlton
7      has been convicted of any crime related to
8      your employment or separation?
9  A   Not that I'm aware of.
10 Q   Are you aware of anyone at the City of
11     Cleveland that's been convicted of a crime
12     related to your separation?
13 A   Not that I'm aware of.
14 Q   Are you aware of anyone at the City of
15     Cleveland that's been convicted of a crime
16     related in any way to your employment with the
17     City?
18 A   Not that I'm aware of.
19 Q   Do you have any reason to believe that
20     Commissioner Carlton's discharge or that your
21     discharge was a crime?
22 A   Yes, I do believe it was.
23 Q   What crime do you believe was violated?
24 A   Violation of my civil rights.
25 Q   It's a criminal violation you're suggesting?

Page 194

1  A   I'm not sure if it's criminal or civil.
2  Q   Do you have any reason to believe that
3      Commissioner Carlton thought your discharge
4      was a crime?
5          MR. LIVINGSTON: Objection.
6  A   I don't know what she was thinking.
7  Q   You can't speak to Commissioner Carlton's
8      thoughts?
9  A   Yes.
10 Q   Or what she may have believed, correct?
11 A   Right.  I don't want to do that.
12 Q   Go to Page 9.  See where it says Count 6?
13 A   Yes.
14 Q   Paragraph 53 refers to rules and regulations;
15     do you see that?
16 A   Yes.
17 Q   What rules and regulations are you referring
18     to there?
19         MR. LIVINGSTON: Objection.  He's not
20     a lawyer.  He didn't draft the complaint.
21         You can answer.
22 A   I'm not sure what I meant.
23 Q   Okay.  So you don't know offhand what rules
24     and regulations you claim are violated?
25 A   I'm trying to think if this was City rules and

Page 195

1  regulations it was referring to.  In that case
2  it would be progressive discipline and stuff
3  like that.
4  Q   Anything other than progressive discipline
5      that you know of?
6  A   No, I don't know.
7  Q   What about in 53, Subparagraph A, it talks
8      about, "The policies operate as an
9      unconstitutional prior restraint on the
10     dissemination of constitutionally protected
11     expression."  What policies are you referring
12     to there?
13 A   I didn't write this.
14 Q   So do you know what policies are being
15     referenced there?
16 A   No.
17 Q   Do you know what policies or do you have an
18     understanding of what policies that you're
19     alleging are unconstitutional?
20         MR. LIVINGSTON: Objection.  Asked and
21     answered.
22 A   I would -- I mean, I can speculate.
23         MR. LIVINGSTON: You don't have to
24     speculate.
25 A   No, I don't.

Page 196

1  Q   So as you sit here today it's unclear to you
2      what policies you're alleging violate the 1st
3      and 14th Amendment, correct?
4  A   Yes.
5  Q   Do you want to go to work for the City again?
6  A   Yes.
7  Q   Do you have any other claims that you're
8      alleging against the City other than those
9      that are outlined in Exhibit 26?
10 A   Everything is in here.
11 Q   So any claim that you may have is in Exhibit
12     26, your complaint?
13 A   Yes.
14 Q   Real quick, as to Count 5, it's going to be on
15     Page 8.  You see Paragraph 50 there?
16 A   Yes.
17 Q   It alleges that, "The City has failed to train
18     or inadequately trains its supervisory
19     employees, including but not limited to
20     Defendant Carlton..."  And it goes on to say
21     training as to constitutionally protected
22     speech.  Do you see that?
23 A   Yes.
24 Q   What other supervisory employees are you
25     referring to?  Are there any others?

```
1   State of Ohio,            )
                              ) SS:  CERTIFICATE
2   County of Cuyahoga,       )

3       I, Karen A. Toth, Notary Public in and for the
4   State of Ohio, duly commissioned and qualified, do
5   hereby certify that the within named witness,
6   Jamie Marquardt, was by me first duly sworn to
7   testify the truth, the whole truth, and nothing but
8   the truth in the cause aforesaid; that the testimony
9   then given by him was by me reduced to
10  stenotypy/computer in the presence of said witness,
11  afterward transcribed, and that the foregoing is a
12  true and correct transcript of the testimony so
13  given by him as aforesaid.
14      I do further certify that this deposition was
15  taken at the time and place in the foregoing caption
16  specified and was completed without adjournment
17      I do further certify that I am not a relative,
18  counsel, or attorney of either party, or otherwise
19  interested in the event of this action.
20      IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my seal of office at Cleveland,
22  Ohio on this 27th day of December, 2018.
23
        _____
24      Karen A. Toth, Notary Public in
        and for the State of Ohio.
25      My Commission expires May 6, 2023.
```