UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMIE MARQUARDT, | ) | Case No.: 1:18 CV 333 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| NICOLE CARLTON, *et al.*, | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

## I. INTRODUCTION

Currently pending before the court in the above-captioned case is Plaintiff Jamie Marquardt's ("Marquardt" or "Plaintiff") Motion for Partial Summary Judgment on the issue of liability and for declaratory and injunctive relief (ECF No. 21). Also pending is Defendants Nicole Carlton ("Carlton") and the City of Cleveland's (collectively, "Defendants") Motion for Summary Judgment on all remaining claims against them (ECF No. 22). The court has previously granted Defendants' Motion for Partial Judgment on the Pleadings in regard to Counts 2, 3, and 4 (ECF No. 26). Thus, only Counts 1, 5, 6, and 7 remain.

For the following reasons, the court denies Plaintiff's Motion for Partial Summary Judgment on Count 1 (his free speech claim) and Count 5 (his insufficient training claim), and grants Defendant's Motion for Summary Judgment on those claims. Further, the court grants Plaintiff's Motion for Summary Judgment on Count 6 (the unconstitutionally broad social media policy claim) and grants in part Plaintiff's Motion with respect to Count 7, insofar as it seeks to enjoin Defendants from enforcing the Social Media Policy, but denies his Motion seeking injunctive relief reinstating him to his former position with back pay. Thus, the court denies Defendants' Motion for Summary

Judgment in regard to Count 6. The court also denies Defendants' Motion with respect to Count 7, insofar as it pertains to the Social Media Policy, but grants Defendants' Motion in regard to Count 7, insofar as it pertains to Plaintiff's request for injunctive relief, reinstating him to his former position with back pay.

## I. BACKGROUND

The City of Cleveland Emergency Medical Services ("EMS") hired Plaintiff in 1995 as a paramedic. (Marquardt Dep. 116:5-7, ECF No. 22-2.) During his twenty-year career with EMS, Plaintiff was promoted to an EMS captain where he was responsible for directing, controlling, and monitoring an EMS shift of 40 to 45 employees. (*Id*. at 125:14-17.) He was terminated on March 16, 2016, after a month-long investigation into two Facebook posts on his account, related to the fatal shooting of Tamir Rice by police in a local Cleveland neighborhood in November of 2014. (Compl. ¶¶ 21-29, ECF No. 1.)

Early in the morning of February 14, 2016, two posts appeared on Plaintiff's personal Facebook account:

> Post No. 1: Let me be the first on record to have the balls to say Tamir Rice should have been shot and I am glad he is dead. I wish I was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around acting bad. I am upset I did not get the chance to kill the little criminal fucker.
>
> Post No. 2: Stop Kevin. How would you feel if you were walking in the park and some ghetto rat pointed a gun in your face? Would you look to him as a hero? Cleveland sees this felony hood rat as a hero.

(*Id*. at ¶ 28.)

Plaintiff denies that he authored the posts, and claims he was only alerted to them via text messages from friends. (*Id*. at ¶¶ 15-22.) He immediately deleted the posts, and issued an apology

via Facebook writing, "I do not believe or stand for what was written. If my good friends did not text me, I would have never known it was there." (*Id*. at ¶ 23.)

Later that day, Plaintiff reported the posts to the EMS Commissioner, Carlton, and again denied he wrote them. (*Id*. at ¶ 24.) Two EMS employees also separately notified their supervisors of the posts that same day. The notified supervisors reviewed Plaintiff's Facebook posts and concluded that they raised safety concerns. (Threat Dep. 26:14-21, ECF No. 22-10.) They then notified their supervisors, who notified Commissioner Carlton. (Carlton Decl. at ¶ 7, ECF No. 22-4.)

On February 24, 2016, Carlton notified Plaintiff that an investigation into his posts was being conducted and informed him of the date of his pre-disciplinary hearing. (ECF No. 21-12.) Plaintiff cooperated throughout the course of the investigation. (Compl. ¶ 26.) The pre-disciplinary hearing was held on March 4, 2016, and was attended by Plaintiff, Carlton, and a union representative. (ECF No. 22-11.) At the conclusion of the investigation, the City terminated Plaintiff for violating Sections 101.01-1, 102.01-2, 4, 102.02-1, 104.02-1, 2, 3, 4, and 202.02-1 and 2 of the Division of Emergency Medical Service Manual Rules and Regulations; Section 1.20 Division of Emergency Medical Service General Orders; and Rule 9.10-5 and 9-10.18 of the Civil Service Rules of the City of Cleveland. (*Id.*)

Plaintiff maintains that he did not write the posts and they do not reflect his beliefs, but claims that even if he did write them, he is entitled to relief for his termination.

On February 12, 2018, Plaintiff initiated this action, alleging that even if he did author the posts: (1) his Facebook posts are protected by the First and Fourteenth Amendments (Count 1); (2) Defendants' rules, regulations, and general orders are unconstitutionally broad (Count 6); and (3) Plaintiff has suffered irreparable harm and is entitled to injunctive relief (Count 7). (Compl. at ¶¶

31, 52, and 55.) Count 5 is a 42 U.S.C. § 1983 claim that alleges negligent training of Carlton as to employees' First Amendment rights. (*Id*. at ¶ 49.)

Plaintiff also alleged the following state law claims: (1) Employees' Right to Free Expression– Cleveland Cod. Ord. § 171.49 (Count 2); (2) Interfering with Civil Rights –Cleveland Cod. Ord. § 615.13 (Count 3); and (3) Interfering with Civil Rights – O.R.C. § 2921.45 (Count 4). Plaintiff brought Counts 2, 3, and 4 pursuant to O.R.C. § 2607.60, which grants a plaintiff a civil cause of action for injuries sustained as a result of a defendant's violation of criminal law. (*Id*. at ¶ 34, 39, and 44.) However, on September 25, 2018, Defendants moved for Partial Judgment on the Pleadings on these state law claims, and on April 2, 2019, the court granted Defendants' Motion. (Order of Apr. 2, 2019, ECF No. 26.)

On February 28, 2019, Plaintiff filed his Motion for Partial Summary Judgment (ECF No. 21), in response to which Defendants filed an Opposition (ECF No. 25) on April 1, 2019. Plaintiff filed his Reply (ECF No. 27) on April 15, 2019. Also on February 28, 2019, Defendants filed their Motion for Summary Judgment (ECF No. 22), in response to which Plaintiff filed an Opposition (ECF No. 24) on April 1, 2019. Defendants filed their Reply (ECF No. 28) on April 15, 2019.

### III.  LEGAL STANDARD

The Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Though the Rule was amended in 2010, the summary judgment standards and burdens have not substantially changed. *See* Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments) ("Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c) . . . ."); *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 n.4 (1st Cir. 2011); *but see Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 407 (stating that under amended Fed. R. Civ. P. 56 a party is not required to submit facts in an admissible form but is required to submit facts that could be put in admissible form). In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a

verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### IV. LAW AND ANALYSIS

**A. First and Fourteenth Amendment Claim**

Plaintiff alleges in Count 1 that Defendants violated his right to free speech under the First and Fourteenth Amendments. He argues Defendants retaliated against him for engaging in protected speech via his Facebook posts.

To establish a prima facie case that Defendants violated his right to free speech, Plaintiff must demonstrate: (1) that he was engaged in constitutionally protected speech; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a "substantial" or "motivating factor" in the adverse action. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004).

In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court established a two-part inquiry for determining when the discharge of a public employee violates the First Amendment. The threshold question is whether the employee's speech may fairly be categorized as constituting speech on a matter of public concern. *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). If the speech relates to a matter of public concern, then the court employs the balancing test outlined in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government employer. *Dambrot*, 55 F.3d at 1186.

*1. Matter of Public Concern*

The court must first determine whether Plaintiff's posts spoke on a matter of public concern. *Connick*, 461 U.S. at 147. Whether speech addresses a matter of public concern is a question of law for the court to decide. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

The *Connick* court described speech that covers matters of public concern as "relating to any matter of political, social, or other concern to the community." *Dambrot*, 55 F.3d at 1186 (quoting *Connick*, 461 U.S. at 146). The *Connick* court also noted, "[w]hether an employee's speech

7

addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. More recently, the Supreme Court held that, "public concern is a subject of legitimate news interest; that is a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).

The Sixth Circuit has applied the two-part *Connick* test in several cases that are useful here. In *Dambrot*, for instance, a college basketball coach was terminated after calling his players the N-word during a huddle in the locker room. *Dambrot*, 55 F.3d at 1181. The Sixth Circuit held that the purpose of his speech was not to impart a politically or socially relevant message, but rather encourage his players to play harder. The court rejected the idea that the speech was protected as a matter of public concern. Rather, the court found that the speech was for his player's own private consumption and, in the form and context of his speech being in a team huddle in the locker room, not a matter of public concern. *Dambrot*, 55 F.3d at 1186.

In another Sixth Circuit case, a former school district employee was terminated for making threats to a co-worker, and also alleging collusion between said co-worker and the school district. *Farhat*, 370 F.3d at 585-86. In evaluating whether the speech was a matter of public concern, the court first determined the focus of the speech, the point of the speech, to what purpose the employee spoke, the intent of the speech, and the communicative purpose of the speaker. *Id*. at 592; *Mayhew v. Town of Smyrna*, 856 F.3d 456, 467 (6th Cir. 2017) (holding that courts should examine the point of the speech in question; it does not matter why the employee spoke but what he said). Furthermore, the *Farhat* court also noted "passing or fleeting references to an arguably public matter do not elevate the speech to a matter of public concern where the point of the speech advances only a

private interest." *Farhat*, 370 F.3d at 592-93. In the case of the former school district employee, the court found that the communicative purpose of the speech was to express a personal grievance with the school district. Any reference to collusion or corruption was passing and incidental, despite the fact that corruption in the school district may be a matter of public concern. *Id*. In the context of the former employee's speech, the court held that the former employee's speech was not a matter of public concern. *See also Johnson v. City of Battle Creek*, No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300 *26 (W.D. Mich. May 10, 2005) (plaintiff's statement threatening to shoot a co-worker, when taken in context of the situation, was gratuitous, unprofessional, and furthered his own private grievances despite referencing matters that may be considered matters of public concern).

Application of the above principles leads to the conclusion that Plaintiff's Facebook posts do not involve matters of public concern. Focusing on the "content, form, and context" of the posts, the court finds no socially or politically relevant message in Plaintiff's posts. *Dambrot*, 55 F.3d at 1186. It is unimaginable that Facebook posts detailing the author's desire to kill a twelve-year-old boy and his joy that he is already dead are a matter of public concern. His references to "I" and "me" in his posts show this was a personal grievance that was written to further his own private interests.

Plaintiff argues that the Tamir Rice shooting was a matter of public interest because of the national scope of the shooting combined with political tensions at the time. This court recognizes the public interest in the Tamir Rice shooting and how the City of Cleveland has responded to the shooting in the years since. But Plaintiff fails to adequately address the content, form, and context of the posts as they relate to such a public concern.

To evaluate the form and context, the court must look at the point of the statements and their communicative purpose. *Farhat*, 370 F.3d at 592. Here, the communicative purpose was not to

discuss public safety, law enforcement, government operations, gun reform, police brutality, or any other public matters. Rather, the point of the posts were for Plaintiff to express his personal joy that Tamir Rice is dead and to voice his disappointment that he was not the one to pull the trigger.

Merely referencing Tamir Rice in a Facebook post is not enough for statements to be matters of public concern. Passing or fleeting references to a public matter do not elevate the matter to public concern when the references focus on speech that advances a private interest. *Farhat*, 370 F.3d at 592-93. To rule otherwise would allow for almost all speech serving a private interest that merely references a public issue to be considered that of public concern. Here, Plaintiff used the word "me" and "I" six times in three sentences of a Facebook post. This further supports a conclusion that he was promoting his own private interests, and not speaking on a matter of public concern as he claims. While the posts touch on Tamir Rice and his tragic death, they do nothing more other than promote his own distasteful private interests involving a desire to kill a twelve-year-old child.

### 2. *Pickering Balancing Test*

Having found that Plaintiff's posts do not touch on a matter of public concern, there is no need for the court to evaluate the posts under the *Pickering* balancing test. *Dambrot*, 55 F.3d at 1191. Nor does the court need to address Commissioner Carlton's qualified immunity defense, since she did not violate Plaintiff's constitutional rights when she terminated him from EMS. *Feathers v. Avey*, 319 F.3d 843, 848 (6th Cir. 2003) (noting the first step in the inquiry is to determine if the government employee violated a constitutional right). Accordingly, the court grants Defendants' Motion for Summary Judgment on Count 1 – First Amendment violation.

### B. Constitutionality of Social Media Policy

Next, Plaintiff argues that the City of Cleveland's Social Media Policy is overbroad and thus unconstitutional on its face (Count 6). He contends that, if the court finds that the Policy is unconstitutional, it should permanently enjoin Defendants from enforcing the Social Media Policy and order them to reinstate him to his former position with back pay (Count 7– injunctive relief).

The overbreadth doctrine allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad that it threatens to "chill" the exercise of free speech and expression. *Dambrot*, 55 F.3d at 1182; *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990); *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Thus, Plaintiff may assert this claim even though the court has already determined that his speech did not involve a matter of public concern and that, as a consequence, his First Amendment rights were not violated.

A statute is unconstitutionally overbroad on its face if there is "a realistic danger that the statute will significantly compromise recognized First Amendment protections of parties not before court . . . ." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Courts apply a modified *Pickering* balancing test when assessing prospective restrictions on government employee speech. See *United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454, 468 (1995). The test requires the court to weigh the policy's impact on all public employees' speech as citizens on matters of public concern against the restricted speech's "necessary impact on the actual operation of the Government." *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017) (quoting *NTEU*, 513 U.S. at 468). The facts of the present case are not relevant in this analysis. Rather, the court looks at the text of the policy to determine the type of speech it restricts and if the government employer justifies the restriction. *Id*. at 861.

11

Under the modified test, courts first examine whether the policy has the potential to restrict speech on matters of public concern. *Moonin*, 868 F.3d at 861. If the policy does restrict this speech, then courts look to the government employer's justification for the policy. They weigh "the impact of the ban as a whole – both on the employees whose speech may be curtailed and on the public interested in what they may say – against the restricted speech's 'necessary impact on the actual operation' of the government." *Id*. (quoting *NTEU*, 513 U.S. at 468). The government has a heavier burden when it seeks to justify a restriction to an employee's speech on matters of public concern, compared to an isolated disciplinary action because of employee speech. *Id*.

Again, *Dambrot* is instructive. There, the Sixth Circuit evaluated the university's discriminatory harassment policy and found it was overbroad. In the policy, racial and ethnic harassment was defined as:

> any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by . . . (c) demeaning or slurring individuals through . . . written literature because of their racial or ethnic affiliation; or (d) using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation.

*Dambrot*, 55 F.3d at 1182.

The court held that this policy was unconstitutional on its face because the policy reached a substantial amount of constitutionally protected speech. The court found that the language of the policy was sweeping and targeted as much and as many types of conduct as possible. *Id*. Additionally, the court found that the policy was too vague because it did not give the plaintiff fair notice of prohibited speech and instead gave the university too much subjective power to determine what was offensive. *Id*. *See also Moonin*, 868 F.3d at 868 (9th Cir. 2017) (citing *City of Lakewood*

*v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988)) (holding that allowing a supervisor to have unbound discretion in determining what communication was "appropriate" raises concern that the policy will be arbitrarily enforced). Although the policy was deemed overbroad, the court found the plaintiff's speech was not protected, so the court held that he was not entitled to recover damages on the overbroad claim. *Dambrot*, 55 F.3d at 1185.

Aside from *Dambrot*, there are very few cases that serve as controlling precedent on the matter. However, the court has found persuasive authority, explicating how to apply the modified *Pickering* balancing test, in other circuits.

The Fourth Circuit applied the modified *Pickering* balancing test in *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016). In that case, two police officers challenged disciplinary actions they received for violations of their Department's social networking policy. The plaintiffs in the case made comments on Facebook about the Department's recent promotions of "rookie cops." *Id*. at 405. Shortly after making the comments, the officers were terminated for violating the Department's Negative Comments provision, which stated:

> Negative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public's perception of the department is not protected by First Amendment free speech clause, in accordance with established case law.

*Id*. at 404.

In applying the *Pickering* balancing test, the court found that the speech prohibited by the policy could affect the public's access to matters of interest. The Fourth Circuit noted the policy's "astonishing breadth," finding that the "Negative Comments Provision" could "reach just about anything," including comments about the police department's operations that would be matters of public concern. *Id*. at 408. The Police Chief's primary justification for the policy was to prevent

13

divisive social media use, which would undermine the department's interests in camaraderie among patrol officers and building community trust. The court held this justification did not meet the burden demonstrating actual disruption to its mission, despite some officers requesting shift transfers. *Id.* Of the policy, the court noted, "the speculative ills targeted by the social networking policy are not sufficient to justify such sweeping restrictions on officers' freedom to debate matters of public concern. *Id*. at 408-09; *See also Moonin*, 868 F.3d at 866 ("Avoiding accountability by reason of persuasive speech to other governmental officials and the public is not an interest that can justify curtailing officers' speech as citizens on matters of public concern.").

In the present case, Plaintiff challenges the constitutionality of EMS's Social Networking Policy. The relevant section states:

> Division of Emergency Medical Service employees shall not post knowingly false, harmful, inappropriate, confidential, or proprietary information/media about the City of Cleveland, the Department of Public Safety, the Division of Emergency Medical Services, the Division of Emergency Medical Services Employees, and any patient or patients' family members at any time on or off duty.

(ECF No. 21-13.)

The court notes that though Plaintiff challenges the policy on the basis of overbreadth, the briefs of neither party addresses it indepth. However, the court finds, upon analysis, that the Social Media Policy is unconstitutionally overbroad.

The threshold question is whether EMS's Social Media Policy regulates the department's right to speak on matters of public concern. There is no question that it does. As the *Liverman* court noted, a general restriction on negative comments – without defining what "negative" means – acts as a virtual blanket ban on all speech critical of the government employer. *Liverman*, 844 F.3d at

407. Defendants' Social Media Policy seeks to prohibit speech that would be considered "harmful" or "inappropriate" towards EMS and the City of Cleveland. Commander Carlton testified that she would consider "anything that is negative . . . anything that has a negative impact" as a violation of the Social Media Policy. (Carlton Dep. 32:23 – 33:5, ECF No. 21-5.) The reality is that speech that has a negative impact on EMS or the City of Cleveland could mean just about anything, including speech that references matters of public concern. Therefore, like the discrimination policy in *Dambrot*, this policy reaches a substantial amount of protected speech. *Dambrot*, 55 F.3d at 1182. The Supreme Court has weighed in on the importance of allowing government employees to discuss matters of public concern, stating, "[g]overnment employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion). Based on a fear that they will be "harmful" to the City, EMS's social media policy prevents employees from speaking on these ills, despite their matter of public concern.

Next, the court must weigh the policy's restrictions against the necessary impact on the actual operation of the government. Defendants failed to address in their Motion, or opposition to Plaintiff's Motion, its justification for the broad Social Media Policy. From other arguments they have raised, it can be inferred that EMS was concerned that harmful social media use could threaten cohesion among those who work in the unit, and undermine efforts to gain the public's trust in the communities in which they serve. Courts have routinely recognized this as a legitimate concern, with the Supreme Court stating, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Liverman*, 844 F.3d at 408 (quoting *Connick*, 461 U.S. at 151-152).

Defendants' justification that it seeks to ensure effective operation of EMS through the prevention of harmful or inappropriate employee speech is not sufficient to allow for the promulgation of such a broad social media policy by Defendants. Although EMS would operate more efficiently if its practices were not questioned by the public, EMS must also be held accountable by the people it serves. *Moonin*, 868 F.3d at 866. Because the Social Media Policy would prevent employees from speaking up about issues within EMS or the City of Cleveland, the public is at a disadvantage in being able to hold the government accountable for its practices.

Defendants also discuss the actual and potential disruption Plaintiff's speech caused within EMS. The government has an interest in preventing speech that it reasonably believes will disrupt the workplace. *Connick*, 461 U.S. at 150-51. The government may justify a policy through evidence that the anticipated harm is "real, not merely conjectural." *NTEU*, 513 at 475. However, even assuming that Defendants provided sufficient evidence of actual disruption by Plaintiff, it still would not justify the broad Social Media Policy. Since Plaintiff's speech was not constitutionally protected as a matter of public concern, the government cannot use his Facebook posts as a justification for the broadness of the Policy. Defendants in this case fail to explain how the Social Media Policy's sweeping restriction on speech would be outweighed by a government interest. *Liverman*, 844 F.3d at 408.

Furthermore, the policy limits speech that is "harmful" or "inappropriate" which leaves the Policy vulnerable to overt viewpoint discrimination. *See e.g., Dambrot*, 55 F.3d at 1182. Commander Carlton in this case evaluates employee speech, and under the policy she has the power to decide what is "harmful" and "inappropriate." It is entirely subjective, and threatens arbitrary application of the Policy. *Moonin*, 868 F.3d at 867 (9th Cir. 2017) (citing *City of Lakewood*, 486 U.S. 750)

16

(noting that such unbound discretion as to substance allows for potentially arbitrary or viewpoint-discriminatory enforcement of a policy).

The EMS Social Media Policy undoubtedly limits employees' right to speak on matters of public concern. Defendants have not provided sufficient evidence to justify such a sweeping policy. Accordingly, the court holds that the Social Media Policy is unconstitutionally overbroad (Count 6). As a result of the court's finding, Defendants are hereby permanently enjoined from enforcing the Social Media Policy as written (Count 7). *Dambrot*, 55 F.3d at 1183-84.

Nevertheless, since it has already been determined that Plaintiff's speech was not protected as a matter of public concern, Plaintiff is not entitled to recover on this claim. *See Dambrot*, 55 F.3d at 1185 (holding that without demonstrating that the plaintiff's speech was protected under the First Amendment, the plaintiff could not recover despite the court finding that the discrimination policy was overbroad). Consequently, the remainder of Plaintiff's request for injunctive relief in Count 7—reinstatement to his former position and request for back pay and other benefits of employment—must also be denied.

### C. Failure to Adequately Train

Lastly, Plaintiff asserts a 42 U.S.C. § 1983 claim in Count 5 against the City for failure to train EMS staff and Commissioner Carlton on First Amendment rights. Failure to train can give rise to municipal liability pursuant to a policy of the city under § 1983 "where the failure . . . amounts to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson*, 563 U.S. 51, 80 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The first inquiry of any case alleging municipal liability under § 1983 is a question of whether there is a direct causal link between municipal policy or custom and the alleged

constitutional deprivation. *City of Canton*, 489 U.S. at 388. To establish causation, Plaintiff must show that the policies were "the moving force [behind] the constitutional violation." *Id*. at 389. Here, the First and Fourteenth Amendments did not protect Plaintiff's posts. Thus, Plaintiff did not suffer any harm from the City's alleged failure to train. Therefore, he cannot recover**.** The court grants Defendants' Motion for Summary Judgment on this claim (Count 5).

## V. CONCLUSION

The court concludes that the derogatory remarks attributed to the Plaintiff for which he was terminated from his position with the City of Cleveland EMS, including "I am upset I did not get to kill the little fucker" did not relate to "matters of public concern". This was more in the nature of a private grievance. Thus, his speech was not protected by the First Amendment. Therefore, Plaintiff is not entitled to the relief he seeks--reinstatement to his former position with back pay.

The court does find that his claim challenging the City of Cleveland's Social Media Policy as being unconstitutionally overbroad is well taken and should be enjoined. While it undoubtedly regulates matters of public concern, it reaches a substantial amount of protected speech. The law allows for a challenge on this ground by persons not yet affected by the Policy when the Policy would chill speech and expression. That is why Defendants can challenge the Policy even though succeeding on this claim will not entitle him to be reinstated with back pay. He cannot be reinstated because his speech did not involve a matter of public concern and was thus not protected by the First Amendment as previously discussed.

For the reasons previously stated, the court denies Plaintiff's Motion for Partial Summary Judgment on Count 1 (his free speech claim) and Count 5 (his insufficient training claim), and grants

Defendants' Motion for Summary Judgment on those claims. Further, the court grants Plaintiff's Motion for Summary Judgment on Count 6 (the unconstitutionally broad social media policy claim) and grants in part Plaintiff's Motion with respect to Count 7, insofar as it seeks to enjoin Defendants from enforcing the social media policy, but denies his Motion seeking injunctive relief reinstating him to his former position with back pay. Thus, the court denies Defendants' Motion for Summary Judgment in regard to Count 6. The court also denies Defendants' Motion with respect to Count 7, insofar as it pertains to its Social Media Policy, but grants Defendants' Motion in regard to Count 7, insofar as it pertains to Plaintiff's request for injunctive relief, reinstating him to his former position with back pay.

      IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

August 23, 2019